Rebecca Noblin
Jeremy C. Lieb
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: rnoblin@earthjustice.org
E: jlieb@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Native Village of Nuiqsut et al.*

Garett R. Rose (Pro Hac Vice)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St. NW
Washington, DC 20005
T: 202.717.8355
E: grose@nrdc.org

*Attorney for Plaintiff Natural Resources Defense Council*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| NATIVE VILLAGE OF NUIQSUT *et al.*, | ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | Case No. 3:19-cv-00056-SLG |
| BUREAU OF LAND MANAGEMENT *et al.*, | ) ) | |
| *Defendants,* | ) ) | |
| and | ) ) | |
| CONOCOPHILLIPS ALASKA, INC., | ) ) | |
| *Intervenor-Defendant.* | ) ) | |

**PLAINTIFFS' OPENING BRIEF UNDER LOCAL RULE 16.3(c)(1)**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 2

I.      The Reserve and the Teshekpuk Lake Special Area. ................................. 2

II.     Nuiqsut subsistence use of the Reserve and project area. ........................ 4

III.    ConocoPhillips' winter exploration plan. .................................................... 6

ARGUMENT ........................................................................................................... 7

I.      Plaintiffs have standing. .............................................................................. 7

II.     Legal framework ......................................................................................... 9

        A.      The National Environmental Policy Act ......................................... 9

        B.      Alaska National Interest Lands Conservation Act Section 810 .................. 12

III.    BLM failed to analyze adequately the impacts of ConocoPhillips' winter
        exploration on caribou. .............................................................................. 13

IV.     BLM failed to analyze adequately the impacts of ConocoPhillips' winter
        exploration on Nuiqsut subsistence activities. ........................................ 19

V.      BLM violated NEPA by not analyzing the cumulative impacts of
        ConocoPhillips' winter exploration program and other exploration and
        construction projects. ................................................................................ 23

VI.     BLM failed to consider an adequate range of alternatives and ignored
        feasible and reasonable alternatives to ConocoPhillips' winter exploration
        program. .................................................................................................... 27

        A.      BLM violated ANILCA by failing to consider feasible alternatives
                that would reduce harm to subsistence uses. ............................... 28

        B.      BLM violated NEPA by failing to consider all reasonable
                alternatives. ................................................................................. 32

VII.    The Court should vacate BLM's winter exploration EA. ..................................... 35

CONCLUSION ............................................................................................................ 36

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ........................................ 37

# TABLE OF AUTHORITIES

## CASES

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
    67 F.3d 723 (9th Cir. 1995) ................................................................. 28, 32

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) ................................................................................. 12

*Barnes v. Fed. Aviation Admin.*,
    865 F.3d 1266 (9th Cir. 2017) ................................................................. 10

*Biodiversity Legal Found. v. Badgley*,
    309 F.3d 1166 (9th Cir. 2002) ................................................................. 35

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ........................................ 10, 11, 15, 18, 25

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962) ................................................................................. 12

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ................................................................. 35

*Cascadia Wildlands v. Bureau of Indian Affairs*,
    801 F.3d 1105 (9th Cir. 2015) ........................................ 10, 13, 16, 18, 22

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) ................................................................. 34

*City of Tenakee Springs v. Clough*,
    915 F.2d 1308 (9th Cir. 1990) .............................................. 13, 28, 31, 32

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ........................................................... 10, 22

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    937 F. Supp. 2d 1140 (N.D. Cal. 2013) .................................................. 21

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*,
    655 F.3d 1000 (9th Cir. 2011) ........................................................... 23, 25

*Ecological Rights Found. v. Pac. Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000) ...................................................... 9

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
234 F. App'x 440 (9th Cir. 2007) ................................................ 33

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
681 F.2d 1172 (9th Cir. 1982) .................................................... 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................................................................... 7

*Friends of Southeast's Future v. Morrison*,
153 F.3d 1059 (9th Cir. 1998) .................................................... 34

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) ........................................ 11, 21, 25, 26

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
373 F. Supp. 2d 1069 (E.D. Cal. 2004) ...................................... 22

*Kunaknana v. Clark*,
742 F.2d 1145 (9th Cir. 1984) .............................................. 13, 28

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................................... 9

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000) .................................................... 12

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) .................................................. 12

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
545 F.3d 1147 (9th Cir. 2008) .................................................... 11

*Nat'l Audubon Soc'y v. Butler*,
160 F. Supp. 2d 1180 (W.D. Wash. 2001) .................................. 23

*Nat'l Parks & Conservation Ass'n v. U.S. Bureau of Land Mgmt.*,
606 F.3d 1058 (9th Cir. 2010) .................................................... 34

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) ............................................................ 11, 33

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
   137 F.3d 1372 (9th Cir.1998) ................................................................ 15

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
   402 F.3d 846 (9th Cir. 2005) ................................................................. 18

*Or. Nat. Res. Council v. U.S. Bureau of Land Mgmt.*,
   470 F.3d 818 (9th Cir. 2006) ............................................................ 24, 26

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) (en banc) ................................................ 18

*Pacific Coast Federation of Fishermen's Associations v. U.S. Department
   of the Interior,* 655 F. App'x 595 (9th Cir. 2016)................................. 34

*Pollinator Stewardship Council v. EPA*,
   806 F.3d 520 (9th Cir. 2015) ................................................................. 35

*Seattle Audubon Soc'y v. Moseley*,
   80 F.3d 1401 (9th Cir. 1996) ................................................................. 35

*Sierra Club v. Bosworth*,
   199 F. Supp. 2d 971 (N.D. Cal. 2002) .............................................. 23, 24

*Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dept. of Interior*,
   608 F.3d 592 (9th Cir. 2010) ....................................... 23, 24, 25, 27

*W. Watersheds Project v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) ............................................................... 11

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ................................................................. 12

## STATUTES

5 U.S.C. § 706(2)(A) ............................................................................... 35

16 U.S.C. § 3120(a)............................................................ 12, 13, 28, 31, 32

42 U.S.C. § 4332(2)(C)(i) ............................................................................................. 9

42 U.S.C. § 4332(2)(E) ........................................................................................... 11, 32

42 U.S.C. § 6503(b) ...................................................................................................... 31

42 U.S.C. § 6504(a) ........................................................................................................ 2

42 U.S.C. § 6506a(b) ................................................................................................. 2, 31

Pub. L. No. 94-258, 90 Stat. 303 (1976) ........................................................................ 2

## REGULATIONS

40 C.F.R. § 1500.1 ...................................................................................................... 31

40 C.F.R. § 1500.2 ........................................................................................................ 9

40 C.F.R. § 1501.4 ...................................................................................................... 10

40 C.F.R. § 1507.2 ...................................................................................................... 11

40 C.F.R. § 1508.7 ...................................................................................................... 23

40 C.F.R. § 1508.9 ...................................................................................................... 11

40 C.F.R. § 1508.13 .................................................................................................... 10

40 C.F.R. § 1508.27 .................................................................................................... 23

40 C.F.R. § 1508.28 ............................................................................................... 21, 26

43 C.F.R. § 3131.3 ...................................................................................................... 31

43 C.F.R. § 3152.2 ................................................................................................. 31, 34

43 C.F.R. § 3152.5 ...................................................................................................... 31

## FEDERAL REGISTER NOTICES

42 Fed. Reg. 28,723, 28,723 (June 3, 1977) ................................................................. 3

**INTRODUCTION**

The Western Arctic in Alaska, managed by the Bureau of Land Management (BLM) as the National Petroleum Reserve-Alaska ("the Reserve"), is a globally important ecological resource, as well as a vital source of subsistence resources for the communities in northern and western Alaska. On December 7, 2018, BLM approved ConocoPhillips Alaska Incorporated's ("ConocoPhillips") expansive plan for winter oil and gas exploration activity in a portion of the Reserve with especially important ecological and cultural values, a region that is home to the Teshekpuk Caribou Herd and a primary subsistence use area for the Native Village of Nuiqsut. BLM approved ConocoPhillips' plan—which includes up to six new exploratory wells, 57 miles of ice roads, an airstrip, 23 ice pads, 43 miles of snow trail, and camps for 545 oil workers, and expands oil and gas activity into previously undeveloped areas of the Reserve—without preparing an environmental impact statement (EIS) or considering alternatives to the plan.

BLM's approval of ConocoPhillips' plan violated the National Environmental Policy Act (NEPA) and section 810 of the Alaska National Interest Lands Conservation Act (ANILCA) in at least three ways. First, BLM's environmental assessment (EA) fails to supply a convincing statement of reasons explaining how ConocoPhillips' winter exploration activities will not have significant effects on the Teshekpuk Caribou Herd and Nuiqsut subsistence activities that would require preparation of an EIS. Second,

BLM violated NEPA by failing to analyze the cumulative impacts of ConocoPhillips'

winter exploration and other exploration and construction projects occurring during the

same time and in the same area. Third, BLM failed to consider any alternatives to

ConocoPhillips' proposal, including reasonable and feasible alternatives proposed by

Plaintiffs, as required by NEPA and ANILCA. Because BLM's NEPA and ANILCA

analysis was arbitrary and unlawful, the Court should vacate and declare unlawful BLM's

record of decision approving ConocoPhillips' winter exploration plan.

## BACKGROUND

### I.     The Reserve and the Teshekpuk Lake Special Area.

The Reserve has long been recognized as a unique and valuable ecosystem that

deserves protection. In 1976, Congress expressly called for protection of the significant

natural, fish and wildlife, scenic, and historical values of the 23.7 million acre Reserve.

Naval Petroleum Reserves Production Act of 1976, Pub. L. 94-258, Title I § 104(b), 90

Stat. 304 (codified at 42 U.S.C. § 6504(a)). Congress granted the Secretary of the

Interior discretion to condition, restrict, or prohibit activities in the reserve as necessary

to protect against significant adverse effects to these surface resources. 42 U.S.C. §

6506a(b). Additionally, Congress designated certain areas, and authorized the Secretary

to designate others, for "maximum protection" of "subsistence, recreational, fish and

wildlife, or historic or scenic value[s]." *Id.* § 6504(a). In these areas exploration must

"be conducted in a manner which will assure the maximum protection of such surface

values." *Id.*; AR 1 at 0369.

Congress specifically designated the Teshekpuk Lake area for protection of surface values, 42 U.S.C. § 6504(a), and the Department of the Interior formally designated the Teshekpuk Lake area as a "special area[] within the [Reserve]" the following year. 42 Fed. Reg. 28,723, 28,723 (June 3, 1977); AR 1 at 0369. The Teshekpuk Lake Special Area protects essential caribou habitat; subsistence resources and uses; and world-class waterbird and shorebird nesting, staging, and molting habitat. AR 1 at 0031, 0273, 0369, 0471. The area provides calving, insect relief, and wintering areas for the more than 40,000 caribou of the Teshekpuk Caribou Herd. *Id.* at 0031, 0297-98, 0369; AR 5 at 4675.

The Fish Creek area southeast of Teshekpuk Lake and directly west of Nuiqsut, which is where much of the winter exploration program will take place, is one of just two primary overwintering areas for the Teshekpuk Caribou Herd, and one of the only places on the arctic coastal plain where caribou overwinter. AR 1 at 0297, 0300-01, 2584, 2539; AR 26 at 8497. The Teshekpuk Caribou Herd is "unique in that the majority of the herd typically remains on the coastal plain through the winter." AR 5 at 4673. In fact, "[d]uring most years since 1990, the majority of Teshekpuk Caribou Herd caribou have wintered on the coastal plain of the [Reserve], especially around Atqasuk and *southeast of Teshekpuk Lake*." AR 1 at 0301 (emphasis added). As oil and gas development encroaches on the Teshekpuk Caribou Herd's winter habitat, the herd faces year-round

exposure to development and industrial activity. AR 1 at 1067. No North Slope caribou herd has previously been exposed to oil gas activities year-round. *Id.*

The Teshekpuk Caribou Herd has been in decline in recent years as a result of low calf production and survival and high adult mortality. AR 3 at 2924. The population has declined 40 percent over the past decade, down from more than 68,000 in 2008. AR 5 at 4675. The underlying causes of the decline are uncertain. AR 3 at 2924.

## II.     Nuiqsut subsistence use of the Reserve and project area.

The community of Nuiqsut is on the eastern border of the Reserve, about 35 miles south of the Beaufort Sea. AR 1 at 0417; AR 5 at 4684. Subsistence activities in the Reserve, especially in areas within and near the Teshekpuk Lake Special Area, are vital to the members of the Native Village of Nuiqsut. AR 1 at 0417-20; AR 5 at 4711-12. "Subsistence refers to a way of life in which wild renewable resources are obtained, processed, and distributed for household and communal consumption according to prescribed social and cultural systems and values." AR 3 at 2963. Most households in Nuiqsut obtain a substantial portion of their food from subsistence. AR 1 at 0420.

Subsistence resources are both nutritionally and economically critical in Nuiqsut. Such resources constitute a mainstay of the diet for Nuiqsut residents and are commonly fresher and healthier than available store-bought food. *Id.* at 0397-98. They provide an alternative to store-bought food that is expensive in northern Alaska communities due to high transportation costs and small market sizes. *Id.* at 0397-98; AR 5 at 4701. Caribou

hunting is particularly important in Nuiqsut, because it is a relatively accessible and affordable activity, as compared to more-expensive forms of marine hunting activities. AR 1 at 0422; AR 3 at 3196. Between 1985 and 2016, residents of Nuiqsut harvested an annual per capita average of 157 edible pounds of caribou. AR 5 at 4752, 5325-32.

"Subsistence is not only a source of food for North Slope residents, but the activities associated with subsistence strengthen community and family social ties; reinforce community and individual cultural identity; and provide a link between contemporary Iñupiat and their ancestors." AR 3 at 2962. In particular, subsistence hunting and trapping embody significant cultural, social, and spiritual values, and the continued viability of the subsistence way of life is of the greatest importance to members of the Native Village of Nuiqsut. AR 1 at 0397, 0420; AR 3 at 2962; AR 5 at 4711-12.

ConocoPhillips' proposed activities fall directly within the "heavy use" segment of Nuiqsut's contemporary subsistence use areas, including the caribou subsistence use area. AR 1 at 0424; AR 3 at 3460-61; AR 26 at 8475. Nuiqsut residents place extreme value on this area because it provides food security, as it is one of very few areas where caribou remain on the coastal plain throughout the year and has historically been one of the only areas close to Nuiqsut where people could hunt and trap without interference from infrastructure and industrial activity. AR 26 at 8497. Members of the Native Village of Nuiqsut use the area year-round for subsistence activities; however, the peak of activity, including for caribou and furbearers, such as wolves, foxes, and wolverines, occurs in the

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 12 of 45

winter months.  AR 3 at 2970-72.

### III.    ConocoPhillips' winter exploration plan.

On November 8, 2018, BLM released a draft EA evaluating ConocoPhillips' plan to expand significantly oil and gas activity into previously undeveloped areas of the Reserve, including large portions of the ecologically and culturally important Fish Creek watershed within the Teshekpuk Lake Special Area.  *See* AR 8 at 7401 (map showing the project would stretch west of the western-most existing wells, Tinmiaq 8 and Tinmiaq 9), AR 38 at 8771-8855.  During an abbreviated public-comment period, AR 23 at 8000, Plaintiffs raised concerns about the potentially significant effects of the plan and about BLM's decision to consider only the proposed plan and a no action alternative.  AR 24 at 8002-11.  On December 7, 2018, BLM released a final EA and finding of no significant impact and signed a record of decision approving ConocoPhillips' plan.  AR 26 at 8467-8580; AR 28 at 8587-93; AR 29 at 8594-98.  Pursuant to this approval, BLM authorized ConocoPhillips to drill up to six exploratory wells and to construct up to 57 miles of ice roads, an airstrip, 23 ice pads, 43 miles of snow trail, and camps capable of housing 545 people.  AR 26 at 8482-84, 8486; AR 29 at 8595.  The plan is one piece of ConocoPhillips' long-range plan to push progressively westward in the Reserve.  *See* AR 23 at 8000 n.4 ("The idea is that, by gradually extending the oil infrastructure west, each new project becomes economically viable."  (quoting A. Bailey, *Early GMT-1 start: First oil begins to flow from ConocoPhillips' NPR-A Alpine satellite pad*, Petroleum News

(Oct. 14, 2018))).

Alongside this winter exploration program, BLM has approved two additional oil and gas projects in the same area. First, ConocoPhillips has approval to pursue a geotechnical exploration program, which includes drilling up to 125 onshore boreholes to identify potential gravel sources for future oil development projects and up to 40 offshore boreholes to delineate routes for transporting supplies from ships to onshore oil development projects. AR 34 at 8691-92. Second, ConocoPhillips is also constructing a gravel road and drill pad for the Greater Mooses Tooth 2 Development Project (GMT2). AR 5 at 4573. These activities, including substantial vehicle traffic over large areas, overlap spatially and temporally with ConocoPhillips' winter oil exploration program within the Teshekpuk Caribou Herd's winter range and Nuiqsut's heavy use subsistence area. AR 1 at 0300-01, 0424, 2584; AR 3 at 3460-61; AR 5 at 5190; AR 26 at 8475; AR 34 at 8693-94.

## ARGUMENT

### I.    Plaintiffs have standing.

Plaintiffs have standing to bring this case because their members have standing in their own right, the interests at stake are germane to Plaintiffs' organizational purposes, and the lawsuit does not require the participation of individual members. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Members of plaintiff groups use and enjoy—and intend to continue to use and

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 14 of 45

enjoy—the Reserve, including areas affected by the winter exploration program, for various purposes, including subsistence, recreation, wildlife viewing, education, research, photography, and/or aesthetic and spiritual enjoyment.  *See* Ex. 1 at 2-3, ¶7; Ex. 2 at 3; ¶5; *id.* at 4-6, ¶¶8-9; *id.* at 44, ¶69; Ex. 3 at 5-6, ¶11-12; Ex. 4 at 7, ¶¶16-17; Ex. 6 at 5-6, ¶8; Ex. 7 at 4-9, ¶¶ 10-12, ¶¶14-15, ¶¶17-22, ¶24; Ex. 9 at 3-4, ¶8; *id.* at 8-13, ¶¶23-34.  Members of plaintiff groups also enjoy or otherwise use migratory wildlife from the Reserve, both in the areas affected by the winter exploration program, and in the species' broader ranges.  *See* Ex. 2 at 3, ¶5; *id.* at 4, ¶8; Ex. 3 at 5-6, ¶11; Ex. 7 at 2, ¶3; *id.* at 5, ¶13.  The winter exploration program will directly and irreparably injure these interests.  *See* Ex. 1 at 3-4, ¶8; *id.* at 6-8, ¶¶15-17; Ex. 2 at 5-7, ¶¶9-11; *id.* at 16-17, ¶29; *id.* at 24-25, ¶40; Ex. 3 at 6-7 ¶¶13-14; Ex. 4 at 7-8, ¶¶18-19; *id.* at 9, ¶21; Ex. 5 at 10-12, ¶24-25; Ex. 6 at 7, ¶¶10-11; Ex. 7 at 8-11, ¶23, ¶¶25-29; Ex. 9 at 16-17 ¶¶40-42.

The defendants' unlawful actions adversely affect Plaintiffs' organizational interests in their members' use and enjoyment of the Reserve's public lands and resources.  Each of the plaintiff groups monitors the use of public lands and wildlife in the Reserve and compliance with the law respecting these lands; educates its members and the public concerning the management of these lands; and advocates policies and practices that protect the natural values and sustainable resources of these lands.  *See* Ex. 1 at 2, ¶5; *id.* at 5, ¶¶11-12; Ex. 2 at 41-42, ¶66; Ex. 3 at 2-5, ¶¶3-7, ¶¶9-10; Ex. 5 at 3-10, ¶¶7-22; Ex. 6 at 4-5, ¶¶6-7; Ex. 8 at 2-3, ¶6; Ex. 9 at 4-5, ¶¶9-10; *id.* at 6-8, ¶¶14-21.  It is

impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands. *See* Ex. 1 at 5, ¶11; Ex. 3 at 7, ¶15; Ex. 5 at 12, ¶27; Ex. 6 at 6-7, ¶9. Plaintiffs' interests and organizational purposes will therefore be directly and irreparably injured by defendants' violations of law in permitting the winter exploration program without adequate environmental review and disclosure. *See* Ex. 1 at 7-8, ¶17; Ex. 2 at 19-21, ¶33; Ex. 3 at 8, ¶17; Ex. 4 at 9, ¶21; Ex. 5 at 12, ¶¶26-27; Ex. 6 at 7, ¶¶10-11. The harm and threat of harm to Plaintiffs' members' subsistence, recreational, educational, research, and/or aesthetic and spiritual enjoyment and other interests in and around the winter exploration program areas, as well as to Plaintiffs' educational and informational interests in a lawful public administrative process, represent a concrete injury in fact that is fairly traceable to the actions challenged in this litigation and redressable by the relief they seek. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

## II.    Legal framework

### A.    The National Environmental Policy Act

NEPA requires federal agencies to prepare "a detailed statement" on "the environmental impact" of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i); *see also* 40 C.F.R. § 1500.2. NEPA review has two principal purposes: (1) to "ensure that the agency will have available, and

will carefully consider, detailed information concerning significant environmental impacts"; and (2) to "guarantee that the relevant information will be made available to the larger public audience." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (internal quotation marks and alterations omitted). "NEPA expresses a Congressional determination that procrastination on environmental concerns is no longer acceptable." *Id.* (quoting *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1181 (9th Cir. 1982)).

For proposals that an agency has not determined normally require an EIS, but also do not fall within established categorical exclusions from NEPA review, the agency prepares an EA to determine whether an EIS is necessary. 40 C.F.R. § 1501.4(a), (b). An agency "must prepare an EIS 'if substantial questions are raised as to whether a project *may* cause significant degradation of some human environmental factor.'" *Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1274 (9th Cir. 2017) (quoting *Ctr. for Biological Diversity*, 538 F.3d at 1219) (emphasis in original); *see Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998); *see also* 40 C.F.R. § 1508.13 (only if an agency affirmatively determines, based on the EA, that the proposed action "will not have a significant effect" on the environment, can it issue a finding of no significant impact and proceed without preparation of a full EIS). "If an agency decides not to prepare an EIS, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801

F.3d 1105, 1111 (9th Cir. 2015) (quoting *Blue Mountains*, 161 F.3d at 1212).

NEPA requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(E). "This 'alternatives provision' applies whether an agency is preparing an [EIS] or an [EA], and requires the agency to give full and meaningful consideration to all reasonable alternatives." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citing *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005)); *see also* 40 C.F.R. § 1507.2(d) ("This requirement of section 102(2)(E) extends to all such proposals, not just the more limited scope of section 102(2)(C)(iii) where the discussion of alternatives is confined to [EISs]."); *id.* § 1508.9(b) (noting EAs "[s]hall include brief discussions of . . . alternatives as required by section 102(2)(E)"). Where an agency has authority to select an action alternative that could reduce adverse impacts, the agency must consider such alternatives. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051-53 (9th Cir. 2013) (holding that grazing allotment EA was deficient because it failed to consider reduced-grazing alternative).

In reviewing the adequacy of a NEPA document, courts apply a "rule of reason" to ensure that the agency has taken the requisite "hard look" at the potential environmental consequences of the proposed action. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992-93 (9th Cir. 2004). This requires that "the agency . . . examine the relevant data and articulate a satisfactory explanation for its action including

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 18 of 45

a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's "'hard look' 'must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000)).

### B. Alaska National Interest Lands Conservation Act Section 810

Congress enacted ANILCA section 810 "to protect Alaskan subsistence resources from unnecessary destruction." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987). To accomplish this purpose, section 810(a) requires, among other things, that an agency considering permitting any use, occupancy, or disposition of public lands first undertake an initial evaluation of the proposed action's effects on subsistence and whether the effects can be avoided. 16 U.S.C. § 3120(a). Specifically, the agency must evaluate (1) the proposed action's effect on subsistence uses and needs; (2) the availability of other lands for the purposes sought to be achieved; and (3) other alternatives that would reduce or eliminate the use of public lands needed for subsistence purposes. *Id.* This initial evaluation, including the obligation to consider alternatives, must occur for all actions subject to ANILCA, regardless of whether the action would significantly restrict subsistence uses. *See* 16 U.S.C. § 3120(a); *Kunaknana v. Clark*,

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 19 of 45

742 F.2d 1145, 1150-51 (9th Cir. 1984). An agency must consider all feasible alternatives that would "minimize the impact of a proposed project on resources which rural village residents of Alaska use for subsistence." *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310, 1311-12 (9th Cir. 1990).

## III.  BLM failed to analyze adequately the impacts of ConocoPhillips' winter exploration on caribou.

Because substantial questions exist concerning the effects of winter exploration on caribou, BLM was required either to prepare an EIS or to supply a convincing statement of reasons to explain why the effects would be insignificant. *See Cascadia Wildlands*, 801 F.3d at 1111. BLM has done neither. The record shows that winter exploration activities have potentially significant impacts on caribou. *See* AR 1 at 1067; AR 3 at 3119. As BLM has acknowledged, the winter exploration program will occur within an important overwintering area for the Teshekpuk Caribou Herd, encompassing a large area around Fish Creek. AR 26 at 8497. Disregarding this record evidence without any specific analysis, BLM concluded that ConocoPhillips' winter activities will have only "minor impacts" on caribou. *Id.* at 8480. BLM's EA is therefore arbitrary and violates NEPA.

As extensive oil and gas activity expands into the Teshekpuk Caribou Herd's winter range southeast of Teshekpuk Lake, the herd faces unprecedented, year-round exposure to oil and gas development. AR 1 at 1067, 1295. Because no other Alaskan caribou herd winters on the coastal plain, where oil and gas development has historically

occurred in the Alaskan Arctic, no herd has previously been exposed to intensive winter exploration activities in its winter range. There is therefore substantial uncertainty about how the herd will respond to this increasing, intensive winter exploration and other development activity. *Id.* at 1067, 1184, 1295, 1524.

The record demonstrates that effects to caribou from exposure to winter exploration activities may be significant. Among other harmful impacts, surface vehicular traffic, aircraft traffic, and drilling activities disturb caribou, which may force them to abandon the local area for the remainder of the winter. *Id.* at 1064-66. Increased movement due to disturbance forces caribou to expend energy resources that are already depleted in the winter, which can result in a loss of body mass. AR 24 at 8055-56. Caribou displaced from habitats with more nutritious forage and caribou that expend energy responding to disturbances may not be able to compensate for these losses of energy reserves in the winter, which would potentially reduce individual survival and reproduction. AR 3 at 3122. This is a particular concern because winter body mass of female caribou strongly correlates with the likelihood of their calving success and survival. AR 24 at 8447-53; *see also id.* at 8351-57.

Despite this record evidence, BLM's EA included no specific discussion of the effects of ConocoPhillips' winter exploration program on caribou. *See* AR 26 at 8467-8580. BLM merely noted in its discussion of subsistence impacts that "the proposed action is anticipated to deflect caribou and furbearers from the area." *Id.* at 8497. And it

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 21 of 45

concluded without explanation—indeed without even any citation or analysis apparent from the record—that "[o]nly minor impacts would be expected" and that the proposed action "would not reduce population levels or distribution during the winter season." *Id.* at 8480. In comments on BLM's draft EA, Plaintiffs raised concerns about the project's potential effects to the Teshekpuk Caribou Herd, and BLM's failure to address those effects. AR 24 at 8007-08. BLM did not make any changes to its analysis in the final EA and responded that "[a]lthough the proposed action may be disruptive to individual caribou and displace some individuals from the immediate vicinity of activities, these impacts would be local in extent, would not affect herd distribution or reduce populations." AR 26 at 8575. Like BLM's original conclusion, this response is not supported by the record or any analysis in the EA.

BLM's limited, general statements about caribou and its cursory conclusion that there will be no significant effects fall well short of establishing that it has taken the "hard look" required by NEPA, especially in the face of contrary record evidence. *See Blue Mountains*, 161 F.3d at 1213 ("[G]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir.1998))). To support its decision not to prepare an EIS, BLM was required to "supply a convincing statement of reasons" explaining why impacts to caribou will be insignificant. *Cascadia Wildlands*, 801 F.3d at

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 22 of 45

1111. BLM has not only failed to provide convincing reasons, it has provided no reasons at all in the EA why the impacts of ConocoPhillips' winter exploration program will not be significant.

BLM's attempt to tier to the discussion of caribou impacts in the Integrated Activity Plan EIS does not support its conclusion that impacts to caribou will be minor. AR 26 at 8480. Far from establishing that annual winter exploration in this project area will have only minor impacts on caribou, the Integrated Activity Plan EIS highlights the potentially significant effects of winter exploration and the information gaps that must be filled before BLM could support any minor impacts conclusion. According to the Integrated Activity Plan EIS:

> Oil and gas development within the [Reserve] could introduce for the first time such infrastructure and activities into the winter range of a North Slope caribou herd (Teshekpuk Caribou Herd). Previously, no North Slope caribou herd has been exposed to oil gas activities year-round. The Teshekpuk Caribou Herd has experienced seismic exploration and activities near villages for many years, and some herd members on the periphery of the range have been exposed to oil field facilities in some years, but there is no evidence as yet of adverse effects other than increased hunting mortality for those animals close to villages. *It is not known what population effects might occur if the majority of the herd were to have year-round contact with oil and gas facilities and activities. Despite the current lack of evidence regarding adverse effects from seismic exploration and village contact, negative effects on caribou energy budgets during winter could result from this new situation. Such an effect could be manifested through increased winter mortality itself, or a reduction in calf productivity.*

AR 1 at 1067, 1184, 1295, 1524 (emphasis added). Moreover, BLM noted that

exploratory drilling operations and ice roads would traverse Teshekpuk Caribou Herd wintering areas and that "any caribou in the immediate vicinity of the activity would be disturbed, possibly having a negative effect on their energy balance, hormonal status, and calving success, due to prolonged stress." *Id.* at 0725.

In the 2012 Integrated Activity Plan EIS, BLM was unable to conclude that winter exploration would have no long-lasting effects on the Teshekpuk Caribou Herd. *See id.* Instead, it explained that the assumption that effects from winter exploration would be temporary "has not been scientifically tested" and "[i]t is possible that this disturbance could have an additive effect on natural winter mortality and could disproportionately impact young of the year and pregnant cows. Such an impact over several years could accumulate and reduce the productivity of the caribou herds involved." *Id.* at 1516. These conclusions in the Integrated Activity Plan EIS run contrary to BLM's assertion in the EA that caribou impacts from winter drilling will be minor. Given the substantial questions raised regarding potentially significant impacts to caribou in the Integrated Activity Plan EIS, BLM could not reach a no significant impacts finding without attempting to fill the information gaps that precluded such a finding in the Integrated Activity Plan EIS. But as explained above, the EA provides no analysis whatsoever of these important questions surrounding caribou impacts and identifies no intervening research that would relieve the concerns about potentially significant impacts.

BLM's failure to provide a convincing statement of reasons why the impacts of

winter exploration will not be significant for caribou demonstrates that it did not take the requisite hard look at all potential impacts of the project, rendering its EA inadequate. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865-66 (9th Cir. 2005) (rejecting finding of no significant impact for which the agency "fail[ed] to provide *any* reason, let alone a convincing one"); *Cascadia Wildlands*, 801 F.3d at 1111 ("The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." (quoting *Blue Mountains*, 161 F.3d at 1212)). The record raises substantial questions as to whether the winter exploration program may significantly affect caribou in this project area, and indeed BLM itself has concluded in a prior analysis that activities like those in the program may cause significant effects. AR 1 at 0725, 1516. Yet BLM did not take a hard look at those potentially significant effects here or justify its conclusion that impacts will be minor. Accordingly, BLM violated NEPA, *see Cascadia Wildlands*, 801 F.3d at 1111, and its decision is arbitrary, *see Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968-69 (9th Cir. 2015) (en banc) (holding that Forest Service's unexplained reversal of factual determination regarding the effects of exempting the Tongass National Forest from the Roadless Rule was arbitrary).

**IV. BLM failed to analyze adequately the impacts of ConocoPhillips' winter exploration on Nuiqsut subsistence activities.**

BLM's EA inexplicably concluded that impacts to subsistence uses from the winter exploration project itself will be only moderate and short term, and that there would be no new effects beyond those addressed in previous EISs. These conclusions are unsupported and, indeed, contrary to the agency's own analysis in this EA and in previous EISs. BLM's EA reveals that the winter exploration program may have significant effects on Nuiqsut subsistence activities, and no previous EIS in the record specifically analyzes the effects of winter exploration in this project area. As with impacts to caribou, BLM failed to either prepare an EIS or supply a convincing statement of reasons explaining why the effects to subsistence from winter exploration will be insignificant, in violation of NEPA.

As the EA explains, ConocoPhillips' winter exploration program will occur in an especially important subsistence use area for members of the Native Village of Nuiqsut. "Nuiqsut residents place extreme value on [this] area because it has been understood as an area that provides food security." AR 26 at 8497. The EA also explicitly notes that "the project area is traditionally valued for winter time caribou harvests (it is known as an area where caribou can be found throughout the year thus has a relatively high food security value);" winter exploration will "deflect caribou and furbearers from the area;" subsistence hunters will avoid the area; and "[b]eing required to travel further to conduct these activities increases the risk, time, and costs involved." *Id.* at 8496-97. Moreover,

substantial evidence in the record demonstrates the potentially significant effects of winter exploration on the Teshekpuk Caribou Herd and the importance of caribou hunting to people in Nuiqsut. *See supra* pp. 4-5, 13-18. BLM does not explain how these effects will be insignificant.

Previous agency analysis points to the type of effects BLM describes in the EA as being potentially significant, with severe and lasting harm to the community. Indeed, BLM has previously noted that limitations on the ability to hunt caribou "definitely hurt the people of Nuiqsut, especially those unable to pursue 'expensive' subsistence resources." AR 3 at 3196. Additionally, residents in Nuiqsut and elsewhere have consistently reported the negative effects of increased oil and gas exploration and development activities:

> Many articulate that oil and gas development is impacting traditional use areas and the ability of Iñupiat to pass on knowledge of subsistence resources in these areas, and use of these resources, to their children. They believe there is a decline of fish populations caused by seismic activities. They also report on the diversion of caribou from traditional migration routes and calving areas caused by an increased number of low flying aircraft, the disruption of caribou movements by low pipelines, the decreased use of traditional harvest areas due to the avoidance of industrial areas by hunters, and the fear of the consequences of oil spills on subsistence resources.

AR 1 1593. "When subsistence users' opportunities to engage in traditional activities are limited, transmittal of knowledge about those activities is reduced." AR 5 at 4957. Consequently, "[i]ndividuals and families' loss of intimate familiarity with an area could

constitute a permanent reduction in Nuiqsut's subsistence use area." *Id.* at 4957.

BLM impermissibly attempted to explain away these inconsistencies by referencing the discussion of subsistence impacts in the GMT2 supplemental EIS and unspecified "previous" analysis of the cumulative effects on subsistence and sociocultural systems, suggesting that there will be no *new* significant effects from this winter exploration. AR 26 at 8497 ("Refer to 2018 GMT2 [supplemental] EIS Section 4.4.5 for the most recent detailed analysis of likely impacts to subsistence from industrial activity in the area generally understood as 'west of Nuiqsut.'"); *id.* at 8479. BLM may incorporate prior NEPA analysis by reference, but consideration of generalized impacts or the effects of other projects in previous EISs does not excuse consideration of impacts specific to the project at hand. *See* 40 C.F.R. §1508.28 ("Tiering refers to the coverage of general matters in broader environmental impact statements with subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and *concentrating solely on the issues specific to the statement subsequently prepared.*" (emphasis added)); *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997-98 (holding that programmatic EIS did not address the cumulative impact of specific timber sales addressed in challenged EAs). In other words, BLM cannot avoid questions about significant effects raised in an EA by pointing to previous EISs that do not address those questions. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140, 1156-57 (N.D. Cal. 2013) (rejecting BLM's reliance on tiering to programmatic

EIS for oil and gas leasing EA where EA pointed to reasonably foreseeable effects that had not been considered in the programmatic EIS).  Neither the GMT2 supplemental EIS nor any other EIS in the record specifically analyzes the effects of winter exploration in this project area.  *See* AR 5 at 4947-93.  Those documents therefore cannot satisfy BLM's obligation to take a hard look at the subsistence impacts of this project.

BLM's conclusion that "impacts to subsistence use from this project in and of itself would be expected to be minor to moderate and short term," and that "no new signification [sic] impacts are anticipated," AR 26 at 8479, cannot be reconciled with its analysis in the EA or with previous EISs in the record.  Those documents raise substantial questions as to whether the winter exploration program may significantly affect subsistence activities in this project area, effects that have not been analyzed in an EIS.  Accordingly, BLM violated NEPA by failing to either prepare an EIS or supply a convincing statement of reasons explaining why the effects to subsistence from winter exploration will be insignificant.  *See Cascadia Wildlands*, 801 F.3d at 1111.  Moreover, BLM's failure to articulate a rational connection between its analysis describing potentially significant effects and its contrary conclusion renders its EA arbitrary and unlawful.  *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1202; *see Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1080-81 (E.D. Cal. 2004) (agency's NEPA finding that project would not significantly affect spotted owls was contradicted by Endangered Species Act finding that

the project would likely adversely affect the spotted owl); *Nat'l Audubon Soc'y v. Butler*, 160 F. Supp. 2d 1180, 1188-89 (W.D. Wash. 2001) (agency's conclusory finding that short-term harassment activities from relocation of tern colony would have no long-term effect on population was contradicted by the agency's analysis in the EA and by other agency research in the record).

**V.    BLM violated NEPA by not analyzing the cumulative impacts of ConocoPhillips' winter exploration program and other exploration and construction projects.**

BLM has also impermissibly failed to analyze the collective impacts of ConocoPhillips' winter exploration program and two other projects the company is pursuing: geophysical exploration and GMT2 construction.  Agencies must look at impacts that arise "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" in an EA.  40 C.F.R. § 1508.7; *see also id.* § 1508.27.  "[G]eneral statements about possible effects and some risk" are insufficient; EAs must include "quantified or detailed information that results in useful analysis."  *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) (internal quotations and citations omitted).  Plaintiffs, to demonstrate a NEPA violation, need show "only the potential for cumulative impacts," *Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592, 605 (9th Cir. 2010), and evidence for such impacts includes similarities of geography, timing, and purpose.  *See Sierra Club v. Bosworth*, 199 F. Supp. 2d 971, 989 (N.D. Cal. 2002)

(noting that "similarities with respect to timing, geography and purpose" are evidence of cumulative impacts from different projects). If an agency fails to analyze cumulative effects, it must redo its environmental analysis. *See Or. Nat. Res. Council v. U.S. Bureau of Land Mgmt.*, 470 F.3d 818, 822-23 (9th Cir. 2006).

Impacts to caribou and subsistence activities from ConocoPhillips' geophysical exploration and GMT2 construction projects will undeniably cumulate with the impacts from winter exploration. BLM concedes that all three projects will occur around the Fish Creek drainage basin during the winter months and involve generally similar activities, such as drilling, increased vehicular traffic, increased human presence, and construction. *See supra* pp. 6-7; *see also* AR 5 at 4573-78, 5179; AR 26 at 8475, 8484-87; AR 34 at 8693-94, 8706-19. The Teshekpuk Caribou Herd overwinters in and migrates through this area, and it is especially important to Nuiqsut residents for winter hunting and trapping. *See supra* pp. 3-5; AR 5 at 5209-10, AR 26 at 8496-97. While Plaintiffs need only prove the "potential for cumulative impacts," *see Te-Moak Tribe*, 608 F.3d at 606-07, the overlap of these projects with a critical caribou area, during the same timeframe, demonstrates that their impacts will cumulate. *See Sierra Club*, 199 F. Supp. at 989.

BLM failed to provide any meaningful analysis of the cumulative impacts from the geophysical exploration program and winter exploration on caribou. The EA's cumulative impacts analysis only mentions the geophysical program in a list of projects and as an example in a parenthetical related to residential disturbance. AR 26 at 8502,

8504; *see also Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 995 (finding that references in passing, such as mere lists of projects, are an insufficient description of environmental effects). Such passing references do not amount to the "quantified or detailed information" of cumulative effects required by NEPA. *Ctr. for Envtl. Law & Policy*, 655 F.3d at 1007.

BLM also failed to provide details on the cumulative impacts that could result from ConocoPhillips' GMT2 construction project. The EA's cumulative impacts analysis says that the GMT2 construction will "present the most prominent immediate impacts," that the cumulative impacts will "likely [be] more intense and extensive than previous winter seasons," and that "likely impacts from the cumulative scenario include hunter disturbance and avoidance and reduced local availability of resources." AR 26 at 8503. These generic and unquantified observations, however, do not show how serious these impacts will be when combined with similar impacts on similar resources from winter exploration, much less from geophysical exploration as well. Nor is "[t]he reader . . . told what data the conclusion was based on, or why objective data cannot be provided." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 994. They do not remotely satisfy BLM's obligation that "an EA fully address cumulative impacts." *Te-Moak Tribe*, 608 F.3d at 602.

BLM's failure to consider the cumulative impacts of ConocoPhillips' three projects wholly undermines the agency's finding of no significant impact. *See Blue*

*Mountains*, 161 F.3d at 1213-14 (finding that "[t]he EA's cursory and inconsistent treatment" of the unknown risks at issue "raises substantial questions about the project's effects on the environment and the unknown risks to the area's" wildlife population).

BLM's cross-references to other NEPA documents do not cure the EA's defects. While BLM is authorized to incorporate prior NEPA analyses by reference, *see* 40 C.F.R. § 1508.28, this process is not a get-out-of-jail free card. To effectively supplement a cumulative impacts analysis, the referenced documents must contain "*specific information about the cumulative effects*" that result. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997; *Or. Nat. Res. Council*, 470 F.3d at 823.

BLM's prior NEPA documents do not contain specific information about the cumulative impacts of these three exploration and construction projects. *Cf. Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997. Instead, as with direct impacts to caribou, *supra* pp. 13-18, the cumulative impacts discussions in the prior NEPA documents point to potentially significant effects and demonstrate the need for detailed information at this stage. Thus, the cumulative impacts analysis in the Integrated Activity Plan EIS notes that it was "assum[ing]" that impacts to the Teshekpuk Caribou Herd from oil and gas exploration (including drilling) "did not persist after exploration was completed" but that "this assumption has not been scientifically tested." AR 1 at 1516. Similarly, this EIS notes that "[i]t is not known what population effects might occur if the majority of the herd were to have year-round contact with oil and gas facilities and activities." *Id.* at

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 33 of 45

1524.  Likewise, in its discussion of related effects in the GMT2 supplemental EIS, BLM conceded that "predicting a herd's response to a newly-constructed road is largely speculative" but "may" alter movement patterns.  AR 5 at 4882-83.  Such admittedly speculative accounts cannot make up for fatal deficiencies in the winter exploration EA.

In short, "[p]laintiffs more than carry their burden by demonstrating that" ConocoPhillips' winter exploration, geotechnical exploration, and GMT2 construction "will directly impact the same resources within the cumulative effects area, and thus have the potential for cumulative impacts." *Te-Moak Tribe*, 608 F.3d at 605-06.  BLM's EA failed to address these impacts in any fashion, let alone "fully." *Id.* at 602.  The EA is therefore inadequate.

**VI.    BLM failed to consider an adequate range of alternatives and ignored feasible and reasonable alternatives to ConocoPhillips' winter exploration program.**

Both ANILCA and NEPA require BLM to consider a range of alternatives to a proposed action.  ANILCA requires that BLM consider alternatives that would reduce or eliminate effects on subsistence, and NEPA requires that BLM consider all reasonable alternatives.  Notwithstanding these directives, BLM considered only ConocoPhillips' proposed action and a no action alternative.  It did not propose its own alternatives, nor did it consider the reasonable and feasible alternatives that Plaintiffs proposed.  This failure to consider alternatives to ConocoPhillips' proposed action violated ANILCA and NEPA.

**A.     BLM violated ANILCA by failing to consider feasible alternatives that would reduce harm to subsistence uses.**

BLM failed to consider any alternative that would reduce or eliminate subsistence effects as required by ANILCA.  Section 810 requires any federal agency "determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands," to consider "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."  16 U.S.C. § 3120(a).  An agency cannot decline to consider alternatives or consider only a no action alternative where feasible alternatives exist.  *See City of Tenakee Springs*, 915 F.2d 1311-12.  This requirement applies to all actions subject to ANILCA, regardless of whether the action would significantly restrict subsistence uses. *See* 16 U.S.C. § 3120(a); *Kunaknana*, 742 F.2d at 1150-51.

BLM did not attempt to comply with ANILCA section 810's requirement to consider feasible alternatives that would reduce subsistence impacts, rendering its winter exploration decision unlawful.  *See Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995) (failure to consider feasible alternatives violated ANILCA and rendered timber sale RODs unlawful).  There are many ways BLM could have modified ConocoPhillips' proposed action to provide alternatives that would minimize impacts to subsistence.  Plaintiffs suggested two such modifications: requiring ConocoPhillips to comply with all best management practices from the Integrated Activity Plan and reducing the number of wells that could be drilled.  AR 24 at 8010-11.

Plaintiffs' proposed alternatives are feasible and could reduce subsistence impacts. The purpose of best management practices, for example, is to protect important resources. AR 1 at 0048-49; AR 26 at 8474. Without evaluating the benefits of full compliance, BLM allowed ConocoPhillips to deviate from three of these requirements: (1) best management practice B-2g, which prohibits compaction of snow cover or snow removal from fish bearing waterbodies, with narrow, specific exceptions, AR 26 at 8487; (2) best management practice B-2d, which caps the percent of a lake's unfrozen water and ice aggregate that may be removed from a lake, *id.* at 8489; and (3) best management practice A-5, which prohibits refueling equipment within 500 feet of the active floodplain of any water body and requires large fuel storage stations to be located 500 feet from any water body, *id.* at 8491. Best management practices B-2g and B-2d are designed to "[m]aintain natural hydrologic regimes in soils surrounding lakes and ponds, and maintain populations of, and adequate habitat for, fish, invertebrates, and waterfowl." *Id.* at 8487, 8489. Best management practice A-5 is designed to "[m]inimize the impact of contaminants from refueling operations on fish, wildlife and the environment." *Id.* at 8491. By protecting fish, invertebrates, waterfowl, wildlife, and the environment these measures would likely reduce impacts to subsistence users who rely upon these resources. BLM has not demonstrated that an alternative requiring compliance with all best management practices is infeasible; in fact, BLM did not consider this alternative at all or even acknowledge that it was proposed.

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 36 of 45

An alternative that would allow fewer wells would also be feasible and would likely reduce subsistence impacts and the use of lands needed for subsistence purposes. Fewer wells would mean fewer ice roads, reduced support vehicle traffic, and fewer opportunities for conflict with subsistence users. *See supra* pp. 5-6. Drilling fewer wells could also reduce the cumulative effects of ConocoPhillips' winter exploration program in the context of its other ongoing activities such as geotechnical exploration and GMT2 construction. *See supra* pp. 23-27. Limiting the number of wells to reduce subsistence impacts is also feasible: there is no set number of wells necessary for an exploration program, and ConocoPhillips' requests have varied from year to year.

BLM's explanation for eliminating from detailed study an alternative of fewer wells is unavailing, and, in fact, contrary to BLM's mandate for the Reserve. According to BLM, it "would be contrary to the terms of [ConocoPhillips'] leases" to put a limit on the number of wells that could be drilled. *Id.* at 8495. BLM cited what it referred to as a company's "obligat[ion] to continue drilling to delineate the resource and an associated future participating area." *Id.* BLM further explained that the leases "allow[] the company to have a drilling program on its leases after going through the review process for particular wells" and "instruct leaseholders to exercise reasonable diligence in developing and producing, while preventing unnecessary damage to, loss of, or waste of leased resources." *Id.*

BLM's explanation ignores its regulatory authority and statutory obligations.

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 37 of 45

Nothing in BLM's regulations or ConocoPhillips' leases prohibits BLM from placing limitations on the scale of exploratory drilling it permits in a given year. BLM has broad discretion to include stipulations and conditions in leases. *See* 42 U.S.C. § 6506a(b) ("Activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Reserve]."); 43 C.F.R. § 3131.3 ("Special stipulations shall be developed to the extent the authorized officer deems necessary and appropriate for mitigating reasonably foreseeable and significant adverse impacts on the surface resources."). BLM also has authority to include conditions on permits necessary to protect "values, mineral resources, and nonmineral resources," 43 C.F.R. § 3152.2(b), and to modify permits, *id.* § 3152.5. Indeed, BLM's apparent position that it has no authority to limit ConocoPhillips' activities on its leases is an abdication of its duty to manage responsibly public lands, including its specific obligations under the Naval Petroleum Reserves Production Act, ANILCA, and NEPA to ensure that any development in the Reserve occurs in an environmentally and culturally responsible and considered way. *See* 16 U.S.C. § 3120(a); 42 U.S.C. § 6503(b); 40 C.F.R. § 1500.1(c).

The Ninth Circuit has made clear that section 810 requires an agency to consider all feasible alternatives, and it has expressly rejected similar arguments that an agency must defer to a lease or permit holder's interests. In *City of Tenakee Springs v. Clough*,

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 38 of 45

the court rejected the Forest Service's argument that it could not consider any alternative to a proposed timber sale that would have made less timber available for harvest because it would be contrary to the terms of an existing 50-year timber sale contract with the Alaska Pulp Company.  915 F.2d at 1311.  The court explained that first, the contract did not clearly require the Forest Service to make any specified amount of timber available, and second, even if it did, the Service had not explained why an amendment was not feasible given that the contract had previously been amended multiple times.  *Id.* at 1311-12.  In *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, the court similarly held that the Tongass Timber Reform Act's provision that the Forest Service "seek" to meet market demand did not relieve the Service of its obligation to consider alternatives under ANILCA or prohibit the Service from selecting alternatives that would minimize subsistence impacts.  67 F.3d at 731.

BLM's clear obligation was to develop and evaluate alternatives to ConocoPhillips' proposed action that would reduce or eliminate effects to subsistence uses.  *See* 16 U.S.C. § 3120(a).  BLM's failure even to attempt to comply with this obligation renders its approval of ConocoPhillips' winter exploration plan unlawful.

## B.   BLM violated NEPA by failing to consider all reasonable alternatives.

BLM's failure to consider and discuss reasonable alternatives to ConocoPhillips' proposed action contravenes BLM's obligations under NEPA to "study, develop, and describe appropriate alternatives to recommended courses of action."  42 U.S.C. §

4332(2)(E).  The alternatives requirement applies to both EISs and EAs and requires an agency to consider all reasonable alternatives to the proposed action.  *See supra* p. 11; *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 F. App'x 440, 442-43 (9th Cir. 2007) ("An agency's failure to analyze a viable alternative that is consistent with the objectives of its proposed action can render an EA inadequate.").

Despite its obligation to consider reasonable alternatives that would avoid or minimize impacts to caribou and subsistence activities, BLM impermissibly considered only ConocoPhillips' proposed plan and a no action alternative.  "Though there is no numerical floor on alternatives to be considered, the EA's analysis of only a no action alternative and [BLM's] preferred alternative (the proposed project) was insufficient." *Envtl. Prot. Info. Ctr.*, 234 F. App'x at 442 (internal citation omitted).  As explained above, Plaintiffs proposed two reasonable alternatives: reducing the number of wells and requiring ConocoPhillips to comply with all best management practices from the Integrated Activity Plan.  These alternatives are reasonable because they further BLM's mandate to protect the surface resources and subsistence values of the Reserve, and they fit within and support the purpose of the action.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246-47 (9th Cir. 2005) ("In judging whether the Forest Service considered appropriate and reasonable alternatives, we focus first on the stated purpose for the Jimtown project.").  BLM's stated purpose for the project was "to provide reasonable access to and use of public lands within the [Reserve] in a manner that would

allow the applicant to explore and appraise oil and gas potential on [Reserve] leases operated by [ConocoPhillips]." AR 26 at 8473. The project's purpose was not limited to a certain number of wells or a subset of best management practices,[1] and "reasonable access" incorporates BLM's responsibility to protect the values of the project area. *See* 43 C.F.R. § 3152.2. BLM's failure to include even a brief discussion of any reasonable alternatives, including alternatives suggested by Plaintiffs, rendered its EA inadequate.

Just as BLM's explanation for eliminating from detailed consideration the alternative of fewer wells did not satisfy ANILCA, it also did not satisfy NEPA. Simply providing a reason for eliminating an alternative from detailed study is not adequate; NEPA requires that BLM's explanation be reasonable. In *Pacific Coast Federation of Fishermen's Associations v. U.S. Department of the Interior*, the court held unlawful an EA that did "not give full and meaningful consideration" to a reasonable alternative. 655 F. App'x 595, 599-600 (9th Cir. 2016). There, the court analyzed and rejected each of the four reasons the agency had set forth in its EA for eliminating an alternative from detailed study. So too here, the court should reject BLM's proffered reasons. As

---

[1] Nor could it be. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998) ("An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality.") (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991)); *see also Nat'l Parks & Conservation Ass'n v. U.S. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010) ("BLM may not circumvent this proscription by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives.").

explained above, *supra* pp. 30-32, BLM's reason for dismissing the alternative of fewer wells is inadequate because it is counterfactual.  BLM has authority to require fewer wells, and the agency provided no separate, reasonable explanation for eliminating such an alternative from detailed study.

In sum, the presence of at least two feasible but unexamined alternatives renders BLM's EA inadequate and its approval of ConocoPhillips' winter exploration plan unlawful.

## VII.    The Court should vacate BLM's winter exploration EA.

The normal remedy under the Administrative Procedure Act for an unlawful agency action is vacatur.  5 U.S.C. § 706(2)(A).  *See also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095-96, 1106 (9th Cir. 2011).  Additionally, the court may grant declaratory relief where there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002) (quoting *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1405 (9th Cir. 1996)).  Because BLM approved the winter exploration plan based on an arbitrary and unlawful EA, this Court should set aside the plan and EA.

## CONCLUSION

BLM violated NEPA and ANILCA by (1) failing to supply a convincing statement of reasons why ConocoPhillips' winter exploration activities will not have significant effects on the Teshekpuk Caribou Herd and Nuiqsut subsistence activities; (2) failing to analyze the cumulative impacts of ConocoPhillips' winter exploration program and other exploration and construction projects occurring during the same time and in the same area; and (3) failing to consider any alternatives to ConocoPhillips' proposal. Plaintiffs therefore request that this Court vacate and declare unlawful BLM's record of decision and EA.

Respectfully submitted this 23rd day of May, 2019.

*s/ Rebecca Noblin*
Rebecca Noblin (Alaska Bar. No. 0611080)
Jeremy C. Lieb (Alaska Bar. No. 1810088)
Eric P. Jorgensen (Alaska Bar. No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs Native Village of Nuiqsut, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council, and Sierra Club*

Garett R. Rose (Pro Hac Vice) (D.C. Bar No. 1023909)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorney for Plaintiff Natural Resources Defense Council*

Case 3:19-cv-00056-SLG   Document 27   Filed 05/23/19   Page 43 of 45

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this document contains 9,091 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 23rd day of May, 2019.

         *s/ Rebecca Noblin*
         Rebecca Noblin

# TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration of Martha Itta |
| 2 | Declaration of Rosemary Ahtuangaruk |
| 3 | Declaration of Adam Kolton |
| 4 | Declaration of Richard Steiner |
| 5 | Declaration of Brendan Cummings |
| 6 | Declaration of Marcie Keever |
| 7 | Declaration of Jeffrey Scott Fair |
| 8 | Declaration of Gina Trujillo |
| 9 | Declaration of Dan Ritzman |

*Native Village of Nuiqsut et al. v. BLM et al.,*
Case No. 3:19-cv-00056-SLG