LAWRENCE VANDYKE,
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

JOHN S. MOST, Trial Attorney
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-616-3353 || 202-305-0506 (fax)
John.Most@usdoj.gov

BRYAN SCHRODER,
United States Attorney
RICHARD POMEROY,
Assistant United States Attorney
Anchorage, Alaska

*Counsel for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| NATIVE VILLAGE OF NUIQSUT *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 3:19-cv-00056-SLG |
| BUREAU OF LAND MANAGEMENT *et al.*, | ) ) ) | **FEDERAL DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' OPENING BRIEF UNDER LOCAL RULE 16.3(c)(1)**[1] |
| Federal Defendants, | ) ) ) | |
| and | ) ) | |
| CONOCOPHILLIPS ALASKA, INC. | ) ) | |
| Intervenor Defendant. | ) ) | |

---

[1] Pursuant to L.R. 16.3, this response brief in opposition shall be deemed a cross-motion for summary judgment.

*Native Village of Nuiqsut et al. v. BLM et al.*,
Case No. 3:19-cv-00056-SLG

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ..................................... 1

    A.    The Naval Petroleum Reserves Production Act of 1976 ............................ 1

    B.    The National Environmental Policy Act of 1969 ........................................ 2

    C.    Section 810 of the Alaska National Interest Lands Conservation Act ......... 2

FACTUAL AND PROCEDURAL BACKGROUND ........................................ 3

    A.    History of the Petroleum Reserve ............................................................. 3

    B.    The 2012 Integrated Activity Plan and Supporting EIS ............................. 4

    C.    The Greater Mooses Tooth Exploratory Areas ......................................... 5

    D.    BLM Decision Making and Commencement of Judicial Proceedings ......... 6

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ...................................................................................................... 8

    1.    Plaintiffs' Claims are Moot and Thus Not Justiciable ....................... 8

    2.    Plaintiffs' NEPA Claims Lack Merit ............................................. 14

        A.    BLM Reasonably Considered the Impacts of Winter Exploration on Caribou ....................................................... 14

        B.    BLM Reasonably Considered the Impacts of Winter Exploration on Subsistence Activities ................................... 18

        C.    BLM's Cumulative Impacts Analysis was Reasonable ........ 21

        D.    BLM's Alternatives Analysis was Reasonable .................... 24

CONCLUSION ................................................................................................ 30

*Native Village of Nuiqsut et al. v. BLM et al.,*
Case No. 3:19-cv-00056 SLG

Case 3:19-cv-00056-SLG   Document 30   Filed 07/17/19   Page 2 of 36

# TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*,
189 F.3d 851  (9th Cir. 1999) ...................................................................... 24

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013).......................................................................................... 9

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997)........................................................................................... 9

*Baltimore Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983)........................................................................................... 8

*Cantrell v. City of Long Beach*,
241 F.3d 674 (9th Cir. 2001) ................................................................... 10, 13

*Cent. S.D. Co-op Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*,
266 F.3d 889 (8th Cir. 2001) ....................................................................... 29

*City of Angoon v. Hodel*,
803 F.2d 1016 (9th Cir. 1986) ..................................................................... 23

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ..................................................................... 15

*Defs. of Wildlife v. BOEM*,
684 F.3d 1242 (11th Cir. 2012) ................................................................... 15

*Dine Citizens Against Ruining Our Env't v. Bernhardt*,
923 F.3d 831 (10th Cir. 2019) ..................................................................... 16

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ........................................................................ 8

*Feldman v. Bomar*,
518 F.3d 637 (9th Cir. 2008) .................................................................... 9, 12

*Friends of the Earth v. Bergland*,
576 F.2d 1377 (9th Cir.1978) ........................................................... 10, 11, 14

*Friends of the River v. FERC*,
720 F.2d 93 (D.C. Cir. 1983)........................................................................ 11

*Genesis Healthcare Corp. v. Symczyk*,
569 U.S. 66 (2013)........................................................................................... 9

*Native Village of Nuiqsut et al. v. BLM et al.*,
Case No. 3:19-cv-00056 SLG

Case 3:19-cv-00056-SLG   Document 30   Filed 07/17/19   Page 3 of 36

*Greenpeace Action v. Franklin,*
  14 F.3d 1324 (9th Cir. 1992) ................................................................. 20

*Idaho Cmty. Action Network v. U.S. Dep't. of Transp.,*
  545 F.3d 1147 (9th Cir. 2008) ............................................................... 28

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.,*
  88 F.3d 754 (9th Cir. 1996) ..................................................................... 2

*Knox v. Serv. Emps. Int'l Union,*
  567 U.S. 298 (2012).................................................................................. 9

*Kunaknana v. Clark,*
  742 F.2d 1145 (9th Cir. 1984) ......................................................... 26, 27

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990).................................................................................. 8

*Managed Pharmacy Care v. Sebelius,*
  716 F.3d 1235 (9th Cir. 2013) ................................................................. 8

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989)...................................................................... 12, 20, 22

*Merrell v. Thomas,*
  807 F.2d 776 (9th Cir. 1986) ................................................................... 2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
  463 U.S. 29 (1983)................................................................................ 8, 25

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
  177 F.3d 800 (9th Cir. 1999) ................................................................... 2

*N. Alaska Envtl. Ctr. v. Kempthorne,*
  457 F.3d 969 (9th Cir. 2006) ........................................................ 3, 4, 5, 7

*Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n,*
  879 F.3d 1202 (D.C. Cir. 2018)............................................................... 11

*Native Ecosystems Council v. U.S. Forest Serv.,*
  428 F.3d 1233 (9th Cir. 2005) ........................................................... 28, 29

*Northcoast Envtl. Ctr. v. Glickman,*
  136 F.3d 660 (9th Cir. 1998) ................................................................... 2

*Nw. Envtl. Def. Ctr. v. Gordon,*
  849 F.2d 1241 (9th Cir. 1988) ................................................................. 9

*Native Village of Nuiqsut et al. v. BLM et al.,*
Case No. 3:19-cv-00056 SLG

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank,*
 693 F.3d 1084 (9th Cir. 2012) ........................................................................... 8

*Robertson v. Methow Valley Citizens Council,*
 490 U.S. 332 (1989) ............................................................................................. 2

*S. Pac. Terminal Co. v. ICC,*
 219 U.S. 498 (1911) ........................................................................................... 13

*Sierra Club v. Penfold,*
 857 F.2d 1307 (9th Cir. 1988) ......................................................................... 10

*Theodore Roosevelt Conservation Partnership v. Salazar,*
 616 F.3d 497 (D.C. Cir. 2010) ......................................................................... 15

*Town of Superior v. U.S. Fish & Wildlife Serv.,*
 913 F. Supp. 2d 1087 (D. Colo. 2012) ............................................................ 29

*United States v. Sanchez-Gomez,*
 138 S. Ct. 1532 (2018) ......................................................................................... 9

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,*
 454 U.S. 464 (1982) ............................................................................................. 9

*W. v. Sec. of the Dep't of Transp.,*
 206 F.3d 920 (9th Cir. 2000) ........................................................................... 13

**Statutes**

5 U.S.C. §§ 701-706 ................................................................................................. 8

5 U.S.C. § 706(2)(A) ................................................................................................. 8

16 U.S.C. § 3120 ....................................................................................................... 3

16 U.S.C. § 3120(a) ............................................................................................ 3, 25

16 U.S.C. § 3120(a)(3)(C) ..................................................................................... 26

42 U.S.C. § 4332(2)(E) ........................................................................................... 28

42 U.S.C. § 6506a(a) .......................................................................................... 2, 28

42 U.S.C. §§ 4321-4335 ........................................................................................... 2

42 U.S.C. §§ 6501-08 .......................................................................................... 1, 3

P.L. 96-514, 94 Stat. 2957 (Dec. 12, 1980) ........................................................... 3

*Native Village of Nuiqsut et al. v. BLM et al.,*
Case No. 3:19-cv-00056 SLG

Case 3:19-cv-00056-SLG   Document 30   Filed 07/17/19   Page 5 of 36

**Regulations**

40 C.F.R. § 1502.20 ....................................................................................... 7, 15

40 C.F.R. § 1508.7 ............................................................................................ 22

40 C.F.R. § 1508.9(b) ...................................................................................... 15

40 C.F.R. § 1508.28 ........................................................................................... 7

43 C.F.R. § 46.140 ............................................................................................. 7

**Other Authorities**

Wright & Miller, *Federal Practice and Procedure* § 3533.3 (1984) ................................ 13

*Native Village of Nuiqsut et al. v. BLM et al.,*
Case No. 3:19-cv-00056 SLG

# INTRODUCTION

Plaintiffs ask the Court to set aside a decision of the Bureau of Land Management (BLM) approving a winter oil and gas exploration program (hereafter, "the Program") (*see* BLM Decision Record at AR8595), as proposed and developed by ConocoPhillips Alaska, Inc. (hereafter, "Conoco"). The decision approved various exploration activities, including the drilling of six exploratory wells as well as construction of ice roads, snow trails, ice pads, and an ice airstrip, all constructed with virtually no surface disturbance, in an area of the Western Arctic managed by BLM and known as the National Petroleum Reserve-Alaska (hereafter, "the Petroleum Reserve"). Plaintiffs claim BLM's approval of the Program violated the National Environmental Policy Act (NEPA) and section 810 of the Alaska National Interest Lands Conservation Act (ANILCA). Federal Defendants ask that the case be dismissed because the Program was completed on May 1 and thus Plaintiffs' claims are moot. Program-specific circumstances dictate that there is no meaningful relief the Court could order, even if Plaintiffs were requesting injunctive relief, which they are not. If the Court concludes otherwise, it should nonetheless enter judgment in favor of Defendants because Plaintiffs' claims lack merit, as explained herein.

# STATUTORY AND REGULATORY BACKGROUND

## A.     The Naval Petroleum Reserves Production Act of 1976

The Petroleum Reserve is managed by BLM under the provisions of the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258, 90 Stat. 303 (codified as

amended at 42 U.S.C. §§ 6501-08) ("NPRPA").  Under the NPRPA, the Secretary of the Interior is required to "conduct an expeditious program of competitive leasing of oil and gas in the Reserve in accordance with this Act." 42 U.S.C. § 6506a(a).

B.     **The National Environmental Policy Act of 1969**

NEPA, 42 U.S.C. §§ 4321-35, serves the dual purposes of informing agency decision makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA serves these purposes by requiring a "federal agency contemplating a major action" to prepare an environmental impact statement or "EIS." *Id.*; *see also Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 666 (9th Cir. 1998) (noting that EIS requirement is "a procedural obligation designed to assure that agencies give proper consideration to the environmental consequences of their actions" (quoting *Merrell v. Thomas*, 807 F.2d 776, 777-78 (9th Cir. 1986))). NEPA is a procedural statute: it does not "mandate particular results but simply prescribes the necessary process." *Methow Valley Citizens*, 490 U.S. at 350; *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999); *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996) ("NEPA exists to ensure a process, not to ensure any result" (quoting *Methow Valley Citizens*, 490 U.S. at 350)).

C.     **Section 810 of the Alaska National Interest Lands Conservation Act**

Section 810 of the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3120, requires federal land-managing agencies in Alaska, "[i]n determining whether to

withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands," to "evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. History of the Petroleum Reserve

The nearly 23-million acres that comprise the Petroleum Reserve were originally designated a naval petroleum reserve by executive order in 1923. *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006). The U.S. Navy managed the Petroleum Reserve until 1976, when Congress enacted the NPRPA, re-designating the reserve as the "National Petroleum Reserve in Alaska," withdrawing it from operation of the mining and mineral leasing laws, and placing it under the jurisdiction of the Secretary of the Interior. 90 Stat. 303. Congress amended the NPRPA in the Department of the Interior Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, at 2964–65 (hereafter "1980 Amendment"), by directing the Secretary of the Interior to undertake "an expeditious program of competitive leasing of oil and gas in the [Petroleum Reserve]."

Prior to 2012, BLM did not have a plan (or associated NEPA analysis) encompassing the entire Petroleum Reserve. Instead, oil and gas leasing occurred under integrated activity plans covering portions of the Petroleum Reserve. Various discoveries were made both within the Petroleum Reserve and in nonfederal lands and waters near the

Petroleum Reserve. In 1994, the discovery of the Alpine oil field on State land in the Colville River Delta near the eastern boundary of the Petroleum Reserve spurred increased industry interest across the North Slope. AR542. Following Alpine, additional discoveries occurred in the northeastern area of the Petroleum Reserve, resulting in the creation of the Greater Mooses Tooth ("GMT") and Bear Tooth exploratory units. *Id.* From 2000 to 2012, industry had drilled 29 exploration wells on 28 federal leases in the Petroleum Reserve, with fifteen of those wells in the GMT Unit. *Id.*

### B. The 2012 Integrated Activity Plan and Supporting EIS

In 2010, BLM commenced the planning process for a new integrated activity plan (IAP) and supporting EIS, issued in final form in November 2012, AR1 (hereafter, "2012 IAP/EIS"). One objective of the undertaking was to determine appropriate management of the entire Petroleum Reserve, based on a consideration of both subsurface resources (e.g., oil and gas) and surface resources and uses (e.g., terrestrial mammals, subsistence use of the Petroleum Reserve, etc.). AR15-17. The process included consultation with tribes, native villages, and cooperating agencies, and robust public involvement. AR21-23. The stated purpose of the 2012 IAP/EIS was to "provide greater certainty and opportunity to industry while better protecting the environment, public use of the land, and public health." AR6. The new plan superseded two earlier plans, one governing the northwestern portion of the Petroleum Reserve (specifically, the 2003 Northwest NPR-A IAP/EIS), and the other governing the northeastern portion (specifically, the 2008 Northeast NPR-A Supplemental IAP/EIS). In addition, the 2012 IAP/EIS addressed, for

the first time, oil and gas development in the southern portion of the Petroleum Reserve. *Id.*

On February 21, 2013, BLM issued a Record of Decision ("ROD"), AR2623, adopting Alternative B-2 in the 2012 IAP/EIS. That alternative called for closing about half of the Petroleum Reserve to leasing, to protect important surface resources and subsistence uses, while designating the remaining 11.8 million acres of the Petroleum Reserve as available for oil and gas leasing. AR2642. The ROD adopted numerous lease stipulations and best management practices ("BMPs") which, among other things, impose requirements and restrictions on lessees conducting oil and gas operations. AR2628, AR2669-723. One of the BMPs (C-2a), AR2684, requires closure of the Petroleum Reserve to overland vehicular travel when snow and weather conditions in the Petroleum Reserve are no longer adequate to support such travel.

To date the 2012 IAP/EIS remains the current plan for the entire Petroleum Reserve, on which BLM relies principally for NEPA compliance, although the agency also relies on earlier EISs covering portions of the Petroleum Reserve, as discussed in the subsection which follows.

### C. The Greater Mooses Tooth Unit

In September 2004, BLM issued the Alpine Satellite Development Plan Final EIS (hereafter, "Alpine EIS") which analyzed Conoco's proposal to expand its Colville River Unit operations, located on state-owned lands, by constructing satellite drill pads in the Petroleum Reserve, two of which (GMT1 and GMT2) are in what is now known as the

Greater Mooses Tooth Unit. AR4533–34. The Assistant Secretary for Land and Minerals Management signed the ROD on November 8, 2004. In October 2014, BLM supplemented the Alpine EIS for the Proposed GMT1 Development Project (hereafter, "GMT1 SEIS") to analyze Conoco's revised proposal to construct the GMT1 drill pad. AR2737. On February 13, 2015, BLM issued a ROD approving the revised proposal. AR4406. In August 2018, BLM issued a supplement to the Alpine EIS for the Proposed GMT2 Development Project (hereafter, "GMT2 SEIS"), to analyze Conoco's revised proposal to construct the GMT2 drill pad. AR4516. BLM issued a ROD approving the GMT2 proposal in October 2018. AR6542. Both the GMT1 and GMT2 SEISs addressed in detail the direct, indirect, and cumulative impacts of the proposed actions on terrestrial mammals (including caribou) and subsistence activities. AR2920–28, 2962–77, 3116–30, 3191–229, 3309–15, 3348–52, 4668–78, 4711–58, 4878–92, 4947–93, 5042–47, 5077–84.

### D. BLM Decision Making and Commencement of Judicial Proceedings

On October 8, 2018, Conoco submitted an application to BLM for a right-of-way (ROW) grant in support of its proposal to drill up to six oil and gas exploration wells (and test those six wells and two additional wells drilled under an earlier authorization) on leases it holds in the Petroleum Reserve located in or near the Bear Tooth Exploratory Unit during the winter of 2018-19. AR6960. Conoco also subsequently submitted an "application for permit to drill" (APD) for each anticipated well. AR7807–25, AR7831–999. On October 11, 2018, BLM gave notice on the Arctic District Office website's NEPA register that it was considering these applications and would prepare an EA. AR8596. BLM made a

preliminary EA available for public comment on November 9, 2018, for a period of two weeks. *Id.*

Comments were received from Conoco and from a coalition of conservation groups, including four of the six plaintiffs in this case (Plaintiffs Native Village of Nuiqsut and the Natural Resources Defense Council did not comment). *Id.* The agency addressed these comments in Appendix J to the final EA. AR8555. The final EA (hereafter, the "2018 EA") tiered to – and incorporated by reference – the 2012 IAP/EIS, as well as the GMT1 and GMT2 SEISs. AR8477; *see also* 40 C.F.R. §§ 1502.20, 1508.28; 43 C.F.R. § 46.140.

On December 7, 2018, BLM issued a decision record approving Conoco's APDs and its application for a right-of-way grant, AR8594, as well as a Finding of No New Significant Impact ("FONNSI"), AR8587, which concluded that the exploration program would not have any new significant impacts (i.e., as compared to those impacts disclosed and analyzed in the three EISs to which the EA tiers). Plaintiffs brought suit on March 1, 2019, ECF No. 1, and amended their complaint on March 26, 2019. ECF No. 5. (hereafter, "Am. Compl.").

## LEGAL STANDARD

NEPA challenges are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872 (1990); *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010). Review is "highly deferential" and presumes agency action is valid. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012) (quoting *Nw. Ecosystem All. V. U.S. Fish & Wildlife Serv.*,

475 F.3d 1136, 1140 (9th Cir. 2007)).  The APA standard is "narrow and a court is not to substitute its judgment for that of the agency . . . ." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A court may, if the equities so counsel, set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235 (9th Cir. 2013).  When examining agency scientific findings made in an area of an agency's technical expertise, the court must be at its most deferential.  *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).

## ARGUMENT

### 1. Plaintiffs' Claims are Moot and Thus Not Justiciable.

Article III, section 2, of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," which in turn limits the authority of federal courts to resolving "the legal rights of litigants in actual controversies." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982) (internal quotation marks omitted).  "A corollary to this case-or-controversy requirement is that 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'"  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71-72 (2013) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)).  "A case that becomes moot at any point during the proceedings is 'no longer a Case or Controversy for purposes of Article III,' and is outside the jurisdiction of the federal courts."  *United States*

*v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted)). "A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever to the prevailing party.'" *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted); *accord Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008) (mootness depends on "whether there is a present controversy as to which effective relief can be granted" (quoting *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988))).

Plaintiffs here challenge an exploratory drilling program that was completed well over two months ago and is therefore moot. Indeed, Conoco can no longer engage in any activities in the Petroleum Reserve by law, because BLM's Arctic District Office closed it to vehicular traffic on May 3, 2019 as "snow and weather conditions [there] were no longer adequate for winter overland travel." *See* Declaration of Ms. Sarah La Marr at ¶ 2 ("La Marr Decl."). The District Office did so – consistent with its annual practice – in order to comply with Best Management Practices C-2a, adopted in the record of decision for the 2012 IAP/EIS, which permits vehicular travel in the Petroleum Reserve only when frost and snow cover are at sufficient depths to protect underlying soils and vegetation from undue degradation, disturbance, or erosion. AR2684. In addition, Ms. La Marr attests that, by May 3, Conoco had "completed all of its activities authorized under the Exploration Program, including suspension of all wells to BLM's satisfaction." La Marr Decl. ¶ 4.[2] In

---

[2] This comports with evidence expected to be proffered by counsel for Conoco (in Intervenor's forthcoming cross-motion for summary judgment) to the effect that the work was actually completed on May 1, 2019.

light of these facts, the Court should dismiss the action because no justiciable controversy exists.

While in a NEPA case Federal Defendants face a "particularly heavy burden in establishing mootness," there is no effective relief the Court can order here with the Program completed and the wells suspended. *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001). The wells cannot be undrilled any more than the completed mine in *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988), could not be "moved" or "unmined." *Id.* at 1318 (citing *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1378–79 (9th Cir.1978)). *Bergland* is instructive for the additional reason that the Ninth Circuit concluded the case was moot because exploratory drilling had ceased during the appeal. In doing so, it rejected plaintiffs' argument that the defendant might engage in similar operations nearby, "attracted by the rich minerals in the area . . . ." *Id.* at 1379. The court explained that "relief under NEPA must be tailored to remedy the particular violations in the case" and is not dispensed "prophylactic[ally]." *Id.* (citation omitted). For this reason, the possibility that a court could theoretically issue an order containing an inappropriate "prophylactic" remedy is not sufficient to defeat Federal Defendants' showing of mootness. And while Plaintiffs raise concerns relating to the resident caribou herd, there is nothing for this Court to enjoin related to the Program. More to the point, if in fact the caribou were disturbed or harassed by the exploration activity, any ongoing effects of that cannot be reversed by court order.

Nor would additional environmental analysis be helpful. Remanding for a supplemental EA or EIS would not advance the purposes of NEPA because the statute is designed to foster sound decision making, which it does by ensuring that a certain process is observed, one that promotes careful study and public participation. It is not punitive. *See NRDC v. U.S. Nuclear Regulatory Comm'n*, 879 F.3d 1202, 1211 (D.C. Cir. 2018) (remand "'to teach the agency a lesson' would be an essentially punitive measure; we can discern no benefit to the public in such a course, and no genuine service to the policies NEPA advances" (quoting *Friends of the River v. Fed. Energy Regulation Comm'n*, 720 F.2d 93, 107-08 (D.C. Cir. 1983))); *accord Bergland*, 576 F.2d at 1379 ("courts will not issue injunctions under NEPA only as prophylactic or punitive measures" (citation omitted)).

By contrast, where courts have ordered supplemental NEPA analysis, or noted the possibility of such analysis as an available remedy, it has been in circumstances where ongoing action remains. Although mootness was not at issue in *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), the decision serves as a guidepost because of its holding that if new information arises and "there remains major Federal [action] to occur," a supplemental EIS "must be prepared." *Marsh*, 490 U.S. at 374. Under the "rule of reason," the Supreme Court continued, courts must consider "the value of the new information [i.e., the information expected from further NEPA analysis] to the still pending decision making process." *Id*. at 374. The same consideration applies here with equal force. With no decision pending and the work completed, it cannot be expected that any

value would be derived from additional NEPA analysis. This is because Plaintiffs in this case, like plaintiffs in *Feldman v. Bomar*, are not confronted by "a continuous, remediable harm that concretely affects their 'existing interests.'" 518 F.3d at 643 (citing *Headwaters, Inc. v. BLM, Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir. 1989)). Any harm that may have occurred is now irremediable.

In their Amended Complaint, Plaintiffs requested injunctive relief, Am. Compl. at 26, but they abandoned that request in the memorandum supporting their summary judgment motion and now seek only vacatur. ECF No. 27 ("Mem.") at 36. But an order of vacatur would be ineffectual as well because the Program is completed. Even if the Court were to consider the possibility of injunctive relief to inform its assessment of whether the case is moot, Plaintiffs can find no support in Ninth Circuit precedent rejecting mootness defenses in NEPA cases because of ongoing activity. For example, in *Cantrell* – which involved plans for reuse of a decommissioned naval base – the court concluded that even though the historic buildings (which had functioned as bird habitat) were irremediably destroyed, the reuse plan was still being executed. As a result, it was possible that further analysis would counsel changes in the plan, including possible development of "ways to mitigate the damage to the birds' habitat by, for example, creating new nesting and foraging areas [on the former base] . . . ." *Cantrell*, 241 F.3d at 678-79. Likewise in *West v. Secretary of the Department of Transportation*, 206 F.3d 920 (9th Cir. 2000), additional highway construction work remained. The Ninth Circuit held that the district court could have (i) required additional NEPA analysis, and (ii) ordered that the disputed

highway interchange – the first of several that were planned – be closed or taken down. *Id*. at 925.

The circumstances in this case are incomparable because, as explained above, the effects of the winter exploration program cannot be reversed or undone and there is nothing to modify. As the *Cantrell* court observed, the "central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Cantrell,* 241 F.3d at 678 (quoting *West*, 206 F.3d at 925 n.4 (quoting CHARLES ALAN WRIGHT & ARTHUR R. MILLER: 13A *Federal Practice and Procedure* § 3533.3 at 268 (1984))). In *Cantrell* and *West*, the changed circumstances had not forestalled relief; in this case, they most certainly have.

Finally, Plaintiffs may contend this is a case where the action involved is of a character "capable of repetition yet evading review," *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911), and thus is not moot. But like in *Bergland*, where a similar argument was rejected, there is "no reasonable possibility" here that the operator would "resume or repeat the exploratory operation which plaintiffs previously sought to enjoin." 576 F.2d at 1379. Nor will denial of review "defeat appellate adjudication on the type of questions presented in this case (before mootness developed)." *Id*. Furthermore, it is not relevant that Conoco may, in future years, apply to conduct additional winter exploration programs in the Petroleum Reserve, *see* Am. Compl. ¶ 44, for approval of any such program would constitute new action for which new NEPA analysis would be required. Plaintiffs sat on their rights for more than four months from

the time BLM announced its consideration of the winter exploration program on October 11, 2018, AR8477, to the filing of the complaint on March 1, 2019, and then declined to seek preliminary injunctive relief. To the extent BLM's decision can be said to have evaded review, it is only due to Plaintiffs' own delay and not to something inherent in the governmental action challenged.

Accordingly, the Court should dismiss the case based on mootness and the absence of any effectual remedy.

### 2. Plaintiffs' NEPA Claims Lack Merit.

Plaintiffs raise four NEPA arguments which should be rejected because the NEPA analyses addressing impacts to caribou and subsistence activities were adequate.

### A. BLM Reasonably Considered The Impacts of Winter Exploration on Caribou.

Plaintiffs argue that BLM failed to adequately analyze the impacts of winter exploration on caribou because it did not prepare an EIS. *See* Mem. at 13-18. Plaintiffs' claim is unsound because BLM appropriately tiered the impacts analysis in the 2018 EA to the detailed and lengthy impacts analysis in the 2012 IAP/EIS (as well as the two supplemental EISs for the Greater Mooses Tooth Exploration Units (GMT1 and GMT2)), and Plaintiffs mischaracterize the impacts analyses articulated in those broader impact statements.

In addition to the EA's analysis of impacts on caribou from winter exploration, BLM appropriately tiered to and incorporated by reference the more extensive impacts analysis contained in the 2012 IAP/EIS. An EA need only contain a "brief discussion . . .

of the environmental impacts of the proposed action." 40 C.F.R. § 1508.9(b); *see also Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1136 (9th Cir. 2008) (stating that EA must include brief discussion of impacts). NEPA's implementing regulations permit and, in fact, encourage tiering of EAs to broader environmental impacts statements. *See* 40 C.F.R. §1502.20. "[The] [EA] need only summarize the issues discussed in the broader statement and incorporate discussion from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.*; *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 511-12 (D.C. Cir. 2010) (upholding tiering of drilling EA to broader development EIS); *Def. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1251 (11th Cir. 2012) (affirming Bureau of Ocean Energy Management's exploratory drilling plan EA tiered to leasing EISs); *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 837, 952 (10th Cir. 2019) (concluding that the EAs prepared in connection with applications for permits to drill were properly tiered to a previous EIS).

Here, Plaintiffs concede that the EA discussed the impacts from Conoco's winter exploration on caribou, but nevertheless complain that BLM failed to take a "hard look" at the impacts and provide a more detailed discussion. *See* Mem. at 14-15. Indeed, while the EA briefly characterized the impacts to caribou as minor, it also indicated that more extensive analysis could be found in the 2012 IAP/EIS, to which the EA is tiered. *See* AR8480 (brief discussion on impacts to caribou, among other mammals); *see also* AR8477 (tiering and incorporating by reference the 2012 IAP/EIS, and the GMT1 and GMT2

SEISs). Contrary to Plaintiffs' contention that BLM provided "general statements on caribou and . . . cursory conclusions," the 2012 IAP/EIS provided a detailed discussion on the direct and indirect impacts of winter exploration on caribou. *See generally* AR0294-301 (describing the caribou herds in the Petroleum Reserve and discussing their migration and calving behavior); *see also* AR0722-32 (discussing effects of alternative A on caribou resulting from various aspects of oil and gas development, including seismic testing, exploratory drilling, construction of ice roads and ice pads, oil and gas production, effects of spills and gas releases, and reclamation activities), AR0941-45 (discussing same as to alternative B-1), AR1064-67 (same as to alternative B-2 (the designated "preferred alternative" adopted in the 2013 IAP/EIS ROD)), 1180-84 (same as to alternative C), 1292-93 (same as to alternative D). To the extent Plaintiffs contend that BLM failed to address their concerns about potential impacts from the proposed action, Plaintiffs' argument fails because, as they concede, BLM responded to their concerns, *see* Mem. at 15, and they have failed to show that new significant impacts would result from the proposed action so as to render the impacts analysis in the 2012 IAP/EIS obsolete or otherwise deficient. *See* AR8587-93 (Finding of No New Significant Impact).

In their attempt to diminish the detailed impacts analysis in the 2012 IAP/EIS and undermine BLM's conclusion that impacts to caribou would be minor, Plaintiffs mischaracterize the impacts discussion in the 2012 IAP/EIS. Plaintiffs erroneously cite to sections of the 2012 IAP/EIS that address impacts from oil and gas development and not winter exploration, to support their unsubstantiated contention that the 2012 IAP/EIS "does

not support [BLM's] conclusion that impacts to caribou [from winter exploration] will be minor." *See* Mem. at 16-17 (citing to AR1067, 1184, 1524, 0725). Because impacts from development are generally substantially greater than from winter exploration, considering the associated permanent infrastructure and activities required, the 2012 IAP/EIS specifically distinguished exploration and development activities and their impacts in different subsections. Plaintiffs' misapplication of the BLM's impacts analysis from oil and gas development to the agency's analysis of impacts from winter exploration is thus misleading and inaccurate, and the Court should therefore dismiss their argument.

Insofar as Plaintiffs argue that the 2012 IAP/EIS demonstrated significant impacts from winter exploration on caribou, *see* Mem. at 17, that EIS already sufficiently addressed the issue, and Plaintiffs are time-barred from re-litigating the adequacy of the 2012 IAP/EIS. *See N. Alaska Envtl. Ctr. v. U.S. Dep't. of the Interior*, No. 3:18-cv-00030-SLG, 2018 WL 6424680 (D. Alaska Dec. 6 2018). Moreover, and contrary to Plaintiffs' contention, Mem. at 17, BLM never asserted that there would not be any significant impacts to caribou from winter exploration, but simply that there were no *new* significant impacts that were not previously addressed in the 2012 IAP/EIS (or the GMT 1 and GMT2 SEISs), to justify the preparation of a new EIS.

Because Plaintiffs have failed to show that BLM failed to take a hard look at the impacts to caribou from winter exploration, or that new significant impacts have arisen requiring the preparation of a new EIS, the Court should deny Plaintiffs' motion for summary judgment.

### B. BLM Reasonably Considered the Impacts of Winter Exploration on Subsistence Activities.

Despite BLM's exhaustive analysis in the EA and tiered NEPA analyses, of the direct and indirect impacts of winter exploration on subsistence, Plaintiffs insist that the analysis is inadequate. Mem. at 19-23. More specifically, Plaintiffs assert that the EA indicates significant impacts and that this requires the preparation of an EIS or a "convincing statement of reasons explaining why the effects to subsistence from winter exploration will be insignificant." *Id.* at 22. Plaintiffs are wrong that an EIS is required for three reasons.

First, the 2018 EA and the 2012 IAP/EIS (to which the EA is tiered) thoroughly addressed the impacts of winter exploration on subsistence activities. *See* AR8496-98 (EA discussing that "[t]he proposed action is anticipated to deflect caribou and furbearers from the area. Subsistence hunters would likely avoid the area either because they believe that resources will not be there or because they prefer not to hunt and trap around exploration activities (industrial traffic, drilling, camps, etc.)"); *see also* AR1101-06 (articulating the impacts from seismic activities, exploratory drilling and development and permanent facilities, including loss of subsistence food, loss of time, loss of money, increased risk of loss of life, displacement of resources away from the drill site, avoidance of development areas by subsistence hunters, and the displacement of subsistence species from traditional harvest areas). Moreover and contrary to Plaintiffs' assertion, Mem. at 20-22, the 2012 IAP/EIS did contemplate impacts to the project area. *See* AR0037 (noting that Preferred Alternative B-2 "makes lands currently under lease and near lands currently under lease in

northeastern NPR-A near Fish Creek available"); and AR1105 (describing impacts in Nuiqsut's subsistence use area, where the Exploration Program occurred). To the extent that Plaintiffs assert that other previously prepared NEPA analyses did not address impacts from winter exploration on subsistence activities, Mem. at 22, Plaintiffs misread the analysis, because the GMT2 SEIS specifically discussed exploration-related impacts, including in the Exploration Program area. *See* AR5078-82.

Second, Plaintiffs have failed to establish that the impacts addressed in the 2018 EA differ significantly from the analysis in the 2012 IAP/EIS and GMT2 SEIS, such that the agency was required to prepare a new EIS. Instead, Plaintiffs provide sweeping, conclusory statements that the EA demonstrates that the impacts from winter exploration are significant, and fail to specifically identify any *new* significant impacts that have come to light since the preparation of the 2012 IAP/EIS and GMT2 SEIS, that would require a more detailed NEPA analysis. Mem. at 19-22. Plaintiffs' argument that BLM failed to consider new significant impacts from winter exploration on subsistence activities is thus without merit.

Third, the FONNSI provided a convincing statement of reasons that winter exploration would not cause new significant impacts on subsistence activities. In a case challenging a FONSI, the Court must ensure "that an agency has taken the requisite 'hard look' at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)

(internal quotations and citation omitted). An agency's decision to issue a FONSI is entitled to "substantial deference." *Marsh*, 490 U.S. at 372. Here, the FONNSI, in its reference to Table 1.2 in the EA, AR8479, articulated that the agency considered the impacts to subsistence, determined that it could be "potentially affected," and provided the basis for its determination. *See* AR8590; *see also* AR8479 (explaining that "[i]mpacts to subsistence use from this project in and of itself would be expected to be minor to moderate and short term[.]"). The FONNSI further explained that BLM, in its consideration of the direct and indirect impacts to subsistence, "also considered site-specific mitigation measures," and that stipulations and restrictions were developed to protect subsistence resources. *See* AR8590 (stating also that "the potential direct and indirect impacts will be mitigated effectively by requirements of the NPR-A ROD and additional permit stipulations determined in Section 4.3 of the EA"); *see also* AR8591 ("it is concluded that the [best management practices] included by the Secretary of the Interior in the ROD for the Final IAP/EIS for the NPR-A, Lease Stipulations for NE SIAP/EIS and other agency permit requirements…are adequate to assure protection of…[s]ubsistence [r]esources. As a result, no new significant direct or indirect impacts…are expected from this proposed action"). Plaintiffs are therefore wrong that BLM failed to provide a convincing statement of reasons that winter exploration would not cause significant impacts on subsistence resources or activities.

Because Plaintiffs have failed to establish that BLM's FONNSI was somehow arbitrary and capricious, the Court should deny their motion for summary judgment.

## C. BLM's Cumulative Impacts Analysis Was Reasonable.

Plaintiffs next contend that BLM failed to analyze the cumulative impacts of Conoco's winter exploration activities, geophysical exploration surveys, and GMT2 construction activities, particularly on caribou and subsistence activities. Plaintiffs' claims are fundamentally flawed however, because the 2018 EA's cumulative impacts analysis incorporated by reference and tiered to previously prepared EISs that specifically addressed these projects. *See* AR8502, AR8590.

As an initial matter, the 2018 EA specifically included a cumulative impacts section, which summarized the impacts of the proposed action, including impacts to subsistence activities. *See* AR8502-07. Furthermore, the EA also clearly articulated that more detailed cumulative effects analyses could be found in the noted EISs. *See id.* (stating that it is tiered to "the most recent cumulative impact analysis in the USDOI BLM 2012 (Volume 4, Chapter 4 Section 4.8), USDOI BLM 2014 (Volume 4, Chapter 4.6), and USDOI BLM 2018 (Volume 1, Chapter 4.6)"). The EA also identified all of the projects within (including the GMT1 and GMT2 projects) and outside of the Petroleum Reserve that were considered as part of the analysis. *Id.*

The record belies Plaintiffs' contention that BLM failed to consider the cumulative effects of the proposed action and the GMT2 project on caribou. The 2012 IAP/EIS and the GMT2 SEIS, to which the EA is tiered, described in detail the cumulative impacts from exploration and development activities on caribou. The 2012 IAP/EIS reasonably considered the impacts of past, present, and reasonably foreseeable future actions. *See* 40

C.F.R. §1508.7; *see e.g.* AR1394-95 (noting Conoco plans to develop GMT1 and GMT2).

Regarding caribou specifically, the 2012 IAP/EIS articulated the cumulative impacts from seismic activities and exploration drilling, as well as oil and gas development and production. *See, e.g.,* AR1515-31 (primarily loss of habitat and disturbance). Plaintiffs challenge however, that BLM's NEPA analysis is somehow deficient because BLM did not "scientifically test" the assumption that impacts to the Teshekpuk Caribou Herd would not persist after exploration ended. Mem. at 26. But Plaintiffs have failed to establish that BLM is required to "scientifically test" the assumption or that the assumption was somehow unreasonable. Moreover, Plaintiffs have failed to show, whether in their brief or during the public comment process, that an appropriate scientific test exists that the agency failed to consider. *See City of Angoon v. Hodel*, 803 F.2d 1016, 1022 (9th Cir. 1986) (requiring Plaintiffs to "structure their participation so that it is meaningful, so that it alerts the agency to [their] positions and contentions" (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 553 (1978))). Furthermore, Plaintiffs ignore BLM's explanations that it did not note any "consequential effect on the abundance or productivity of the caribou," and that because conditions for winter survival vary from year to year, it might be difficult to "test" the assumption when explorations conclude at the end of winter. *See* AR1516. Plaintiffs also assert that the 2012 IAP/EIS, and consequently the 2018 EA, is weak because the agency could not definitively state the effect of year-round contact with oil and gas facilities on caribou populations. Mem. at 26. Plaintiffs' contention however, is without merit because BLM acknowledged that negative effects such as winter

mortality, reduction in calf productivity, and additive or synergistic effects on caribou productivity could occur.  AR1524.

The GMT2 SEIS also reasonably addressed cumulative impacts on caribou. Plaintiffs complain that the 2018 EA includes only generic observations of the cumulative impacts. Mem. at 25, 27.  Plaintiffs' argument is untenable because the 2018 EA's brief discussion of the cumulative impacts, *see* AR8502-08, is buttressed by the lengthy and detailed cumulative impacts analysis in the 2018 GMT2 SEIS, *see* AR5042-45, 4878-88, to which the EA is tiered.

Plaintiffs are also wrong that BLM failed to address cumulative impacts from the winter exploration and development projects on subsistence activities.  As an initial matter, Plaintiffs' brief fails to specifically articulate the inadequacies in BLM's cumulative impacts analysis regarding subsistence, and as such the Court should deem the argument waived.  *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851 858, n.4 (9th Cir. 1999) (stating that "arguments not raised in opening brief are waived") (citation omitted). Furthermore, the record belies Plaintiffs' contention as the EA directly addressed the cumulative effects of the proposed action, *see* AR8503 ("hunter disturbance and avoidance and reduced resource availability," and the 2012 IAP/EIS and GMT2 SEIS address cumulative effects on subsistence in detail.  AR 1589-612; 5077-84.

Because Plaintiffs have failed to establish that BLM's cumulative impacts analysis was inadequate, the Court should deny their motion for summary judgment.

### D. BLM's Alternatives Analysis Was Reasonable.

Plaintiffs next contend that BLM failed to consider a reasonable range of alternatives as required under ANILCA and NEPA. Mem. at 27. They argue that BLM violated Section 810(a) of ANILCA, 16 U.S.C. § 3120(a), because it failed to consider feasible alternatives that would "reduce or eliminate subsistence effects," *id.* at 28, and failed to comply with NEPA's requirement to consider reasonable alternatives, Mem. at 32. Neither the law nor the record substantiates Plaintiffs' contentions.

Plaintiffs' argument that BLM violated ANILCA is unsubstantiated for two reason. First, Section 810(a) of ANILCA does not require BLM to consider alternatives to eliminate or reduce subsistence effects. Second, BLM considered Plaintiffs' proposed alternatives and reasonably determined that they were not appropriate.

The plain language of Section 810(a) requires BLM to consider only alternatives that would reduce or eliminate *the amount of public lands needed for a proposed action* and not, as Plaintiffs argue, alternatives that would otherwise mitigate the impacts on subsistence activities. Section 810(a) provides that

> In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and *other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes.*

16 U.S.C. § 3120(a) (emphasis added). In *Kunaknana v. Clark*, the Court specifically

addressed the procedural requirements of Section 810(a), articulating that "[t]he plain terms of Section 810(a) require the director or his designee, here the BLM (agency), to 'evaluate' three factors concerning the decision to issue oil and gas leases involved in the programmatic leasing sale. These factors include: (1) the effect of leases on subsistence uses and needs; (2) the availability of other lands for oil and gas leasing; and (3) other alternatives which would reduce or eliminate *the amount of land taken away from subsistence uses*." 742 F.2d 1145, 1150-51 (9th Cir. 1984) (emphasis added). Thus, contrary to Plaintiffs' contention, Section 810(a) does not include a requirement to consider alternatives that would "reduce subsistence impacts." Mem. at 28. Moreover, the consideration of other means (mitigating) to reduce subsistence impacts are activated only once the agency has determined that an action may "significantly restrict subsistence uses." *See* 16 U.S.C. § 3120(a)(3)(C); *see also Kunaknana,* 742 F.2d at 1151 (instructing that the determinations required under Section 810(a) are "necessary only if the agency first concludes that the contemplated action may significantly restrict subsistence uses").

Turning to the claim that BLM failed to consider feasible alternatives under ANILCA, Plaintiffs' argument is belied by the record. As an initial matter, BLM prepared a Section 810 evaluation that examined the effect of the proposed action on subsistence uses and needs, and concluded that the proposed action would not result in any significant effects on subsistence. *See* AR 8581-86. The evaluation also considered alternatives to the proposed action that would reduce or eliminate the use, occupancy, or disposition of public lands, concluding that no other lands that would be appropriate for the project's

purpose were available, and that the no-action alternative was infeasible. *See* AR 8585. Regarding the latter, the agency reasonably explained that "the no-action alternative would [be] . . . contrary to the current Administration's policy, and [Conoco's] lease rights." *Id.* (articulating that Conoco would not be able to conduct exploratory drilling and testing under existing, valid oil and gas leases).

Plaintiffs nevertheless challenge that the alternatives BLM considered were inadequate under Section 810 because BLM failed to consider requiring Conoco to comply with best management practices B-2d, B-2g, and A-5; or reducing the number of wells that could be drilled, to reduce subsistence effects. Mem. at 28-30. However, as articulated above, Plaintiffs' contention is without merit because Section 810(a) only requires the consideration of alternatives that would "reduce or eliminate the amount of lands taken away from subsistence uses," *see Kunaknana,* 742 F.2d at 1151, and these proposed alternatives would not meet that requirement. The proposal that Conoco comply with certain best management practices pertain to modifying how the land should be used to minimize subsistence effects – i.e., mitigation considerations – and not whether the lands should actually be used, in whole, in part, or at all, to fulfill the purpose of the proposed action. This is the very issue addressed by Section 810(a).

As for the proposal to reduce the number of wells, BLM reasonably articulated why it considered but eliminated this proposal from analysis. *See* AR8495 (stating that the nature of the proposed action significantly limited the number of alternatives that could be considered, and as such "only limited alternatives for exploration are possible," and that

"[t]his alternative would be contrary to the terms of [Conoco's] leases, which allows [sic] the company to have a drilling program on its leases after going through the review process for particular wells").  Plaintiffs reject this explanation on the grounds that BLM could exercise regulatory authority to impose "limitations on the scale of exploratory drilling it permits in a given year."  Mem. at 31.  But Plaintiffs have failed to cite any authority that BLM is required to impose such limitations, or that such limitations would be reasonable, especially in light of the Secretary's mandate under the NPRPA of 1976, 42 U.S.C. § 6506a(a), to undertake "an expeditious program of competitive leasing or oil and gas in the [Petroleum Reserve] . . . ."  *Id.*

Plaintiffs' assertion that BLM's alternatives analysis under NEPA was inadequate, is equally unsound.  NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  Although this requirement applies equally to the preparation of an EIS or EA, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245-46 (9th Cir. 2005).  "Thus, whereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' with an EA, an agency only is required to include a brief discussion of reasonable alternatives."  *N. Idaho Cmty. Action Network v. U.S. Dep't. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citing 40 C.F.R. § 1502.14(a) and 40 C.F.R. § 1508.9(b)).  "When an agency has concluded through an [EA] that a

proposed project will have a minimal environmental effect, the range of alternatives it must consider to satisfy NEPA is diminished." *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1118 (D. Colo. 2012) (quoting *Cent. S.D. Coop. Grazing Dist. v. Sec'y of the U.S. Dep't of Agric.*, 266 F.3d 889, 897 (8th Cir. 2001)), *aff'd sub nom. WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015). Moreover, "[t]he statutory and regulatory requirements that an agency must consider 'appropriate' and 'reasonable' alternatives do[] not dictate the minimum number of alternatives that an agency must consider." *Native Ecosystems Council*, 428 F.3d at 1246.

Here, Plaintiffs complain that BLM failed to consider their two proposed alternatives to minimize impacts to caribou and subsistence activities: compliance with best management practices B-2d, B-2g and A-5, and fewer wells. Mem. at 33. But BLM considered those alternatives which it determined were appropriate and reasonable – the proposed action and no-action alternative – in light of the purpose and need for the project, and this complied with NEPA. *See Native Ecosystems Council*, 428 F.3d at 1246. Moreover, as discussed above, the agency also reasonably explained that it considered but eliminated from detailed analysis, an alternative that would reduce the number of wells approved for drilling, because it would not meet the purpose and need of the proposed action, and that is all NEPA requires. BLM therefore complied with NEPA.

Because Plaintiffs have failed to establish that BLM's analysis of alternatives under Section 810 of ANILCA and NEPA was inadequate, the Court should deny Plaintiffs' request for judgment.

## CONCLUSION

For the foregoing reasons, Federal Defendants ask the Court to dismiss this action as moot or, in the alternative, enter judgment in favor of all Defendants.

Respectfully submitted this 17th day of July, 2019.

LAWRENCE VANDYKE
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

 /s/ John S. Most
JOHN S. MOST, Trial Attorney
Natural Resources Section
Virginia Bar No. 27176
P.O. Box 7611
Washington, D.C. 20044
202-616-3353 || 202-305-0506 (fax)
John.Most@usdoj.gov

BRYAN SCHRODER,
United States Attorney
RICHARD POMEROY,
Assistant United States Attorney
Anchorage, Alaska

*Counsel for Federal Defendants*

Of Counsel

Mike Gieryic
Office of the Regional Solicitor
Alaska Region
United States Department of the Interior

**CERTIFICATE OF SERVICE**

     I hereby certify that on July 17, 2019, a copy of the foregoing notice was served by electronic means on all counsel of record by the Court's CM/ECF system.


<u>         /s/ *John S. Most*         </u>
JOHN S. MOST