Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900

Bryn R. Pallesen (Bar No. 1810104)
bryn.pallesen@stoel.com
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900

Attorneys for ConocoPhillips Alaska, Inc.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF NUIQSUT, et al., | No.: 3:19-cv-00056-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, et al., | |
| Federal Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC. | |
| Intervenor-Defendant. | |

**INTERVENOR-DEFENDANT'S OPPOSITION BRIEF (L.R. 16.3(c)(2))**

*Nuiqsut, et al. v. BLM, et al.*
Case No. 3:19-cv-00056-SLG

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................. 1

II.     BACKGROUND ................................................................................ 3

        A.      The Petroleum Reserve ............................................................ 3

        B.      The IAP EIS ............................................................................ 5

        C.      The 2018-19 Program............................................................... 7

III.    ARGUMENT ..................................................................................... 9

        A.      Plaintiffs' Claims Are Not Justiciable...................................... 9

                1.      Plaintiffs' Claims Are Moot......................................... 9

                2.      Plaintiffs Lack Standing ............................................. 11

        B.      BLM's NEPA Analysis Is Fully Consistent with Applicable Law............ 18

                1.      Plaintiffs Premise Their Claims on the Wrong Standard ............... 19

                2.      BLM Rationally Concluded that the 2018-19 Program Would
                        Have No New Significant Impacts................................... 22

                3.      Plaintiffs Mischaracterize the Record ........................... 26

                4.      Plaintiffs Rely Upon Inapt Case Law.............................. 30

        C.      BLM Considered a Reasonable Range of Alternatives............................. 32

                1.      BLM's Alternatives Satisfy NEPA ................................. 32

                2.      BLM's Alternatives Comply with ANILCA.................................. 38

IV.     CONCLUSION ................................................................................ 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,*
  67 F.3d 723 (9th Cir. 1995) ............................................................................... 39

*Amoco Prod. Co. v. Vill. of Gambell, Alaska,*
  480 U.S. 531 (1987) ............................................................................................ 41

*Blue Mountains Biodiversity Project v. Blackwood,*
  161 F.3d 1208 (9th Cir. 1998) ........................................................................... 31

*Cascadia Wildlands v. Bureau of Indian Affairs,*
  801 F.3d 1105 (9th Cir. 2015) ........................................................................... 30

*Center for Biological Diversity v. BLM,*
  937 F. Supp. 2d 1140 (N.D. Cal 2013) ............................................................ 30

*City of Tanakee Springs v. Clough,*
  915 F.2d 1308 (9th Cir. 1990) ........................................................................... 39

*City of Tenakee Springs v. Clough,*
  750 F. Supp. 1406 (D. Alaska 1990) ................................................................ 40

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation,*
  655 F.3d 1000 (9th Cir. 2011) ..................................................................... 33, 38

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ............................................................................................ 11

*Earth Island Inst. v. U.S. Forest Serv.,*
  697 F.3d 1010 (9th Cir. 2012) ............................................................... 33, 34, 39

*Feldman v. Bomar,*
  518 F.3d 637 (9th Cir. 2008) ............................................................................... 9

*Friends of the Earth, Inc. v. Bergland,*
  576 F.2d 1377 (9th Cir. 1978) ........................................................................... 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ............................................................................................ 11

ii

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

**STOEL RIVES** LLP

510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

*Headwaters, Inc. v. Bureau of Land Mgmt.,*
893 F.2d 1012 (9th Cir. 1989) .......................................................................... 10, 34

*Hoonah Indian Ass'n v. Morrison,*
170 F.3d 1223 (9th Cir. 1999) .................................................................................. 41

*Jicarilla Apache Tribe of Indians v. Morton,*
471 F.2d 1275 (9th Cir. 1973) .................................................................................. 21

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Management,*
387 F.3d 989 (9th Cir. 2004) .............................................................................. 30, 31

*Kunaknana v. Clark,*
742 F.2d 1145 (9th Cir. 1984) .................................................................................. 39

*La. Crawfish Producers Ass'n–W. v. U.S. Army Corps of Eng'rs,*
463 F.3d 352 (5th Cir. 2006) ................................................................................... 33

*Leu v. Int'l Boundary Comm'n,*
605 F.3d 693 (9th Cir. 2010) .............................................................................. 13, 14

*Los Angeles v. Lyons,*
461 U.S. 95 (1983) .................................................................................................... 12

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................................ 11, 12, 14, 18

*Mayfield v. United States,*
599 F.3d 964 (9th Cir. 2010) .................................................................................... 17

*Mo., Kan. & Tex. Ry. Co. v. Ferris,*
179 U.S. 602 (1900) ................................................................................................. 10

*N. Alaska Envtl. Ctr. v. Kempthorne,*
457 F.3d 969 (9th Cir. 2006) ................................................................................. 3, 4

*N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior,*
No. 3:18-cv-00030-SLG, 2018 WL 6424680 (D. Alaska Dec. 6, 2018) ..................... 20

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.,*
545 F.3d 1147 (9th Cir. 2008) ...................................................................... 33, 35, 38

iii

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

*Nat. Res. Def. Council v. Zinke,*
    No. 3:18-cv-00031-SLG, 2018 WL 6424687 (D. Alaska Dec. 6, 2018)....................20

*Native Ecosystems Council v. U.S. Forest Service,*
    428 F.3d 1233 (9th Cir. 2005) ............................................................33, 34

*Native Ecosystems Council v. Weldon,*
    697 F.3d 1043 (9th Cir. 2012) ......................................................................32

*Ninilchik Traditional Council v. United States,*
    227 F.3d 1186 (9th Cir. 2000) ................................................................39, 40

*North Carolina v. Rice,*
    404 U.S. 244 (1971)......................................................................................10

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004)....................................................................................6, 19

*Nw. Envtl. Def. Ctr. v. Gordon,*
    849 F.2d 1241 (9th Cir. 1988) ........................................................................9

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
    402 F.3d 846 (9th Cir. 2005) ........................................................................30

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of the Interior,*
    655 F. App'x 595 (9th Cir. 2016) ................................................................36

*Salmon River Concerned Citizens v. Robertson,*
    32 F.3d 1346 (9th Cir. 1994) ..................................................................19, 22

*San Diego Cty. Gun Rights Comm. v. Reno,*
    98 F.3d 1121 (9th Cir. 1996) ........................................................................12

*Save Strawberry Canyon v. U.S. Dept' of Energy,*
    830 F. Supp. 2d 737 (N.D. Cal. 2011) .........................................................29

*Seattle Audubon Soc'y v. Lyons,*
    871 F. Supp. 1291 (W.D. Wash. 1994).........................................................21

*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002) .....................................................................11

iv

STOEL RIVES LLP

510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

*Sierra Club v. Espy,*
   38 F.3d 792 (5th Cir. 1994) .................................................................. 34

*Sierra Club v. Penfold,*
   857 F.2d 1307 (9th Cir. 1988) ........................................................... 9, 10

*Sierra Club v. Penfold,*
   664 F. Supp. 1299 (D. Alaska 1987) ............................................. 9, 10, 38

*State of Alaska v. Andrus,*
   580 F.2d 465 (D.C. Cir. 1978) ............................................................. 21

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) .............................................................................. 15

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ....................................................................... 12, 17

*Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of the
   Interior,*
   608 F.3d 592 (9th Cir. 2010) ............................................................... 31

*Theodore Roosevelt Conservation P'ship v. Salazar,*
   616 F.3d 497 (D.C. Cir. 2010) .............................................. 19, 20, 21, 22

*W. Oil & Gas Ass'n v. Alaska,*
   439 U.S. 922 (1978) ............................................................................. 21

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ............................................................................. 12

*Wilderness Soc'y, Inc. v. Rey,*
   622 F.3d 1251 (9th Cir. 2010) ............................................................. 13

**Statutes**

16 U.S.C. § 3120(a) .................................................................................. 39

42 U.S.C. § 4321 ............................................................................... passim

42 U.S.C. § 4332(e) .................................................................................. 32

42 U.S.C. § 6504(b) ................................................................................... 4

v

42 U.S.C. § 6506a(a) ............................................................................. 3

**Regulations**

40 C.F.R. § 1501.4(b), (e) .................................................................... 25

40 C.F.R. § 1502.9(c)(1)(ii) ........................................................... 19, 20

40 C.F.R. § 1502.20 ............................................................................ 19

40 C.F.R. § 1502.22 ............................................................................ 22

43 C.F.R. pts. 3000, 3130, 3150, 3160 ................................................ 4

43 C.F.R. pts. 3150, 3160 ..................................................................... 4

43 C.F.R. § 46.140(c) .......................................................................... 20

43 C.F.R. §§ 3131.3, 3162.3-1(h)(1), (2) ............................................. 5

43 C.F.R. § 3162.3-1 ............................................................................ 5

**Other Authorities**

126 Cong. Rec. 29,489 (1980) .............................................................. 3

www.blm.gov/download/file/fid/10986 (last visited July 19, 2019) .............................. 39

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

vi

# I. INTRODUCTION

This lawsuit challenges the approval of ConocoPhillips Alaska, Inc.'s ("ConocoPhillips") 2018-19 winter exploration program (the "2018-19 Program") in the National Petroleum Reserve-Alaska ("NPR-A" or the "Petroleum Reserve"). The 2018-19 Program was authorized on December 7, 2018, and was fully completed on April 28, 2019. As is typical of NPR-A winter exploration programs, all infrastructure associated with the 2018-19 Program was *temporary*, involving ice roads, pads, and airstrips (all of which have melted), personnel camps that have been taken down, and wells that have been drilled and plugged. ConocoPhillips safely and successfully carried out the short-term and routine 2018-19 Program.

Prior to authorizing the 2018-19 Program, the Bureau of Land Management ("BLM") prepared an Environmental Assessment ("EA") under the National Environmental Policy Act ("NEPA"). The EA "tiered" to, and relied on, the 2012 NPR-A Integrated Activity Plan Environmental Impact Statement (the "IAP EIS"), which comprehensively evaluated the impacts of leasing, exploration, and development in the Petroleum Reserve, including anticipated winter exploration activities like the 2018-19 Program. BLM also tiered to and relied upon two additional environmental impact statements ("EISs"). Based on that review, BLM concluded that the 2018-19 Program would have no new significant adverse impacts not already addressed in the prior evaluations, and issued a Finding of No New Significant Impact ("FONNSI"). This is the

1

same practice BLM has followed for *every* winter exploration program in the Petroleum Reserve for two decades.

Plaintiffs assert that this level of analysis is insufficient to comply with NEPA and Section 810(a) of the Alaska Native Interest Lands Conservation Act ("ANILCA"). But the Court lacks jurisdiction over these claims for two reasons. First, Plaintiffs' claims are moot because the 2018-19 Program is fully complete and no effective relief can be granted. Vacatur of the 2018-19 Program would be meaningless, and a judicial declaration would amount to no more than an improper advisory opinion about past events. Second, Plaintiffs lack standing because they have produced no evidence of any harm suffered as a result of the 2018-19 Program. Although the 2018-19 Program was completed before Plaintiffs filed their Opening Brief, they do not provide a single declaration showing that the interests of any member were actually injured by the 2018-19 Program or that the 2018-19 Program has ongoing impacts after completion. Instead, the declarations oddly discuss the 2018-19 Program as if it were a *future event*, and speculate that it could cause harms (that did not happen). This hypothetical prognostication is insufficient to establish standing.

In any event, Plaintiffs' claims have no merit. As set forth below, Plaintiffs' claims are premised upon a misunderstanding of BLM's tiered NEPA review, ignore detailed analyses in the record, and demand a level of analysis that is not required by statute or case law. Accordingly, ConocoPhillips respectfully requests that this Court

2

grant summary judgment in favor of the Federal Defendants and ConocoPhillips on all of Plaintiffs' claims.

## II. BACKGROUND

**A.    The Petroleum Reserve.**

President Harding established the Naval Petroleum Reserve No. 4 on Alaska's North Slope in 1923.[1] In 1976, Congress enacted the National Petroleum Reserves Production Act ("NPRPA"), and transferred authority over the reserve to the Secretary of Interior (delegated to BLM).[2] The reserve remains the largest single unit of public land in the United States, encompassing approximately 23.6 million acres.[3]

In 1980, Congress renamed the Naval Petroleum Reserve as the NPR-A and amended the NPRPA to direct the Secretary of the Interior to carry out an "expeditious program of competitive leasing of oil and gas" within the Petroleum Reserve.[4] This was driven by the fuel crisis of the 1970s[5] and the recognition that "we can no longer delay efforts which would increase the domestic supply of oil and gas and lessen our reliance on imports."[6]

---

[1] *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 973–74 (9th Cir. 2006).

[2] *Id*. at 973.

[3] *Id*.

[4] Department of the Interior Appropriations Act, Fiscal Year 1981 (Pub. L. No. 96-514) (codified at 42 U.S.C. § 6506a(a)).

[5] *N. Alaska Envtl. Ctr.*, 457 F.3d at 973.

[6] 126 Cong. Rec. 29,489 (1980) (statement of Sen. Stevens).

3

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

The NPRPA also ensures that environmental values are served in a variety of ways, including the protection of areas "designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value[.]"[7] Pursuant to this provision, five "Special Areas" have been established in the Petroleum Reserve.[8] For portions of the Petroleum Reserve where leasing is allowed, BLM's administration occurs through a structured three-phase process: (1) leasing; (2) exploration; and (3) development.[9] Each stage is subject to independent decision-making and approval by BLM (as well as by other local, state, and federal agencies), and each stage requires NEPA review.[10]

At the leasing stage, BLM determines which lands to make available for leasing, which lands to defer or make unavailable, and which protective stipulations and other mitigation measures to apply to protect surface resources.[11] At the exploration stage, the leaseholder may conduct surface-disturbing activities such as geophysical exploration, seismic surveys, or the drilling of subsurface or exploratory wells, after obtaining permits from BLM.[12] BLM may approve or reject the exploration plan or impose "[a]dditional

---

[7] 42 U.S.C. § 6504(b).

[8] AR2734.

[9] *N. Alaska Envtl. Ctr.*, 457 F.3d at 977; *see* 43 C.F.R. pts. 3000, 3130, 3150, 3160.

[10] *N. Alaska Envtl. Ctr.*, 457 F.3d at 977.

[11] *Id.*

[12] 43 C.F.R. pts. 3150, 3160.

4

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

stipulations needed to protect surface resources and special areas . . . at the time the surface use plan and permit to drill are approved."[13] The development stage may involve more extensive surface activities, such as the construction of gravel roads and airstrips, pipelines, and permanent facilities. This stage requires BLM's approval of a drilling and surface use operations plan, as well as other approvals.[14]

## B.    The IAP EIS.

Pursuant to President Obama's directive, BLM finalized an Integrated Activity Plan in 2013 (the "IAP") covering the entire Petroleum Reserve.[15] The IAP makes approximately 11.8 million acres available for oil and gas leasing.[16] The IAP also establishes performance-based stipulations and best management practices ("BMPs") applicable to oil and gas activities (including winter exploration activities) in the Petroleum Reserve, and restricts surface infrastructure in certain areas.[17]

The IAP is supported by the comprehensive IAP EIS.[18] The IAP EIS "contains five alternatives that provide a broad range of oil and gas leasing availability, surface protections, and Special Area designations."[19] To evaluate the environmental impacts of

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

---

[13] 43 C.F.R. §§ 3131.3, 3162.3-1(h)(1), (2).

[14] 43 C.F.R. § 3162.3-1.

[15] AR0003; AR0006.

[16] AR2628.

[17] *Id.*

[18] *See* AR0001-AR2622.

[19] AR0008.

5

each of these alternatives, BLM recognized that there are "many uncertainties associated with projecting future petroleum exploration and development" and, accordingly, developed hypothetical exploration and development scenarios for each of the alternatives.[20] To account for uncertainty, BLM made a series of "reasonable assumptions"[21] conservatively designed "to minimize the chance that the resultant impact analysis will understate potential impacts."[22] The IAP EIS considered all aspects of winter exploration activities in the Petroleum Reserve, and evaluated ranges of those activities across alternatives.[23] The actual amount of exploration that has occurred in the Petroleum Reserve since 2013 is well below the upper end of those ranges.[24]

Under the IAP EIS, BLM has approved exploration programs in each of the years 2013, 2015, 2017, and 2018.[25] In approving each of those programs, BLM prepared an EA to comply with NEPA, and incorporated and tiered from the IAP EIS.[26] Each of those EAs found that the exploration activities would have no new significant impacts that

---

[20] AR0581.

[21] *Id.*

[22] *Id.*

[23] *See infra* § III.B.2.

[24] *See* Declaration of Lorna K. Richmond in Support of Intervenor-Defendant's Opposition Brief ("Richmond Decl.") ¶ 8.

[25] *See* AR8550-AR8552. Under these programs, a total of 18 exploration wells and 10 appraisal wells have been drilled.

[26] BLM has approved 36 exploration programs in the NPR-A dating back to 1998. *All* of these approvals were reviewed with EAs and, insofar as ConocoPhillips is aware, *none* of those EAs were found to be unlawful. AR8542-AR8852.

6

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

were not already considered in the IAP EIS, and there is no evidence contradicting those findings. In contrast, for development activities—such as the construction of the GMT-1 and GMT-2 projects—BLM prepared supplemental EISs that tier to, and incorporate by reference, the IAP EIS and the earlier 2004 Alpine Satellites Development Plan EIS.[27]

Numerous advocacy groups, including some of the Plaintiffs, commented on the draft IAP EIS, and BLM responded to their comments with detailed explanations and changes to the IAP EIS.[28] No party challenged the IAP EIS (within the 60-day limitations period), the GMT-1 project, the GMT-2 project, or *any* of the exploration program authorizations (until this lawsuit).

## C. The 2018-19 Program.

ConocoPhillips submitted its Surface Use Plan of Operations for the Exploration Program in August 2018[29] and, in October 2018, submitted a Request for Right of Way Permit;[30] requests to deviate from IAP EIS BMPs A-5, B-2, and B-2g;[31] and applications

---

[27] *See* AR2743, AR4520. The IAP EIS contemplates that activities requiring BLM approval such as a "proposed exploratory drilling plan" or "proposed construction of infrastructure for development of a petroleum discovery . . . would require further NEPA analysis." AR0023.

[28] *See, e.g.*, AR1735-AR1745.

[29] AR6939-AR6959.

[30] AR6960.

[31] AR7795; AR7797; AR7802; AR7826.

7

for permits to drill.[32] BLM released a draft EA on November 8, 2018,[33] after issuing its

ANILCA Section 810 approval on November 7, 2018.[34] On December 7, 2018, after

Plaintiffs and ConocoPhillips submitted comments on the draft EA,[35] BLM issued the

final EA, FONNSI, and Decision Record approving the 2018-19 Program with minor

modifications.[36] The final EA includes responses to all public comments.[37]

　　　Under the Decision Record and associated permits approving the 2018-19

Program, ConocoPhillips was authorized to build up to 57 miles of ice roads, up to 42.7

miles of snow trails, up to 23 ice pads of various dimensions, one ice airstrip, and

temporary camps capable of housing 545 people; in addition to conducting exploration

drilling at up to six potential sites, testing/recompleting two existing well sites, gauging

monitoring at two existing well sites, and retrieving a data logger at one location.[38]

　　　In carrying out the program, ConocoPhillips built 15 ice pads, 1 ice airstrip, and

57 miles of ice roads plus two additional miles for lake access; drilled six new wells; and

tested six wells, some of which were drilled as part of the 2018-19 Program, and some of

---

[32] AR7807; AR7831; AR7850; AR7869; AR7888; AR7905; AR7924; AR7943; AR7962; AR7981.

[33] AR8467.

[34] AR8581.

[35] *See* AR8002; AR8461.

[36] AR8467; AR8587; AR8494.

[37] AR8555-AR8580.

[38] AR8582; AR8595.

8

which had been previously drilled.[39] The 2018-19 Program was fully completed on April 28, 2019.[40]

## III.  ARGUMENT[41]

**A.    Plaintiffs' Claims Are Not Justiciable.**

**1.    Plaintiffs' Claims Are Moot.**

ConocoPhillips agrees with and adopts BLM's argument that Plaintiffs' claims are moot because the 2018-19 Program is fully complete and there is no "'present controversy as to which effective relief can be granted.'"[42] All equipment has been demobilized. The authorized ice roads and ice pads have melted. The exploration and appraisal wells have been capped.[43] No structures remain in the 2018-19 Program area.[44] There is no activity to enjoin, and vacatur of the expired 2018-19 Program approval would be a meaningless exercise.

The Ninth Circuit's decision in *Sierra Club v. Penfold* is instructive.[45] There, the court found a NEPA challenge to a completed mining operation to be moot, in part

---

[39] Richmond Decl. ¶ 4.

[40] Richmond Decl. ¶ 5.

[41] ConocoPhillips adopts and incorporates BLM's legal standard. *See* Dkt. 30 at 13-14.

[42] *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008) (quoting *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988)).

[43] Richmond Decl. ¶¶ 5-6.

[44] Richmond Decl. ¶¶ 5-7.

[45] 857 F.2d 1307, 1317 (9th Cir. 1988).

9

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

because the completed mining operation could not be moved and the impacts of the operation could not be reversed.[46] The court reasoned: "[E]ven if we assume BLM's decision making process is unlawful, no adequate remedy exists. Unlike a power transmission line, a completed mining operation cannot be moved. The impacts of the Plan mines are not remediable since we cannot order that the Plans be 'unmined.'"[47] The same is true here. The ice roads and pads have already melted and the wells cannot be "undrilled."[48] This case presents a moot question that "require[s] no answer,"[49] and should be dismissed.

Nor does this case fall within the exception to the mootness doctrine for cases that are "capable of repetition, yet evading review." The Ninth Circuit has stated that "'[w]here prompt application for a stay pending appeal can preserve an issue for appeal, the issue is not one that will evade review.'"[50] Plaintiffs had ample time to file a complaint and move for a preliminary injunction. Instead, Plaintiffs waited nearly four

---

[46] *Id.*

[47] *Id.* at 1318.

[48] *See also Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1978) (NEPA challenge to completed exploratory drilling operation moot); *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015–16 (9th Cir. 1989) (NEPA challenge moot where timber on disputed units had been cut and half hauled away at time of appeal).

[49] *Mo., Kan. & Tex. Ry. Co. v. Ferris*, 179 U.S. 602, 606 (1900); *accord North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam) (federal courts lack jurisdiction "to decide moot questions or abstract propositions," because "moot questions require no answer" (internal quotation marks, citations, and alterations omitted)).

[50] *Headwaters, Inc.*, 893 F.2d at 1016 (citation omitted).

10

months to file their Complaint and nearly another month to file their Amended

Complaint, and then proceeded to file their summary judgment motion in May 2019, after

the 2018-19 Program was complete. Nothing prevented Plaintiffs from filing this lawsuit

earlier, before the alleged deficiencies became moot for lack of an effective remedy.

## 2. Plaintiffs Lack Standing.

Additionally, Plaintiffs' lawsuit must be dismissed for lack of Article III standing.

To satisfy Article III's standing requirements, Plaintiffs must demonstrate that at least

one of their members:

> (1) . . . has suffered an "injury in fact" that is (a) concrete and
> particularized and (b) actual or imminent, not conjectural or
> hypothetical; (2) the injury is fairly traceable to the
> challenged action of the defendant; and (3) it is likely, as
> opposed to merely speculative, that the injury will be
> redressed by a favorable decision.[51]

In environmental cases, "[t]he relevant showing for purposes of Article III standing . . . is

not injury to the environment but injury *to the plaintiff*."[52] Plaintiffs bear the burden of

establishing their standing to bring suit,[53] and they "must demonstrate standing for each

claim [they] seek[ ] to press."[54] At the summary judgment stage, a plaintiff "must 'set

---

[51] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (discussing associational standing requirements).

[52] *Friends of the Earth, Inc.*, 528 U.S. at 181 (emphasis added).

[53] *See Lujan*, 504 U.S. at 561.

[54] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

11

forth' by affidavit or other evidence 'specific facts'" demonstrating the three

requirements for Article III standing.[55]

Although Plaintiffs submit nine declarations from various of their members,[56] all

of these declarations fail to demonstrate *any* (let alone all) of the required elements of

standing.

### a. Plaintiffs have not established injury-in-fact.

Plaintiffs must present specific facts establishing a harm suffered by at least one of

their members that is "concrete" and "actual or imminent, not 'conjectural' or

'hypothetical.'"[57] The injury must be likely, not an "ingenious academic exercise in the

conceivable."[58] Where "plaintiffs seek declaratory and injunctive relief only, there is a

further requirement that they show a very significant possibility of future harm; it is

insufficient for them to demonstrate only a past injury."[59] The primary flaw with

Plaintiffs' declarations is that by the time Plaintiffs moved for summary judgment, the

2018-19 Program was *already completed*. At this point in time, there can be no credible

---

[55] *Lujan*, 504 U.S. at 561 (citation omitted).

[56] *See* Dkts. 27-1 through 27-9.

[57] *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983)).

[58] *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–99 (2009) (internal quotation marks and citation omitted).

[59] *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).

12

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

allegation of *imminent* future harm. The 2018-19 Program has been complete for months and it does not conceivably pose a risk of harm to anybody.

None of the nine declarants acknowledge that the 2018-19 Program is complete (even though most of the declarations are signed after the completion date). They also do not identify any actual injury that occurred from the 2018-19 Program.[60] Instead, Plaintiffs' declarations make predictions about the possible impact of the 2018-19 Program *as if it had not yet happened*. This is akin to predicting the outcome of *yesterday's* baseball game without acknowledging that the game is over and the box score has been published. It is a hypothetical exercise that ignores present facts. The declarants offer no allegations that the completed program will cause imminent future harm.

For example, Martha Itta states that "[t]he area where CPAI conducts its current winter exploration activities is extremely important to the Village's members" because "[i]t is where we fish and hunt," but then fails to offer facts showing that the 2018-19 Program had any adverse impact on Ms. Itta or other Nuiqsut residents with respect to fishing or hunting.[61] Ms. Itta states that "[w]e will be hungry if we can't get our

---

[60] Even if they did, "[p]ast injury is not sufficient to confer standing" for prospective relief (*Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010)), and "allegations of past injury alone are not sufficient to confer standing" for a declaratory judgment action (*Leu v. Int'l Boundary Comm'n*, 605 F.3d 693, 694 (9th Cir. 2010) (internal citation omitted)).

[61] Dkt. 27-1 ¶ 10.

13

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

caribou."[62] But Ms. Itta does not testify that these events occurred during the 2018-19 Program, or that such events are imminent after the expiration of the 2018-19 Program.

Similarly, Richard Steiner suggests that a "major oil spill[ ] in pristine, sensitive high-latitude environments *can cause* long lasting, and permanent, ecological damage."[63] But no major spill occurred during the 2018-19 Program, and thus Mr. Steiner's concern did not materialize and cannot occur in the future because the program has been complete for months. Brendan Cummings hypothesizes that "[o]il and gas exploration activities under ConocoPhillips' 2018-19 exploration plan *would harm* important habitat and disturb species such as the polar bear and the yellow-billed loon that are already imperiled by global warming and ongoing oil development."[64] But, like the rest of the declarants, Mr. Cummings presents no facts demonstrating if and how the completed 2018-19 Program harmed or otherwise disturbed the polar bear or the yellow-billed loon.

None of Plaintiffs' declarations present evidence showing "that the injury is *certainly* impending."[65] Rather, they surmise about effects that they believe *could* occur—despite the fact that the declarations were submitted *after* the program

---

[62] *Id.* There is no indication that the Native Village of Nuiqsut approved filing this lawsuit in its name. Ms. Itta's declaration does not say that the present litigation was ratified by or supported by the Village's Council, nor have any Council members submitted a declaration.

[63] Dkt. 27-4 ¶ 10 (emphasis added).

[64] Dkt. 27-5 ¶ 24 (emphasis added).

[65] *Lujan*, 504 U.S. at 564 n.2 (internal quotation marks and citation omitted).

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

completed—and identify no harms that actually occurred. Plaintiffs therefore fail to demonstrate injury-in-fact.

### b. Plaintiffs do not establish causation.

For many of the same reasons, Plaintiffs fail to show that their hypothetical injuries were caused by the 2018-19 Program. To satisfy the second element of standing, a plaintiff must demonstrate "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant."[66] Plaintiffs do not make this necessary connection. *None* of Plaintiffs' supporting declarations identify any harm to the declarants specifically caused by the 2018-19 Program. Instead, the declarants speculate about the *potential* effects of exploration and other oil activities in the NPR-A more generally.

For example, Ms. Itta states that "[t]he community of Nuiqsut is surrounded by oil wells from the east now to the west, and the oil activities are threatening the Village members' way of life"[67] and that "[ConocoPhillips]'s exploration activities and the other oil activities in the region affect every aspect of our lives."[68] Similarly, Rosemary Ahtuangaruak declares that she "fear[s] that industrial oil and gas exploration and development activities in the Reserve and in the Beaufort Sea, like those proposed and pursued by ConocoPhillips Alaska and Hilcorp, respectively, will continue to change our

---

[66] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 1016–17 (1998).

[67] Dkt. 27-1 ¶ 7.

[68] Dkt. 27-1 ¶ 8.

15

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

natural environment in negative ways and thereby affect [her] ability to live and to effectively share and pass on our traditional way of life," adding that "[i]ncreased contact with these unnatural activities causes a cascade of reactions."[69] And Dan Ritzman states that "[o]il and gas development in the Reserve will also add stress to a rapidly changing environment hammered by global warming, loss of permafrost, and record summer sea-ice loss."[70] None of these concerns are tied to the now-complete 2018-19 Program.

All of the declarants discuss the 2018-19 Program as if it has not yet commenced when, in fact, it was complete when they submitted their declarations.[71] Ms. Itta, purporting to speak for the Native Village of Nuiqsut, declares that "[w]e *will* be hungry *if we can't get* our caribou."[72] Ms. Kolton states that "[i]ncreased stress on the Arctic from oil and gas activities *could* have lasting detrimental impacts on the ecosystem, the wildlife, and other subsistence resources of the Arctic[.]"[73] Mr. Keever and Mr. Scott worry that the 2018-19 Program "*will likely* disturb yellow-billed loons or drive them

---

[69] Dkt. 27-2 ¶ 26.

[70] Dkt. 27-9 ¶ 11.

[71] This flaw also pervades Plaintiffs' Opening Brief. *See, e.g.*, Dkt. 27 at 15 (claiming that the "winter exploration program *will* directly and irreparably injure [Plaintiffs' members'] interests").

[72] Dkt. 27-1 ¶ 5 (emphases added).

[73] Dkt. 27-3 ¶ 8 (emphasis added).

16

away."[74] Mr. Steiner states that he "feel[s] a major spill from the project is too great a risk."[75]

Article III standing requires more, namely a factual showing that an injury is "likely," not merely an "ingenious academic exercise in the conceivable."[76] The completed 2018-19 Program either caused harm to Plaintiffs or did not. Plaintiffs have presented no evidence from which this Court can conclude that any of the Plaintiffs suffered injury due to the 2018-19 Program. No environmental harm occurred, and no facts show that caribou have been displaced or that yellow-billed loons (which are only present in the summer) have been affected. Plaintiffs instead ask this Court to allow them to proceed with this lawsuit because an event that has already happened could have caused (but did not cause) future harm. That is both insufficient and unreasonable.[77]

### c. Even if Plaintiffs showed injury-in-fact, it is not redressable.

Finally, Plaintiffs lack standing because their requested relief—*i.e.*, that this Court "vacate and declare unlawful BLM's record of decision and EA"[78]—will not redress any injury alleged by Plaintiffs in this case.[79] To begin with, Plaintiffs have failed to identify

---

[74] Dkt. 27-7 ¶ 23 (emphasis added); *accord* Dkt. 27-5 at ¶ 24.

[75] Dkt. 27-4 ¶ 19.

[76] *Summers*, 555 U.S. at 497–99 (internal quotation marks and citation omitted).

[77] *See Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (neither speculation nor subjective apprehension about future harm supports standing).

[78] Dkt. 27 at 43.

[79] *See Mayfield*, 599 F.3d at 969.

17

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

any member who was actually injured in fact by the 2018-19 Program or who faces an imminent injury now that the 2018-19 Program is over. There is nothing to redress. Moreover, assuming solely for purposes of argument that Plaintiffs have established an injury to at least one of their members, a declaration from this Court that BLM did not comply with NEPA or ANILCA—which ConocoPhillips steadfastly maintains would not be justified on the record—would not redress any such injury. The 2018-19 Program, including demobilization, is complete. Any future exploration programs by ConocoPhillips will require a new BLM approval, on a new record, and any such future programs are not at issue here. Plaintiffs have challenged a program that has been completed and for which a declaration about BLM's alleged failure to comply with NEPA or ANILCA will have no consequence.

In sum, Plaintiffs fail to establish the "irreducible constitutional minimum of standing," and their claims should be dismissed.[80]

## B.  BLM's NEPA Analysis Is Fully Consistent with Applicable Law.

Plaintiffs' arguments also fail on the merits. BLM took the required "hard look" at the consequences of the 2018-19 Program by producing a thorough EA that was tiered to three relevant EISs. Nothing more was required under NEPA.

---

[80] *Lujan*, 504 U.S. at 560.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

1.      **Plaintiffs Premise Their Claims on the Wrong Standard.**

Plaintiffs' lead argument is that BLM was required to produce *another* EIS specifically for the 2018-19 Program. As set forth below, this argument is premised on a misunderstanding of NEPA.

NEPA and its implementing regulations *encourage* agencies, like BLM here, to rely upon and tier to comprehensive EISs that address the activity in question.[81] In this context, "[a] comprehensive programmatic impact statement generally obviates the need for a subsequent site-specific or project-specific impact statement, *unless new and significant environmental impacts arise that were not previously considered*."[82] As the D.C. Circuit explained:

> In general, an agency preparing an environmental assessment for a drilling permit is not required to reevaluate the analyses included in the relevant project's EIS. Instead, NEPA regulations allow "tiering," which permits site-specific environmental analyses to incorporate by reference the general discussions of prior, broader environmental impact statements. . . . While courts have required environmental assessments to analyze certain impacts for the first time when the broader analysis did not address the impact in question *at*

---

[81] *See* 40 C.F.R. § 1502.20.

[82] *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994) (emphasis added); *see Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 511–12 (D.C. Cir. 2010); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72–73 (2004) ("A regulation of the Council on Environmental Quality requires supplementation where '[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'") (quoting 40 C.F.R. § 1502.9(c)(1)(ii) (2003)).

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

*all, see, e.g., Kern,* 284 F.3d at 1078, this is not such a case.[83]

The Department of Interior's NEPA regulations similarly explain that "[t]iering to the programmatic or broader-scope environmental impact statement would allow the preparation of an environmental assessment and a finding of no significant impact for the individual proposed action, so long as any previously unanalyzed effects are not significant."[84] Plaintiffs do not cite these plainly applicable standards, much less attempt to apply them. For this reason alone, the Court should dismiss Plaintiffs' claims challenging BLM's decision to prepare an EA and issue a FONNSI.[85]

      Plaintiffs instead rely upon an argument with a faulty premise. They argue that BLM was required to prepare *another, new* EIS[86] because there is supposedly "substantial uncertainty about how the [Teshekpuk Caribou] herd will respond to this

---

[83] *Theodore Roosevelt Conservation P'ship,* 616 F.3d at 511–12.

[84] 43 C.F.R. § 46.140(c); *see id.* ("A finding of no significant impact other than those already disclosed and analyzed in the environmental impact statement to which the environmental assessment is tiered may also be called a 'finding of no *new* significant impact.'" (emphasis in original)); *see also* 40 C.F.R. § 1502.9(c)(1)(ii) (standard for supplementing an EIS).

[85] *See N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior,* No. 3:18-cv-00030-SLG, 2018 WL 6424680, at *5 (D. Alaska Dec. 6, 2018) ("Plaintiffs have not asserted that a supplemental EIS is necessary in this case; rather, they maintain an entirely new EA or EIS is required. As such, Plaintiffs have waived any potential supplementation claims by failing to assert them in their Amended Complaint."); *Nat. Res. Def. Council v. Zinke,* No. 3:18-cv-00031-SLG, 2018 WL 6424687, at *4 (D. Alaska Dec. 6, 2018) (same).

[86] Plaintiffs frame their EIS argument to avoid mentioning the supplementation standard. However, if BLM determined in its EA that there were new significant impacts, it would have correctly prepared a supplemental EIS, not a wholly new EIS.

20

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

increasing, intensive winter exploration and other development activity," and that "BLM could not reach a no significant impacts finding without attempting to fill the information gaps" in the EA regarding these "potentially significant impacts."[87] Plaintiffs make similar claims about BLM's subsistence analysis and cumulative effects assessment.[88]

But BLM's decision to tier from the IAP EIS and prepare an EA and FONNSI is not judged by whether there is "substantial uncertainty" or missing information. Indeed, it is well-established that "NEPA cannot be 'read as a requirement that [c]omplete information concerning the environmental impact of a project must be obtained before action may be taken.'"[89] "It is not required that every conceivable impact be analyzed, or that action be deferred until all studies have been done that might be done."[90] For example, in *Theodore Roosevelt*, the D.C. Circuit rejected this same argument, holding that BLM was not required to "fill in any holes" because, as here, the programmatic EIS generally addressed the topics at issue and the agency was not obligated to reevaluate

---

[87] Dkt. 27 at 21-24.

[88] Dkt. 27 at 29 (asserting that EAs and EISs "raise substantial questions as to whether the winter exploration program may significantly affect subsistence activities in this project area"), 33 (asserting that earlier NEPA documents "point to potentially significant effects and demonstrate the need for detailed information at this stage").

[89] *State of Alaska v. Andrus*, 580 F.2d 465, 473–74 (D.C. Cir. 1978) (quoting *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280 (9th Cir. 1973)), *vacated in part sub nom. W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978); *see also Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1318 (W.D. Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996).

[90] *See, e.g.*, *Lyons*, 871 F. Supp. at 1318.

those analyses.[91] In fact, when preparing the IAP EIS, BLM was required by regulation to, and did, identify areas of uncertainty and missing information.[92]

BLM was *not*, however, required to "fill the information gaps" in subsequent analyses tiered to the IAP EIS in order to reduce or eliminate the supposed "substantial uncertainty."[93] Rather, BLM was required to determine, based on the best *available* information, whether there were any "new and significant environmental impacts . . . that were not previously considered."[94] Plaintiffs' failure to address this essential question requires dismissal of their claims.

## 2. BLM Rationally Concluded that the 2018-19 Program Would Have No New Significant Impacts.

Applying the correct standard, it is clear that BLM's FONNSI satisfies NEPA requirements. The IAP EIS comprehensively evaluates the effects of winter exploration activities in the NPR-A. BLM properly tiered from the IAP EIS, performed an evaluation in the EA of the proposed 2018-19 Program that considered new information, and rationally concluded that "the preferred alternative would not result in significant impacts

---

[91] *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 511–12.

[92] *See* 40 C.F.R. § 1502.22 ("When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking."). Plaintiffs do not challenge (and have never challenged) the IAP EIS's compliance with 40 C.F.R. § 1502.22.

[93] *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 511–12.

[94] *Salmon River Concerned Citizens*, 32 F.3d at 1356.

22

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

beyond those already addressed in the [IAP EIS and associated ROD]."[95] That is

precisely what the law required BLM to do.

In the IAP EIS, BLM evaluated the environmental impacts of five different

alternatives that included a range of scenarios contemplating different levels of winter

exploration activity.[96] It described in detail all of the activities involved in carrying out a

winter exploration program, including construction of ice roads, snow trails, ice airstrips,

and ice pads; transportation of personnel and equipment; and drilling and plugging of

exploration wells.[97] For example, in one paragraph, BLM described the elements of

exploration activity as follows:

> Exploration operations require movement of heavy equipment
> (drilling rigs, drill pipe, and camps) and large amounts of
> materials (steel casing, drilling mud, cement, and fuel) to
> remote locations. Approved low-ground pressure vehicles
> would be used to transport lighter equipment and personnel
> via snow-packed trails to construct ice pads, roads, and
> airstrips. Transportation logistics must also allow for regular
> crew changes and resupply. An exploration well crew could
> consist of 30 to 60 people, working 1- to 2-week shifts.[98]

BLM then produced hypothetical development scenarios, for the purpose of evaluating

impacts, and those scenarios included detailed estimates of winter exploration activity

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

---

[95] AR8477.

[96] *See generally* AR0541-AR0614.

[97] *See* AR0552-AR0556.

[98] AR0554.

23

levels, along with other oil and gas activities.[99] These scenarios covered all areas in the Petroleum Reserve open to leasing for which exploration and development activities could occur, including the area covered by the 2018-19 Program.[100]

Specifically, for exploration activities, the IAP EIS assumed that up to 128 oil and gas exploration wells would be drilled, up to 128 oil and gas delineation wells would be drilled, up to 108,734 miles of ice roads and snow-packed trails would be constructed, and up to 125 ice airstrips would be constructed.[101] The environmental impact analyses in Chapter 4 of the IAP EIS specifically evaluate the potential effects associated with each of the hypothetical scenarios. BLM addressed the effects of exploration activities in Chapter 4, including specifically in the wildlife (caribou) section and in the subsistence section.[102] Plaintiffs ignore these obviously relevant assumptions and evaluations in the IAP EIS. Plaintiffs also fail to identify *any* new exploration activities or areas that are not already addressed in the IAP EIS.

As it did for its previous three winter exploration program approvals dating back to 2013 (none of which were challenged by Plaintiffs), BLM prepared an EA that tiered from, and incorporated by reference, the IAP EIS, as well as other relevant NEPA

---

[99] AR0580-AR0614; AR0651-AR0652.

[100] AR0032-AR0049; *see also* AR2540; AR2542; AR2544; AR2546; AR2548.

[101] AR0606-AR0608.

[102] AR0721-AR0742; AR0821-AR0836; AR0651-AR0652; *see* AR0136-AR0137; AR0142-AR0145.

24

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

analyses.[103] Consistent with applicable law (described above), BLM explained in the EA that if it "determines that the preferred alternative would not result in significant impacts *beyond those already addressed in the IAP/EIS* . . . and ROD . . . , the BLM would prepare a Finding of No New Significant Impacts and Decision Record approving the selected alternative."[104]

Typical of a tiered NEPA review, BLM's EA addresses additional, relevant topics with specificity (including topics raised in Plaintiffs' comments), while relying upon the analyses in the IAP EIS for effects of activities that were comprehensively addressed in that document.[105] The EA included a detailed, three-page assessment of all new information regarding potential subsistence impacts.[106] It also included detailed assessments of three discrete areas for which BLM granted exceptions to certain BMPs contained in the IAP EIS.[107] BLM included specific responses to all public comments, even though it was not required to solicit any public comments.[108] BLM rationally concluded that there were no new significant impacts beyond those already evaluated in

---

[103] AR8476-AR8477; AR8542-AR8552.

[104] AR8477 (emphasis added).

[105] *See, e.g.*, AR8478-AR8481; AR8496-AR8498.

[106] AR8496-AR8498.

[107] AR8487-AR8492; AR8499-AR8502.

[108] AR8555-AR8580; *see* 40 C.F.R. § 1501.4(b), (e) (public comment period not required for EA).

25

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

the IAP EIS.[109] BLM also determined that the 2018-19 Program was "in conformance" with the IAP EIS, including all of the mitigation measures contained in the IAP EIS.[110] In short, BLM's tiered NEPA review met (and exceeded) all applicable legal requirements.

### 3. Plaintiffs Mischaracterize the Record.

Plaintiffs generally ignore BLM's reasoned analysis and instead cherry-pick statements from the IAP EIS to attempt to manufacture contradictions between the IAP EIS and the EA.[111] But as addressed above, the IAP EIS is *part of* the agency's NEPA analysis here, and BLM was required to evaluate whether there were *additional, new* significant impacts that were not evaluated in the IAP EIS. In a tiered review, the EIS can address significant impacts and the subsequent EA can find that any *additional* impacts on the same resource are not significant. In addition, Plaintiffs' specific claims about caribou, subsistence, and cumulative effects are contradicted by the record.

*Caribou*. Plaintiffs repeatedly mischaracterize BLM's treatment of potential effects on caribou. For example, Plaintiffs state that "no herd has previously been exposed to intensive winter exploration activities in its winter range."[112] This ignores both the IAP EIS's extensive evaluation of exploration activities and the fact that

---

[109] AR8496; AR8503; AR8591; *see also* AR8592.

[110] *See* AR8597.

[111] *See* Dkt. 27 at 24 ("These conclusions in the [IAP EIS] run contrary to BLM's assertion in the EA that caribou impacts from winter drilling will be minor."), 27 ("Previous agency analysis points to the type of effects BLM describes in the EA as being potentially significant[.]").

[112] Dkt. 27 at 21.

26

exploration activities have occurred in the winter range in three previous years since the IAP EIS was issued (and for many years before that).[113] As another example, Plaintiffs cite a single paragraph from the IAP EIS stating, in part:

> It is not known what population effects might occur if the majority of the herd were to have year-round contact with oil and gas facilities and activities. Despite the current lack of evidence regarding adverse effects from seismic exploration and village contact, negative effects on caribou energy budgets during winter could result from this new situation. Such an effect could be manifested through increased winter mortality itself, or a reduction in calf productivity.[114]

However, Plaintiffs conveniently omit the preceding paragraphs, which discuss how the preferred alternative is anticipated to have minor impacts on the Teshekpuk Herd, in large part due to the exclusion of significant calving, foraging, and insect-relief areas from oil and gas activities.[115] Plaintiffs also ignore BLM's detailed assessment of all caribou herds in Chapter 3 of the IAP EIS.[116] And, again, BLM transparently addressed the areas of uncertainty associated with those assessments.

***Subsistence***. Plaintiffs' similarly present a misleading picture of BLM's subsistence analyses. For example, Plaintiffs select a single paragraph from the EA, accusing BLM of "impermissibly attempting to explain away [winter exploration impacts on Nuiqsut subsistence] by referencing discussion of subsistence impacts in the GMT2

---

[113] AR0580-AR0614; AR0651-AR0652; *see* AR8542-AR8552.

[114] Dkt. 27 at 23.

[115] AR1065-AR1067.

[116] AR0294-AR0306.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

supplemental EIS and unspecified 'previous' analysis of the cumulative effects on subsistence and socioculture systems."[117] But Plaintiffs omit the immediately preceding paragraph, which explains:

> Because subsistence, sociocultural systems, and environmental justice are inherently interconnected and because potential impacts to these resources have already been comprehensively analyzed for the NPR-A IAP (2012) and more recently for the GMT-1 project (BLM 2015) and GMT-2 project (BLM 2018), for the purpose of this EA they are briefly summarized and analyzed together.[118]

Indeed, the section of the IAP EIS addressing subsistence (§ 3.4.3) appears to be the longest of any subchapter in the "Affected Environment" chapter at nearly 50 pages long, with pages 403 through 411 discussing subsistence activities in Nuiqsut in specific detail. The word "subsistence" appears some 894 times in the first three chapters of the IAP EIS alone.[119] And, subsistence is also addressed in detail in the EA.[120] This comprehensive record directly contradicts Plaintiffs' false assertion that "no previous EIS in the record specifically analyzes the effects of winter exploration [on subsistence] in this project area."[121]

---

[117] Dkt. 27 at 28.

[118] AR8496-AR8497; *see also* AR8497-AR8498.

[119] *See* AR0015-AR0529.

[120] AR8496-AR8498.

[121] Dkt. 27 at 29.

28

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

***Cumulative Effects***. Plaintiffs' allegations regarding cumulative effects fare no better. By premising their argument on showing a "potential for cumulative impacts," Plaintiffs again forget that BLM was required only to evaluate whether there are any new significant effects that were not already considered.[122] But, in any event, the cumulative effects associated with the 2018-19 Program, the GMT-2 project, and the geotechnical surveys are fully addressed in the record.[123] BLM, for instance, specifically addressed the potential cumulative impacts of those and additional projects occurring in or around the Petroleum Reserve during winter 2018 in the EA (including responses to specific comments)[124] and concluded that the 2018-19 Program would not "add substantially to the incremental past, present, and future impacts" of oil and gas exploration and development activities in and around the NPR-A.[125] In addition to that analysis, BLM separately evaluated the GMT2 construction project and the geotechnical exploration project under NEPA.[126] In so doing, BLM more than sufficiently addressed potential cumulative effects.[127]

---

[122] Dkt. 27 at 30.

[123] *See* AR8502-AR8507; AR5014-AR5090; AR1371-AR1667; AR8723-AR8726 (finding that "other concurrent exploration and construction activities on the west side of Nuiqsut (in the NPR-A) would not be easily discernible").

[124] AR8502-AR8507; AR8579.

[125] AR503.

[126] *See* AR4516-AR6541; AR8684-AR8742.

[127] *See Save Strawberry Canyon v. U.S. Dept' of Energy*, 830 F. Supp. 2d 737, 752 (N.D. Cal. 2011).

29

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

### 4. Plaintiffs Rely Upon Inapt Case Law.

In addition to the lack of record support, Plaintiffs' arguments rely upon inapt case law. In *Klamath-Siskiyou Wildlands Center v. BLM*, the Ninth Circuit found fault with two BLM timber sale EAs that failed to address cumulative impacts because the programmatic EIS to which they tiered *also* failed to address cumulative impacts.[128] The court also rejected as insufficient the agency's effort to tier its EA to a watershed analysis that was not a NEPA document. *Klamath* stands for the unremarkable principle—inapplicable here—that an agency cannot lawfully tier to an EIS that is also deficient. Similarly, in *Center for Biological Diversity v. BLM*,[129] the district court rejected BLM's effort to tier four oil and gas leases involving hydraulic fracturing to a regional management plan programmatic EIS because the agency completely failed to address fracking in the programmatic EIS.[130] The difference here, of course, is that BLM addressed winter exploration activities in detail in the IAP EIS.[131]

---

[128] 387 F.3d 989, 997 (9th Cir. 2004).

[129] 937 F. Supp. 2d 1140 (N.D. Cal 2013).

[130] *Id*. at 1157.

[131] *See supra* § III.B.2. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865–66 (9th Cir. 2005), is also inapt because it does not address tiering at all and simply holds that the agency failed justify its determination that construction of an oil refinery dock would not have a significant impact. *Cascadia Wildlands v. Bureau of Indian Affairs* has no value here because the agency's analysis was not nearly as robust as the analysis here, and in any event, the Ninth Circuit *upheld* the EAs at issue in that case. 801 F.3d 1105, 1114 (9th Cir. 2015).

30

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

With respect to cumulative effects, none of the cases cited by Plaintiffs apply to the circumstances of this case. In *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of the Interior*[132] and in *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*,[133] the Ninth Circuit found fault with BLM's cumulative impacts analyses primarily because they "only consider[ed] the effects of the very project[s] at issue."[134] Here, the EA identifies the other projects both inside and near to the Petroleum Reserve that were being undertaken during winter 2018, describes the potential cumulative impacts of those projects, and concludes, based on prior NEPA analyses, that "[n]either the Proposed Action nor the No-Action Alternative would add substantially to the incremental past, present, and future impacts described [in the EA and other NEPA analyses]."[135] In addition, the EA is tiered to prior NEPA analyses that specifically address the cumulative effects of oil exploration and development activities in the Petroleum Reserve.[136] The EA further documents the "small number and minimal

---

[132] 608 F.3d 592 (9th Cir. 2010).

[133] 387 F.3d 989 (9th Cir. 2004).

[134] *Klamath-Siskiyou*, 387 F.3d at 996; *accord Te-Moak Tribe*, 608 F.3d at 603–04 ("The EA's discussion of the Amendment's direct effects in lieu of a discussion of cumulative impacts is inadequate.").

[135] AR8502-AR8504.

[136] *See, e.g.*, AR8502; AR5014-AR5090. *Contra Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) (criticizing cumulative impacts analysis where EA relied on study that "assessed only the impacts of the fire on the watershed[,] not the additional impacts of logging several thousand acres and building several miles of roads").

31

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

severity of the impacts occurring from 1999 to 2017" due to "the overall effectiveness of the environmental protections that are applied to winter exploration activities in the NPR-A."[137]

In sum, Plaintiffs have presented no credible evidence or argument showing that BLM's NEPA approach was unlawful. Ultimately, Plaintiffs simply disagree with BLM's conclusions about the significance of certain potential effects. But Plaintiffs are not the experts and BLM's decisions are entitled to substantial deference.[138] Accordingly, the Court should reject the arguments set forth in Sections III, IV, and V of Plaintiffs' Opening Brief.

## C. BLM Considered a Reasonable Range of Alternatives.

### 1. BLM's Alternatives Satisfy NEPA.

Plaintiffs also argue that BLM violated its NEPA obligations by failing to consider reasonable alternatives to ConocoPhillips' proposed action, including the alternatives proposed by Plaintiffs during the comment period.[139] This argument is contrary to the record and Ninth Circuit case law.[140]

---

[137] AR8503.

[138] *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) ("A court generally must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." (internal quotation marks and citations omitted)).

[139] *See* AR8003; AR8010.

[140] *See* Dkt. 27 at 39 (quoting 42 U.S.C. § 4332(e)).

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

### a.   Plaintiffs' arguments ignore controlling authority.

In *Native Ecosystems Council v. U.S. Forest Service*, the Ninth Circuit determined to "join our sister circuits in holding that an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS," and that an agency preparing an EA only is required to include a brief discussion of reasonable alternatives.[141] Since then, the Ninth Circuit has repeatedly held that an agency's consideration of a "no action" alternative and its "preferred" alternative in an EA satisfies that "lesser" obligation.[142] This authority controls here. Plaintiffs' argument that BLM was required to consider more alternatives in the EA fails as a matter of law.

### b.   Plaintiffs' argument is factually wrong.

Furthermore, Plaintiffs are simply wrong in asserting that BLM failed to consider the alternatives proposed by Plaintiffs during the comment period. Indeed, the EA specifically states that BLM considered but eliminated from detailed analysis Plaintiffs'

---

[141] 428 F.3d 1233, 1246 (9th Cir. 2005) (upholding the Forest Service's consideration of a "no action" alternative and its "preferred" alternative, even though no other alternatives were considered in detail); *accord N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008).

[142] *See, e.g., Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1022 (9th Cir. 2012) ("Since [*Native Ecosystems Council*], we are aware of no Ninth Circuit case where an EA was found arbitrary and capricious when it considered both a no-action and preferred action alternative."); *N. Idaho Community*, 545 F.3d at 1154 (holding agencies "fulfilled their obligations under NEPA's alternatives provision when they considered and discussed only two alternatives in the . . . EA"); *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1012 (9th Cir. 2011) (same); *see also La. Crawfish Producers Ass'n–W. v. U.S. Army Corps of Eng'rs*, 463 F.3d 352, 356–57 (5th Cir. 2006) (observing that there is "no case law" that "require[s an agency] to consider and reject [a] proposed alternative in [an] EA").

33

proposed alternative to reduce the number of wells approved for drilling because the alternative "would not meet the purpose and need" of the proposed action.[143] In these circumstances, the Ninth Circuit has reasoned that "it makes no sense" for agencies "to consider alternatives that do not promote the goal" or the "purpose" the agency is trying to accomplish.[144]

Additionally, BLM found that the 2018-19 Program will "have no new significant impacts on the environment and will cause no undue or unnecessary degradation to the public lands."[145] In *Earth Island Institute v. U.S. Forest Service*, the Ninth Circuit observed that "'it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway.'"[146] This, however, is exactly what Plaintiffs are asking this Court to do—*i.e.*, to fault BLM for eliminating from detailed analysis Plaintiffs' proposed alternative of reducing the number of exploratory wells.

---

[143] AR8495; *see* AR8473-AR8474.

[144] *Native Ecosystems Council*, 428 F.3d at 1248 (internal quotation marks and citation omitted).

[145] AR8592.

[146] 697 F.3d at 1023 (quoting *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)); *see also Headwaters, Inc.*, 914 F.2d at 1181 ("NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.").

34

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

Plaintiffs ask this Court to find the EA inadequate for the additional reason that BLM did not consider Plaintiffs' proposed alternative of requiring ConocoPhillips to comply with all BMPs from the IAP.[147] But, contrary to what Plaintiffs would have this Court believe, BLM did give "full and meaningful" consideration to this exact alternative. In Sections 2.1.1.2, 2.1.2.1, and 2.1.5.1 of the EA, BLM describes its evaluation of the potential environmental impacts of allowing ConocoPhillips to deviate from BMPs B-2g, B-2d, and A-5.[148] This evaluation necessarily required BLM to consider what Plaintiffs fault it for not doing—*i.e.*, considering the potential environmental impact of requiring compliance with all BMPs. This is more than sufficient under Ninth Circuit law.[149]

       **c.**        **Plaintiffs ignore the IAP EIS.**

Plaintiffs also assiduously ignore the IAP EIS to which the EA is tiered. Plaintiffs claim that BLM failed "to include even a brief discussion of any reasonable alternatives," but this overlooks the IAP EIS in which BLM gave "'full and meaningful

---

[147] *See* Dkt. 27 at 40.

[148] AR8487, AR8489, AR8491-AR8492.

[149] *See N. Idaho Community*, 545 F.3d at 1153 (finding agency satisfied obligations under NEPA by "briefly discuss[ing] two alternatives" without discussing the other alternatives the agency had rejected and whether the agency had provided sufficient reasons for rejecting the alternatives).

35

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

consideration'"[150] to (and then rejected) the very alternatives Plaintiffs claim BLM should have considered here.

In particular, the IAP EIS includes consideration of five alternatives: a no-action alternative, the preferred alternative, and three other alternatives, each of which contemplates a different number of wells to be drilled.[151] Alternative A (the no-action alternative) contemplated construction of 196 exploration and delineation wells. Alternative B-1 contemplated construction of 128 wells; Alternative B-2, 152 wells; Alternative C, 236 wells; and Alternative D, 256 wells.[152] After undertaking a thorough comparison of the likely environmental consequences of each alternative,[153] BLM approved Alternative B-2.[154] Of import here, BLM concluded that the likely effects of oil and gas activities under Alternative B-2 were not substantially different from those under Alternative B-1.[155] BLM also concluded that the number of wells was relatively inconsequential for the majority of studied categories, including effects on air quality,[156]

---

[150] Dkt. 27 at 34 (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of the Interior*, 655 F. App'x 595, 599-600 (9th Cir. 2016)).

[151] *See, e.g.*, AR0129.

[152] *Id*.

[153] AR0126-AR0152.

[154] AR2629.

[155] *See* AR0126-AR0152.

[156] AR0126 (air pollutant emissions for Alternative B-1 are projected to be "slightly less compared to Alternatives B-2 and A").

36

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

paleontological resources,[157] water resources and water quality,[158] vegetation,[159] fish,[160] birds,[161] caribou,[162] cultural resources,[163] recreational resources,[164] and rivers.[165]

The IAP EIS also expressly addresses BMPs, their purpose, and when an applicant might deviate from them. Specifically, the IAP EIS describes BMPs as "*guidance* for future performance-based requirements to obtain BLM authorization in the NPR-A,"[166] and Appendix A of the IAP Record of Decision specifically provides that an applicant

---

[157] AR0127 ("The potential for impacts to paleontological resources from exploration activities is low . . . .").

[158] AR0129 (finding that even under Alternative D (256 wells), "[e]xploratory drilling . . . is not expected to have a measurable effect on water quality since spills would occur in the winter and will likely occur on ice pads").

[159] AR0130 (impacts to vegetation would be "minor" for all alternatives).

[160] AR0133 (finding a "measurable change at the population level is not likely" for all alternatives).

[161] AR0135 (same).

[162] AR0137 (stating "[p]opulation level effects would be unlikely for species of terrestrial mammals" for both Alternative B-1 and B-2).

[163] AR0141 (concluding that all alternatives present "[a] lower potential impact . . . from exploration activities that are undertaken during the winter months with infrastructure constructed of snow and ice").

[164] AR0146 (finding "[w]inter oil and gas activities would have a minimal effect on recreational resources" for all alternatives).

[165] AR0147 ("The impacts under Alternative B-2 would be essentially the same as under B-1 . . . .").

[166] AR0048 (emphasis added).

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

may propose a deviation from BMPs and when BLM should allow such deviations.[167] In this case, ConocoPhillips and BLM precisely followed this procedure.[168]

In sum, under Ninth Circuit law, BLM's consideration of these alternatives in the IAP EIS—even without the additional consideration given to them in the EA—fulfills BLM's obligations under NEPA. Plaintiffs' claim that the EA (and the IAP EIS to which it is tiered) is inadequate under NEPA for failing to consider reasonable alternatives is without merit as a matter of fact and of law.[169]

### 2. BLM's Alternatives Comply with ANILCA.

Lastly, Plaintiffs argue that BLM also violated ANILCA Section 810 by not considering alternatives related to subsistence impacts. This argument fails for the same reasons Plaintiffs' NEPA claim fails.[170]

ANILCA Section 810(a) requires federal agencies contemplating "the use, occupancy, or disposition of public lands" in Alaska to "evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands

---

[167] *See* AR2673-AR2674.

[168] *See* AR8487, AR8489, AR8491-AR8492.

[169] *See, e.g., Ctr. for Envtl. Law & Policy*, 655 F.3d at 1012 (BLM adequately discussed alternatives in EA, where EA discussed two alternatives—the preferred alternative and a no-action alternative—and the SEIS to which it was tiered considered and rejected the alternatives plaintiff-appellant preferred); *N. Idaho Community*, 545 F.3d at 1153–54 (approving an EA that discussed only two alternatives because a prior EIS had evaluated the project's environmental effects in depth). The cases cited by Plaintiffs are distinguishable and do not require this Court to find the EA inadequate.

[170] *See Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987) ("NEPA case law is helpful in interpreting § 810.").

for the purposes sought to be achieved, and other alternatives which would reduce or

eliminate the use, occupancy, or disposition of public lands needed for subsistence

purposes."[171] Plaintiffs misleadingly argue that an agency fails to satisfy those

requirements if the agency's Section 810 evaluation "decline[s] to consider alternatives

or consider[s] only a no action alternative where feasible alternatives exist."[172] No court

has held that an agency fails to satisfy its obligations under Section 810(a) when it

considers a no-action alternative and the preferred alternative.[173] Further, BLM's

guidance with respect to a Section 810 evaluation for an EA explicitly approves

consideration of only a proposed action and a no-action alternative: "Commonly, EAs

consist of at least two alternatives: the proposed action, and a no-action alternative. As a

result, an analysis of this topic may be very brief."[174]

---

[171] 16 U.S.C. § 3120(a).

[172] Dkt. 27 at 35.

[173] The cases on which Plaintiffs rely are inapposite. *City of Tanakee Springs v. Clough*, 915 F.2d 1308 (9th Cir. 1990), *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995), and *Kunaknana v. Clark*, 742 F.2d 1145 (9th Cir. 1984), all deal with the more stringent analysis requirements for an EIS or a SEIS. *See Earth Island Institute*, 697 F.3d at 1023.

[174] BLM, Compliance with ANILCA Section 810, at 12, www.blm.gov/download/file/fid/10986 (last visited July 19, 2019); *see also Kunaknana*, 742 F.2d at 1150 ("Agency interpretations of a statute are entitled to great deference and should be upheld so long as they are reasonable."); *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1191 (9th Cir. 2000) (Ninth Circuit has "deferred to the Secretary of the Interior's interpretation of ANILCA").

39

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

BLM's Section 810 analysis more than meets that standard.[175] BLM devoted a separate section of the EA to ANILCA Section 810.[176] Comparing the no-action alternative to the proposed action, the EA documents BLM's conclusions that the 2018-19 Program "would not alter the distribution, migration or location of harvestable fisheries resources," "would not create any legal barriers that would limit subsistence harvest and access," and "would not appreciably impact any other harvestable resources such as wood, water, berries or vegetation,"[177] and, consequently, that the "direct and indirect effects of the proposed action are not anticipated to significantly restrict subsistence uses."[178] BLM further concluded that its subsistence analysis had identified "[n]o new significant impacts" to subsistence uses from the 2018-19 Program. Having found as much, BLM had no obligation to do more in order to comply with Section 810.[179]

Moreover, the NEPA analyses to which the EA tiers include thorough analyses of subsistence impacts from oil and gas exploration in and near the NPR-A. The IAP EIS's

---

[175] *See* AR8581-AR8586.

[176] *Id*.

[177] AR8585.

[178] AR8586.

[179] *See* BLM, Compliance with ANILCA Section 810, at 12; *see also City of Tenakee Springs v. Clough*, 750 F. Supp. 1406, 1421 (D. Alaska 1990) (acknowledging the agency's argument that "ANILCA, like NEPA, does not require affected agencies to consider project alternatives which do not achieve the purpose contemplated for the proposed action" as "correct"), *overruled on other grounds*, 915 F.2d 1308 (9th Cir. 1990).

40

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

Section 810 analysis, for example, is nearly 30 pages in length and examines the potential effects on subsistence for all five of the IAP EIS alternatives.[180] BLM's Section 810 analysis for the GMT-2 SEIS is similarly robust, and documents the potential subsistence impacts for the three GMT-2 SEIS alternatives.[181]

Despite these analyses, Plaintiffs claim that BLM committed an "abdication" by considering, but eliminating from detailed analysis, alternatives to reduce the number of wells approved for drilling in the 2018-19 Program.[182] However, in *Amoco Production Co. v. Village of Gambell*, the Supreme Court instructed courts "emphatically"[183] that Congress did not subordinate all other uses of public lands to subsistence uses:

> Congress clearly did not state in ANILCA that subsistence uses are always more important than development of energy resources, or other uses of federal lands; rather, it expressly declared that preservation of subsistence resources is *a* public interest and established a framework for reconciliation, where possible, of competing public interests.[184]

---

[180] AR2243-AR2271; *see also* AR2245–AR2263 (concluding that Alternative A (196 wells), Alternative B-1 (128 wells), Alternative B-2 (152 wells), and Alternative C (236 wells) "would not significantly restrict subsistence use by communities in or near the NPR-A (Anaktuvuk Pass, Atqasuk, Barrow, *Nuiqsut*, Point Lay, and Wainwright" (emphasis added).).

[181] AR5477-AR5502. Plaintiffs have never challenged the ANILCA analyses in the IAP EIS or the GMT-2 SEIS, and do not do so here.

[182] Dkt. 27 at 38.

[183] *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1227 (9th Cir. 1999).

[184] *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545–46 (1987); *Hoonah Indian Ass'n*, 170 F.3d at 1230 ("Subsistence uses by rural Alaskans are an important public interest to which the [agency] had to give careful attention. But they are not the only such interest.").

41

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

BLM met the requirements of Section 810 by expressly considering the potential impacts on the abundance and availability of, and access to, subsistence resources.

In light of the analyses undertaken by BLM in the EA and the documents to which it is tiered, the standard for evaluating ANILCA alternatives for an EA, and the fact that in past years BLM has approved a similar or greater number of wells than proposed for the 2018-19 Program,[185] Plaintiffs' claim that BLM failed to comply with its obligations under Section 810 fails.

## IV.  CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and enter judgment in favor of BLM and ConocoPhillips.

DATED:  July 30, 2019.

STOEL RIVES LLP

By:  _/s/ Ryan P. Steen_
　　　RYAN P. STEEN (Bar No. 0912084)
　　　JASON T. MORGAN (Bar No. 1602010)
　　　BRYN R. PALLESEN (Bar No. 1810104)

Attorneys for ConocoPhillips Alaska, Inc.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

---

[185] *See* AR8495.

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 9,984 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 30th day of July, 2019.

/s/ Ryan P. Steen
Ryan P. Steen

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2019, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:19-cv-00056-SLG who are registered CM/ECF users will be served by the CM/ECF system.

Rebecca Noblin - Email: rnoblin@earthjustice.org
Jeremy C. Lieb - Email: jlieb@earthjustice.org
Eric P. Jorgensen - Email: ejorgensen@earthjustice.org
Garett R. Rose – Email: grose@nrdc.org
John S. Most - Email: john.most@usdoj.gov


/s/ Ryan P. Steen
Ryan P. Steen

102897945.5 0028116-00146

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

44