Rebecca Noblin
Jeremy C. Lieb
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: rnoblin@earthjustice.org
E: jlieb@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Native Village of Nuiqsut et al.*

Garett R. Rose (Pro Hac Vice)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St. NW
Washington, DC 20005
T: 202.717.8355
E: grose@nrdc.org

*Attorney for Plaintiff Natural Resources Defense Council*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| NATIVE VILLAGE OF NUIQSUT *et al.*, | ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 3:19-cv-00056-SLG |
| BUREAU OF LAND MANAGEMENT *et al.*, | ) ) | |
| *Defendants*, | ) ) | |
| and | ) ) | |
| CONOCOPHILLIPS ALASKA, INC., | ) ) | |
| *Intervenor-Defendant*. | ) ) | |

## PLAINTIFFS' REPLY BRIEF UNDER LOCAL RULE 16.3(c)(3)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT .................................................................................................... 1

I.    This Court has jurisdiction. ................................................................... 1

      A.    Plaintiffs' claims are not moot. ................................................... 1

      B.    Plaintiffs have standing. ............................................................. 6

II.   Defendants and Intervenor have not shown that BLM took a hard look at
      ConocoPhillips' winter exploration program. ........................................ 8

      A.    Intervenor premises its argument on the wrong standard. ........... 8

      B.    BLM failed to analyze adequately the impacts of ConocoPhillips'
            winter exploration on caribou. .................................................. 10

      C.    BLM failed to analyze adequately the impacts of ConocoPhillips'
            winter exploration on Nuiqsut subsistence activities. ................ 12

      D.    BLM violated NEPA by not analyzing the cumulative impacts of
            ConocoPhillips' winter exploration program and other exploration
            and construction projects.......................................................... 15

III.  BLM failed to consider feasible alternatives to ConocoPhillips' winter
      exploration program. ........................................................................... 17

      A.    BLM violated ANILCA by failing to consider feasible alternatives
            that would reduce harm to subsistence uses. ............................. 17

      B.    BLM violated NEPA by failing to consider viable alternatives. .... 20

CONCLUSION ................................................................................................ 23

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ......................................... 24

# TABLE OF AUTHORITIES

## CASES

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
  67 F.3d 723 (9th Cir. 1995) ................................................................. 18, 20

*Am. Civil Liberties Union of Nev. v. Lomax*,
  471 F.3d 1010 (9th Cir. 2006) .................................................................... 7

*Barnes v. Fed. Aviation Admin.*,
  865 F.3d 1266 (9th Cir. 2017) .................................................................... 8

*Cascadia Wildlands v. Bureau of Indian Affairs*,
  801 F.3d 1105 (9th Cir. 2015) ............................................................... 8, 12

*City of Tenakee Springs v. Clough*,
  915 F.2d 1308 (9th Cir. 1990) ........................................................ 17, 18, 20

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*,
  867 F.3d 1093 (9th Cir. 2017) .................................................................... 6

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  623 F.3d 633 (9th Cir. 2010) .................................................................... 22

*Ctr. for Envtl. Law & Pol'y v. U.S. Bureau of Reclamation*,
  655 F.3d F.3d 1000 (9th Cir. 2011) .......................................................... 16

*Earth Island Institute v. U.S. Forest Service*,
  697 F.3d 1010 (9th Cir. 2012) .................................................................. 22

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
  234 F. App'x 440 (9th Cir. 2007) .............................................................. 20

*Friends of the Earth, Inc. v. Bergland*,
  576 F.2d 1377 (9th Cir. 1978) .................................................................... 5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Srvs. (TOC), Inc.*,
  528 U.S. 167 (2000) .................................................................................. 6

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) .......................................................... 2, 3, 4, 5

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
  681 F.3d 1006 (9th Cir. 2012) ...................................................................... 3

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
  387 F.3d 989 (9th Cir. 2004) ........................................................ 8, 15, 16, 17

*Kunaknana v. Clark*,
  742 F.2d 1145 (9th Cir. 1984) ..................................................................... 19

*Lee v. Schmidt–Wenzel*,
  766 F.2d 1387 (9th Cir. 1985) ....................................................................... 4

*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017) ......................................................................... 9

*Nat. Res. Def. Council, Inc. v. Evans*,
  316 F.3d 904 (9th Cir. 2003) ..................................................................... 4, 5

*Nat'l Parks & Conservation Ass'n v. Babbit*,
  241 F.3d 722 (9th Cir. 2001) ....................................................................... 14

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ..................................................................... 21

*Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Dep't of the Interior*,
  655 F. App'x 595 (9th Cir. 2016) .......................................................... 21, 22

*Pit River Tribe v. U.S. Forest Service*,
  469 F.3d 768 (9th Cir. 2006) ......................................................................... 9

*Protectmarriage.com-Yes on 8 v. Bowen*,
  752 F.3d 827 (9th Cir. 2014) ......................................................................... 3

*Salmon River Concerned Citizens v. Robertson*,
  32 F.3d 1346 (9th Cir. 1994) ......................................................................... 9

*San Luis & Delta Mendota Water Auth. v. United States*,
  672 F.3d 676 (9th Cir. 2012) ......................................................................... 7

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013) ....................................................................... 2

*Sierra Club v. Penfold*,
    857 F.2d 1307 (9th Cir. 1988) ......................................................... 5

*Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Department of the Interior*,
    608 F.3d 592 (9th Cir. 2010) ......................................................... 17

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) ......................................................... 9

*W. Watersheds Project v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013) ......................................... 8, 10, 11, 21, 22

*Wildwest Institute v. Kurth*,
    855 F.3d 995 (9th Cir. 2017) ......................................................... 2

## STATUTES

16 U.S.C. § 3120(a) ......................................................... 17, 19, 20

## REGULATIONS

40 C.F.R. § 1502.20 ......................................................... 10

40 C.F.R. § 1508.25(b) ......................................................... 22

40 C.F.R. § 1508.28 ......................................................... 22

## OTHER AUTHORITIES

ConocoPhillips, Willow Master Development Plan Request (May 10, 2018),
    https://eplanning.blm.gov/epl-front-
    office/eplanning/planAndProjectSite.do?methodName=dispatchToPattern
    Page&currentPageId=161457 ......................................................... 4

## INTRODUCTION

At the core of Defendant's and Intervenor's arguments is the incorrect assertion that BLM's EA and, primarily, its prior programmatic, Reserve-wide planning EIS adequately analyzed direct and cumulative impacts to caribou and subsistence from ConocoPhillips' winter exploration. In fact, neither the EA nor the tiered-to EISs assess site-specific impacts of the exploration, accounting for the details of where, when, and how the project goes forward. Without that analysis, the agency cannot make a non-arbitrary determination about whether significant impacts may occur and, thus, cannot supply a convincing statement of reasons justifying its finding of no significant impact. Similarly, the agency's failure to consider viable alternatives to the exploration plan in its EA is not cured by broad planning alternatives in prior EISs. These problems with BLM's impact analysis are recurring ones that this Court has jurisdiction to resolve, even though the particular, time-limited ConocoPhillips activity is complete.

## ARGUMENT

I.    **This Court has jurisdiction.**

A.    **Plaintiffs' claims are not moot.**

Plaintiffs' challenge is not moot. BLM's authorization of winter exploration is capable of repetition yet evades review because the annual timeframe for winter exploration in the Reserve—six months at most—is too short to permit full review and there is a reasonable likelihood BLM will again authorize winter exploration in the area.

That ConocoPhillips' 2018-2019 winter exploration activity has ended cannot bar judicial review or the harms experienced by Plaintiffs from unlawful decisionmaking that may occur over and over without recourse.

A case is "not moot if it is capable of repetition, yet evading review." *Wildwest Institute v. Kurth*, 855 F.3d 995, 1002 (9th Cir. 2017); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1287 (9th Cir. 2013). A challenged action evades review if its duration is "too short to allow full litigation before it ceases or expires." *Wildwest Institute*, 855 F.3d at 1002-03 (internal quotations omitted). An action is "fully litigated if it is reviewed by [the Ninth Circuit Court of Appeals] and the Supreme Court." *Shell Offshore*, 709 F.3d at 1288 (internal quotations omitted). To be capable of repetition, "there must be a reasonable likelihood that the same party will be subject to the action again," *id.*, which is a low threshold. *See, e.g.*, *id.* (concluding that the prong was satisfied where "there is no reason to believe that Greenpeace USA's 'stop Shell' campaign was limited to the 2012 drilling season"); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir. 1992) (concluding that the type of analysis at issue was likely to recur).

BLM's deficient authorization and environmental review of winter exploration evades review because the authorization quickly expires. The period between authorization of exploration and its expiration is only months due to the seasonal requirements for ice roads and tundra travel. *See* AR 26 at 8484; Doc. 30-1 at 2. Any

future authorization for exploration will be subject to similar time constraints. This short timeframe is well within the periods the Ninth Circuit has held insufficient to assure review by that court and the Supreme Court. *See, e.g.*, *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1018 (9th Cir. 2012) ("We have repeatedly held that similar actions lasting only one or two years evade review.").

Preliminary relief would not have preserved the challenge for review. In cases like this, where an authorization necessarily expires before it can be fully litigated, what saves the case from mootness is the possibility that the same kind of action is capable of repetition later. Even if Plaintiffs had obtained a preliminary injunction or temporary restraining order, BLM's authorization would have expired at the end of the exploration season. *See Greenpeace Action*, 14 F.3d at 1330 ("Although the harvest of pollock could have been enjoined, the expiration of the 1991 TAC could not. No injunction could have preserved this challenge to a short-term rule."). Unlike scenarios where preliminary relief can effectively preserve an issue for review, the automatic expiration of the exploration authorization allows the issue here to evade review regardless of whether preliminary relief was sought or obtained. *Compare id.*, *with Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 837-38 (9th Cir. 2014) (order enjoining state from publicly disclosing information about political committee's donors would have permitted parties to fully litigate case on the merits).

There is also a reasonable likelihood Plaintiffs will again be subject to BLM's

unlawful authorization of winter exploration in the Reserve. *See Lee v. Schmidt–Wenzel*, 766 F.2d 1387, 1390 (9th Cir. 1985). BLM has a record of relying on EAs to approve exploration in the Reserve, *see* Doc. 31 at 8-9 ("This is the same practice BLM has followed for *every* winter exploration program in the Petroleum Reserve for two decades."); *see also* AR 24 at 8108-69, 8170-285, and interest in the area of this exploration from the oil and gas industry continues unabated, *see, e.g.*, ConocoPhillips, Willow Master Development Plan Request (May 10, 2018), https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=161457; Doc. 27 at 13-14. BLM also has a history of tiering to prior plan-level EISs for the Reserve to analyze impacts to caribou and subsistence and to justify a finding of no new significant impacts. *See* AR 24 at 8118, 8146, 8149, 8184-84, 8233; *Nat. Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir. 2003) (finding a challenged agency action capable of repetition where there is a pattern of agency reliance on the same rationales and analyses). Further, given that the Teshekpuk Caribou Herd ranges in areas where BLM is likely to be asked to approve winter activities, *see, e.g.*, AR 1 at 2584, AR 5 at 4673, it is likely that future NEPA analyses will need to address impacts to caribou and subsistence practices. *See Greenpeace Action*, 14 F.3d at 1330 ("[T]he major issue—whether the Secretary has adequately examined the effects of pollock fishing on the Steller sea lions—is likely to recur in future years.").

Defendants erroneously assert that this case does not fall into the exception to mootness because there is no reasonable possibility that ConocoPhillips would repeat the exploration. Doc. 30 at 19-20. This argument avoids the governing standard. Plaintiffs are challenging BLM's approval of exploration, which, as just demonstrated, may well be granted for winter activity again, whether by ConocoPhillips or others, relying on similar analysis and documentation. When challenging agency authorization, the Ninth Circuit simply requires that the challenged authorization be capable of repetition. *See, e.g.*, *Greenpeace Action*, 14 F.3d at 1330; *Evans*, 316 F.3d at 910. Plaintiffs need not show that ConocoPhillips will repeat the same exploration.

The caselaw Defendants and Intervenor principally cite is inapplicable here. Doc. 30 at 19-20; Doc. 31 at 16-17. *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377 (9th Cir. 1978), is not to the contrary: there, the plaintiffs sought an injunction for activity that had ceased and for which there was "no reasonable possibility" of renewal. *See id.* at 1379. Likewise, the plaintiffs in *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988), sought to compel BLM compliance with a prior settlement and the court stated it could not "reasonably foresee how *compliance with the stipulation* will correct future conduct." *Id.* at 1317-18. Here, Plaintiffs seek declaratory judgment and vacatur of BLM's ROD and EA for an activity—winter exploration in the Reserve—that is reasonably likely to be repeated. These requested remedies will prevent BLM from again performing inadequate analysis and from relying on this EA in future environmental analyses. If this case can be

mooted by the short season, so too would challenges to those future exploration activities, and the harms Plaintiffs experience would be perpetually irremediable.

**B.    Plaintiffs have standing.**

Plaintiffs have alleged facts sufficient to establish standing.  Contrary to Intervenor's claims, Doc. 31 at 18-20, standing is established at the time of the complaint or amended complaint, not when subsequent motions are filed.  *See Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1102 (9th Cir. 2017).  Both the complaint and amended complaint were filed before ConocoPhillips' activities were complete, *see* Doc. 1; Doc. 5; Doc. 32 at 2-3.  The end of the exploration program this year implicates mootness questions, not standing. Plaintiffs fall into one of the well-articulated mootness exceptions, as discussed above.  *Supra* pp. 1-6.  Intervenor's argument about redressability, *see* Doc. 31 at 24-25, similarly goes to mootness, not standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Srvs. (TOC), Inc.*, 528 U.S. 167, 189-92 (2000) (noting that "confusion is understandable" when attempting to distinguish standing from mootness and then articulating the differences).

Intervenor also claims that Plaintiffs have not sufficiently alleged harm, Doc. 31 at 19-22, but Plaintiffs declarations readily show concrete and imminent harm at the time of filing.  Plaintiffs' members identified concrete, particularized, and imminent harm traceable to the exploration activities authorized by BLM when the action commenced. Declarant Martha Itta, for example, identified the continuing importance of the

exploration area to the residents of Nuiqsut, herself included. *See* Doc. 27-1 at 2-3, ¶¶6-7. She then identified activities that are part of ConocoPhillips' winter exploration program and specific, concrete harms to herself and other residents of Nuiqsut resulting from those activities. *See id.* at 3-5, ¶¶8-10 (noting, among other things, the "exploration-related infrastructure occupying traditional hunting, fishing, and gathering lands, forcing residents to purchase food at stores"); *see also* Doc. 27-2 at 14-19, 25-27, 33, ¶¶26-32, 41-44, 55. Declarant Jeffrey Fair similarly explained his connection to the exploration area and the harm that would come from development. *See* Doc. 27-7 at 5-6, 8-11, ¶¶15, 17, 23, 25-28 (stating, among other things, that "[d]evelopment due to exploration could negatively impact caribou migration paths, upsetting my ability to observe them under wild and natural conditions during my travels").

Additionally, Plaintiffs' injuries were redressable when the action commenced. *See Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006). Plaintiffs requested declaratory judgment, vacatur, and an injunction in their amended complaint, Doc. 5 at 27, which would have stopped exploration and sent BLM back to the drawing board. Moreover, as discussed, *supra* pp. 5-6, the Plaintiffs' injuries continue to be redressable. *San Luis & Delta Mendota Water Auth. v. United States*, 672 F.3d 676, 703-04 (9th Cir. 2012) (finding redressability satisfied in a case falling into the mootness exception where relief would redress possibility of future injury).

**II.    Defendants and Intervenor have not shown that BLM took a hard look at ConocoPhillips' winter exploration program.**

**A.    Intervenor premises its argument on the wrong standard.**

Contrary to Intervenor's assertion, tiering to a prior programmatic EIS does not obviate BLM's duty to analyze the specific effects of the proposed action in an EA. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1049-50 (9th Cir. 2013) (finding that because a tiered-to "EIS contains sufficient analysis for informed decision-making at the programmatic level does not reduce or minimize BLM's critical duty to fully evaluate site-specific impacts" of the proposed action). BLM is obligated to supply a convincing statement of reasons in an EA, justifying a no significant effects conclusion. *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015). Tiering satisfies BLM's NEPA obligations only to the extent that the tiered-to documents contain sufficient analysis to support conclusions regarding site-specific impacts. *See, e.g., Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997-99 (9th Cir. 2004) (asking whether "the record raises substantial questions about whether there will be significant environmental effects" from the proposed action when rejecting EA that tiered to prior EISs). Further, "[i]f substantial questions are raised as to whether a project *may* cause significant degradation of some human environmental factor," those impacts must be adequately disclosed and evaluated in an EIS. *Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1274 (9th Cir. 2017). These are the proper legal standards regardless of whether the EA in question tiers to a prior EIS.

Intervenor inaptly cite *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, (9th Cir. 1994), for the proposition that "[a] comprehensive programmatic impact statement generally obviates the need for a subsequent site-specific or project-specific impact statement, unless new and significant environmental impacts arise that were not previously considered." *Id.* at 1356. The Ninth Circuit later clarified in *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768 (9th Cir. 2006), that a programmatic impact statement can only take the place of a more specific impact statement when it adequately addresses the impacts of subsequent specific projects. *Id.* at 783. If not, the agency must consider the site-specific environmental impacts of a subsequent action and its alternatives. *Id.* at 784.

Intervenor also cite a D.C. Circuit case to assert incorrectly that BLM need only consider an impact if it did not consider the impact *at all* in the tiered-to EIS. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 512 (D.C. Cir. 2010). This out-of-circuit decision merely stands for the proposition that an agency need not tread the same ground twice. *Id.* It does not speak to the present situation, in which a programmatic EIS has raised the question whether there might be significant impacts in later phases, but the site-specific EA has declined to consider those potential impacts. *See Mayo v. Reynolds*, 875 F.3d 11, 23 (D.C. Cir. 2017) (discussing *Theodore Roosevelt Conservation Partnership* and concluding that "[u]nder the rule of reason, subsequent 'site-specific' NEPA analyses are required only for 'those localized environmental

impacts that were not fully evaluated in the program statement.'").

   B.   **BLM failed to analyze adequately the impacts of ConocoPhillips'
         winter exploration on caribou.**

In the face of substantial questions concerning the effects of winter exploration on caribou, *see* Doc. 27 at 20-21, BLM violated NEPA by failing to supply in its EA a convincing explanation, supported by a site-specific assessment, of why ConocoPhillips' project will not cause significant impacts. Defendants and Intervenor incorrectly argue that the Integrated Activity Plan EIS's (Plan EIS) general discussions of caribou impacts satisfy BLM's obligation because there are no "new significant impacts" from the winter exploration program. Doc. 30 at 22-23; *see also* Doc. 31 at 30-31. As explained above, *supra* p. 9, the relevant question is not whether there is an entirely new category of effects but whether BLM considered the *site-specific* effects of this proposed action. *See* 40 C.F.R. § 1502.20 (an EA that tiers to a programmatic EIS "shall concentrate on the issues specific to the subsequent action"); *W. Watersheds Project*, 719 F.3d at 1049-50.

Here the Plan EIS raised the question whether winter exploration may cause significant impacts to caribou, but neither the EA nor the Plan EIS attempt to answer that question for ConocoPhillips' winter exploration program. As Plaintiffs argued in their opening brief, *see* Doc. 27 at 21-23, the EA is devoid of any caribou discussion other than a single sentence in the subsistence section and an unsupported conclusion that impacts to all "non threatened and endangered mammals" will be minor. *See* AR 26 at 8497, 8480. Because the EA does not address the effects of the proposed action on

caribou, Defendants resort to asserting that the Plan EIS fulfilled this obligation. But while the Plan EIS describes caribou herds in the Reserve and discusses generally how caribou may be effected by winter exploration activities in the Reserve, *see* AR 1 at 0294-307, 1064-67; Doc. 27 at 23-24, it does not include any site-specific analysis of the effects of winter exploration on caribou in ConocoPhillips' 2018-19 winter exploration project area. As explained in Plaintiffs' opening brief, the record demonstrates that this project area provides especially important winter caribou habitat and this exploration, along with other concurrent activities, will expose caribou to development and industrial activity in unprecedented ways. Doc. 27 at 10-11. Thus, the Plan EIS's general discussions cannot substitute for a specific analysis of this particular winter exploration program's impacts in this particular place. *W. Watersheds Project*, 719 F.3d at 1049-50.

Moreover, in this case, the general caribou discussions in the Plan EIS serve to highlight the potential for ConocoPhillips' winter exploration program to significantly affect caribou in ways not yet analyzed. *See* Doc. 27 at 22-24. For instance, the Plan EIS states that the assumption of temporary effects from exploration "has not been scientifically tested" and that effects could vary based on different conditions and in some years "have an additive effect on natural winter mortality."[1] AR 1 at 1516. The Plan EIS also acknowledged that "[i]t is not known what population effects might occur

---

[1] Defendants fault Plaintiffs for citing to portions of the Plan EIS describing in part development impacts, Doc. 31 at 23-24, but the quoted language unambiguously includes exploration activities, Doc. 27 at 24 (quoting AR 1 at 0725, 1516).

if the majority of the herd were to have year-round contact with oil and gas facilities and activities," AR 1 at 1067, as may be the case here, Doc. 27 at 10-11, 20-21. Far from satisfying BLM's obligations, the Plan EIS shows that at the time of its writing, BLM had not done the analysis necessary to determine whether ConocoPhillips' winter exploration program might significantly affect caribou. *See* AR 1 at 1516. Moreover, in addition to information contained and questions raised in the Plan EIS, Plaintiffs submitted multiple studies, one of which was published several years after the Plan EIS, demonstrating the potential for significant effects to caribou from winter activities. *See* AR 24 at 8007-08 (discussing caribou studies in the record at AR 24 at 8052-56, 8351-57, 8447-53).

Rather than grappling with the questions raised in the Plan EIS and elsewhere in the record, BLM disregarded them in the EA. Ultimately, because it has not done a project-specific analysis, the Bureau has not "suppl[ied] a convincing statement of reasons" explaining why impacts to caribou from ConocoPhillips' specific winter exploration program, particularly given its location, will be insignificant. *Cascadia Wildlands*, 801 F.3d at 1111. Indeed, BLM provided no reasons at all to justify its conclusion that the impacts of this particular project on caribou will not be significant.

### C. BLM failed to analyze adequately the impacts of ConocoPhillips' winter exploration on Nuiqsut subsistence activities.

BLM has not fulfilled its obligation under NEPA to provide a convincing statement of reasons justifying its conclusion that ConocoPhillips' winter exploration program will not have significant effects on subsistence activities. As with the effects of

the winter exploration program on caribou, in this context such a justification would require site-specific analysis, which the EA and prior EISs fail to provide. Defendants and Intervenor fail to overcome this fatal deficiency.

The record reveals that the winter exploration program may have significant effects on Nuiqsut subsistence activities, and those site-specific effects have not been addressed in any previous EIS in the record. Doc. 27 at 26-30. For example, BLM expressly acknowledges the extreme value Nuiqsut residents place on this particular project area for its ability to provide food security, including winter caribou harvest. AR 26 at 8497. But the Plan EIS's general discussion of subsistence effects from oil and gas activities includes no discussion of the subsistence effects of winter exploration in this particular project area. *See* AR 1 at 1101-06. Neither does the GMT2 EIS's brief discussion of the cumulative effects of that project together with nearby oil and gas exploration and development activities fill this gap. *See* AR 5 at 5078-82. And the specific pages in the Plan EIS cited by Defendants merely confirm that the project area is open to leasing under the Plan, AR 1 at 0037 (noting that Preferred Alternative B-2 "makes lands currently under lease and near lands currently under lease in northeastern NPR-A near Fish Creek available"), and that some of the Nuiqsut subsistence use area is within the portion of the Teshekpuk Lake Special Area closed to leasing, AR 1 at 1105. The prior EISs thus contain no site-specific analysis of the effects of winter exploration on subsistence in this project area.

Neither does the EA provide the requisite site-specific assessment and a convincing statement of reasons why winter exploration would not cause new significant impacts on subsistence activities, Defendants arguments to the contrary notwithstanding. Doc. 30 at 25-26; AR 26 at 8479; AR 28 at 8590-91. They argue that BLM provided a basis for its determination but cite only to the same conclusory statement that Plaintiffs cite, in which BLM asserts that "[i]mpacts to subsistence use from this project in and of itself would be expected to be minor to moderate and short term." Doc. 30 at 26 (citing AR 26 at 8479). The EA does not provide any support for that conclusion and, as discussed above, it is not supported by reference to previous EISs in the record.

Defendants also incorrectly suggest that several mitigation measures intended to protect subsistence resources support BLM's finding. Doc. 30 at 26. While mitigation measures can support an agency's finding of no significant impact, including mitigation does not substitute for an agency's convincing statement of reasons why a project's impacts are insignificant. *Nat'l Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 733-34 (9th Cir. 2001) ("A . . . mere listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of no significant impact."), *overruled on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157-58 (2010). BLM fails to provide any explanation of how these measures will "constitute an adequate buffer against the negative impacts that may result from the authorized activity." *Id.* at 734.

**D.    BLM violated NEPA by not analyzing the cumulative impacts of ConocoPhillips' winter exploration program and other exploration and construction projects.**

BLM failed to analyze the cumulative impacts of ConocoPhillips' winter exploration program, the geophysical exploration program, and GMT2 construction. As with the direct impacts to caribou and subsistence activities, neither the EA itself nor the tiered-to documents contain the requisite site-specific information about cumulative impacts and, in fact, point toward information gaps that must be further analyzed at this stage. *See* Doc. 27 at 26-30. Defendants and Intervenor incorrectly assert that BLM satisfied its NEPA obligations with regard to cumulative impacts because the EA tiers to prior NEPA documents and otherwise contains a purportedly satisfactory cumulative impacts discussion.[2] *See* Doc. 30 at 27-29; Doc. 31 at 29, 30-32. While the NEPA regulations certainly authorize tiering, tiering is only a sufficient replacement for new analysis if the tiered-to documents contain the relevant "specific information about the cumulative effects" to support a finding of no significant impact. *Klamath-Siskiyou*, 387 F.3d at 997.

The EA's cumulative impacts analysis fails to provide detailed information on the cumulative impacts from the conjunction of ConocoPhillips' winter exploration,

---

[2] As to Defendants' argument that Plaintiffs somehow waived a cumulative impacts argument with respect to subsistence, *see* Doc. 30 at 29, Plaintiffs opening brief makes abundantly clear that impacts to caribou and impacts to subsistence activities are necessarily intertwined. *See, e.g.*, Doc. 27 at 30-34.

geophysical exploration program, and GMT2 construction projects. The EA contains

only passing references to the geophysical exploration program, *see* Doc. 27 at 31, which

is insufficient under NEPA. *See Klamath-Siskiyou*, 387 F.3d at 995; *Ctr. for Envtl. Law*

*& Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d F.3d 1000, 1007 (9th Cir. 2011).

Similarly, the EA provides only generic and unquantified information on GMT2

construction. *See* Doc. 27 at 32; *Klamath-Siskiyou*, 387 F.3d at 994. Despite ample

evidence that the conjunction of these three projects would affect caribou and subsistence

activities, *see* Doc. 27 at 30-31, BLM's EA fails to analyze those impacts in adequate

detail.

   Further, none of the tiered-to EISs contain the specific, detailed discussion of

cumulative impacts that NEPA requires at the project-level stage. These documents

contain generalized accounts of the impacts from exploration and development activities.

*See, e.g.,* AR 1 at 1515-31 (discussing general impacts of oil and gas development and

exploration on caribou and other terrestrial mammals, but not including any discussion of

the impacts of the three projects at issue here); AR 5 at 4878-88 (same). Moreover, these

tiered-to discussions identify important data gaps, such as the population effects from

year-round contact with oil and gas development, *see* AR 1 at 1524, that must be

addressed at the project-specific stage. While the tiered-to EISs might be sufficient for

programmatic analyses, they do not make up for the absence of a particularized

discussion of cumulative impacts in the EA.[3]

## III. BLM failed to consider feasible alternatives to ConocoPhillips' winter exploration program.

### A. BLM violated ANILCA by failing to consider feasible alternatives that would reduce harm to subsistence uses.

Defendants do not dispute that ANILCA section 810 requires BLM to consider all feasible "alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a); *see City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990); Doc. 27 at 35. They instead wrongly suggest that BLM satisfied this requirement by complying with a different requirement of section 810. And they make the unsupported argument that there are no "feasible" alternatives to the proposed action and no action alternative. Neither defense succeeds: BLM's failure to consider feasible alternatives that would reduce subsistence effects violated ANILCA section 810.

Defendants incorrectly assert that section 810 only requires an agency to consider alternatives that would reduce or eliminate the amount of public lands needed for a proposed action. Doc. 30 at 30-32. That is contradicted by caselaw, which establishes

---

[3] Contrary to Intervenor's, suggestion, *see* Doc. 31 at 37-39, the rules of *Klamath-Siskiyou* and *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Department of the Interior*, 608 F.3d 592 (9th Cir. 2010) are directly applicable. The tiered-to EISs are deficient for a project-level assessment because they lack site-specific analysis and therefore cannot support the agency's conclusions here. *See Klamath-Siskiyou*, 387 F.3d at 997. Further, the EA is deficient because it lacks the "sufficiently detailed" discussion of the cumulative impacts of the three projects. *See Te-Moak*, 608 F.3d at 603.

that the provision is "intended to minimize the impact of a proposed project on resources which rural village residents of Alaska use for subsistence." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995) (quoting *City of Tenakee Springs*, 915 F.2d at 1310). Alternatives that may restrict the duration or intensity of use or otherwise reduce the impact to subsistence resources plainly "reduce" the use or occupancy of land and therefore fall within the provision's meaning. *See Alaska Wilderness Recreation*, 67 F.3d at 730-31 (addressing alternatives that would produce lower volume of timber); *City of Tenakee Springs*, 915 F.2d at 1310 (same). BLM failed to consider any such alternative.

Moreover, even if Defendants' interpretation were correct, it would not establish that BLM satisfied its obligation to consider alternatives here. Indeed, both alternatives Plaintiffs proposed *would* reduce the area of public lands affected. Defendants do not dispute that an alternative permitting fewer wells would reduce the area affected, *see* Doc. 30 at 32, and an alternative requiring compliance with all best management practices would as well, for example, by prohibiting compaction of snow cover or snow removal on most fish bearing waterbodies, AR 26 at 8487, and restricting the location of refueling and fuel storage, *id.* at 8491.

Defendants also wrongly suggest that BLM satisfied its ANILCA obligation to consider alternatives by concluding that no other lands would be appropriate for the project's purpose. Doc. 31-32. The requirement to consider "the availability of other

lands for the purposes sought to be achieved" is, however, separate from the requirement to consider "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a). Agencies must do both, *see Kunaknana v. Clark*, 742 F.2d 1145, 1150-51 (9th Cir. 1984), and the possibility that other land may not be available does not establish that no alternatives exist that would reduce subsistence effects.

Defendants' argument for refusing to consider Plaintiffs' proposed alternative of fewer wells is unpersuasive. Doc. 30 at 33. BLM's explanation—chiefly, that a fewer-wells alternative "would be contrary to the terms of [ConocoPhillips'] leases," Doc. 30 at 32-33—is both not contrary to the lease and not a valid basis for rejecting an alternative under ANILCA. Doc. 27 at 37-39. Moreover, Plaintiffs do not, as Defendants suggest, Doc. 30 at 33, argue that BLM was *required* to impose any specific limitations on the number of wells that may be drilled. Instead, Plaintiffs argue that because BLM has discretion to place limitations on the scale of exploratory drilling it permits in a given year, alternatives that may reduce the number of wells are feasible and must be considered if they would reduce or eliminate effects to subsistence. Doc. 27 at 38-39.

Finally, Defendants and Intervenor make several irrelevant assertions about alternatives. First, Defendants suggest that BLM's conclusion that the proposed action would not significantly restrict subsistence uses is relevant. Doc. 30 at 31. It is not. The obligation to consider alternatives applies to all actions subject to ANILCA, regardless of

whether the action would significantly restrict subsistence uses. 16 U.S.C. § 3120(a). Second, Intervenor asserts that no court has held that an agency fails to satisfy its obligations under Section 810 when it considers the preferred alternative and a no action alternative. This is irrelevant. None of the very few cases interpreting ANILCA Section 810(a)'s alternatives requirement has specifically addressed a circumstance where an agency considered only the proposed action and a no action alternative. Further, in those cases finding an agency's consideration of alternatives inadequate, the agency had already considered *more* than the proposed and no action alternatives. *See Alaska Wilderness Recreation*, 67 F.3d at 731; *City of Tenakee Springs*, 915 F.2d at 1311. Third, Intervenor asserts that the cases Plaintiffs cite are inapposite because agencies in those cases produced EISs rather than EAs. Doc. 31 at 46. Again, this is irrelevant. An agency must conduct an ANILCA section 810 analysis for all actions subject to ANILCA, regardless whether the action requires an EA or EIS, or falls within any other category under NEPA. 16 U.S.C. § 3120(a).

**B.     BLM violated NEPA by failing to consider viable alternatives.**

BLM's refusal to consider viable alternatives, including two proposed by Plaintiffs, *see* Doc. 27 at 36-39, also failed to satisfy NEPA. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 F. App'x 440, 442-43 (9th Cir. 2007) ("An agency's failure to analyze a viable alternative that is consistent with the objectives of its proposed action can render an EA inadequate."); *see* Doc. 27 at 39-42. Defendants and Intervenor point

out that an agency is not obligated to discuss alternatives in the same detail in an EA and an EIS, but that does not justify excluding a viable alternative entirely. *See W. Watersheds Project*, 719 F.3d at 1050; *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245-46 (9th Cir. 2005). "The existence of a viable but unexamined alternative renders an EA inadequate." *W. Watersheds Project*, 719 F.3d at 1050 (internal quotations removed).

Contrary to Intervenor's suggestion, the Ninth Circuit has made clear an agency must consider all reasonable alternatives in an EA; the number of alternatives it considers is not dispositive. *See W. Watersheds Project*, 719 F.3d at 1050. Courts have held multiple times that an agency was obligated to consider alternatives beyond the proposed action and a no action alternative in an EA. *See, e.g., id.* at 1053; *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Dep't of the Interior*, 655 F. App'x 595, 599-600 (9th Cir. 2016). Indeed, even consideration of multiple action alternatives and a no action alternative is insufficient if an agency fails to consider a viable alternative. *See W. Watersheds Project*, 719 F.3d at 1050 (holding that BLM was obligated to consider reduced-grazing alternative in grazing allotment EA). Moreover, that an agency acknowledged but did not examine an alternative does not satisfy the obligation. *Id.* at

1052. [4]

Intervenor is also wrong that the Plan EIS fully considered the alternatives Plaintiffs proposed. Doc. 31 at 41-42. A programmatic EIS's consideration of alternatives does not by itself relieve BLM of the obligation to consider site-specific alternatives. *See* 40 C.F.R. §1508.28; *W. Watersheds Project*, 719 F.3d at 1050-51 (9th Cir. 2013). The Plan EIS considered alternatives that, among other things, differed in the number of total exploratory wells anticipated in the entire Reserve over multiple years. AR 1 at 0129. It did not, however, consider alternative options for exploratory drilling on specific leases during individual winter seasons.

Further, Intervenor incorrectly claims that BLM satisfied its obligations to discuss alternatives by separately discussing the effect of permitting deviation from each management practice. Doc. 31 at 42. An agency, however, has a distinct obligation under NEPA to consider alternatives to the proposed action. 40 C.F.R. § 1508.25(b). Examining the effects of deviation from individual management practices in isolation does not allow for the meaningful comparison between alternatives required by NEPA. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 648 (9th Cir. 2010). BLM failed to consider and present in comparative form an alternative that would

_____

[4] *Earth Island Institute v. U.S. Forest Service*, which Intervenor relies on, approved the Forest Service's consideration of only a proposed action and no-action alternative where an alternative proposed by Plaintiffs in that case did not meet the purpose and need of the project. 697 F.3d 1010, 1022 (9th Cir. 2012). Here, the proposed activities meet the purpose of the action. Doc. 27 at 40-41.

Case 3:19-cv-00056-SLG   Document 33   Filed 08/23/19   Page 27 of 29

require ConocoPhillips to comply with all best management practices.

## CONCLUSION

BLM violated NEPA and ANILCA by (1) failing to supply a convincing statement of reasons, supported by a site-specific assessment, explaining why ConocoPhillips' winter exploration activities will not have significant effects on the Teshekpuk Caribou Herd and Nuiqsut subsistence activities; (2) failing to analyze the specific cumulative impacts of ConocoPhillips' winter exploration program and other exploration and construction projects occurring during the same time and in the same area; and (3) failing to consider viable alternatives to ConocoPhillips' proposal. Plaintiffs therefore request that this Court vacate and declare unlawful BLM's record of decision and EA.

Respectfully submitted this 23rd day of August, 2019.

*s/ Rebecca Noblin*
Rebecca Noblin (Alaska Bar. No. 0611080)
Jeremy C. Lieb (Alaska Bar. No. 1810088)
Eric P. Jorgensen (Alaska Bar. No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs Native Village of Nuiqsut, Alaska Wilderness League, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council, and Sierra Club*

Garett R. Rose (Pro Hac Vice)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorney for Plaintiff Natural Resources Defense Council*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this document contains 5,687 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 23rd day of August, 2019.

*s/ Rebecca Noblin*
Rebecca Noblin

*Native Village of Nuiqsut et al. v. BLM et al.,*
Case No. 3:19-cv-00056-SLG

24

Case 3:19-cv-00056-SLG   Document 33   Filed 08/23/19   Page 29 of 29

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this document contains 5,687 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 23rd day of August, 2019.

*s/ Rebecca Noblin*
Rebecca Noblin