# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

NATIVE VILLAGE OF NUIQSUT, *et al.*,

        Plaintiffs,

    v.

BUREAU OF LAND MANAGEMENT, *et al.*,

        Defendants,

    and

CONOCOPHILLIPS ALASKA, INC.,

        Intervenor-Defendant.

Case No. 3:19-cv-00056-SLG

## DECISION AND ORDER

    This is an action in which Plaintiffs, comprised of Native Village of Nuiqsut, Alaska Wilderness League, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council, and Sierra Club, seek the invalidation of the Bureau of Land Management's approval of the 2018-2019 winter exploration activity undertaken by ConocoPhillips Alaska, Inc. in the National Petroleum Reserve-Alaska.[1] For the reasons set forth herein, Plaintiffs' requested relief is denied.

---

[1] Pursuant to the briefing schedule for administrative agency appeals, *see* L. R. Civ. P. 16.3(c), Plaintiffs' Opening Brief is at 27; Defendants Bureau of Land Management, David Bernhardt, Ted Murphy, and Nichelle Jones' ("Federal Defendants") Brief in Opposition is at Docket 30; Intervenor-Defendant ConocoPhillips' Brief in Opposition is at Docket 31; and Plaintiffs' Reply

## BACKGROUND

The National Petroleum Reserve-Alaska ("NPR-A"), on Alaska's North Slope, consists of 23.6 million acres and is the nation's largest single unit of public land.[2] Established as the Naval Petroleum Reserve in 1923, the NPR-A was renamed and placed under the authority of the Secretary of the Interior in 1976 by the National Petroleum Reserve Protection Act ("NPRPA"), 42 U.S.C. § 6501 *et seq*.[3] In 1980, the NPRPA was amended to direct the Secretary of the Interior to "conduct an expeditious program of competitive leasing of oil and gas in the Reserve."[4]

The NPRPA provides that exploration within designated areas "containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve."[5] The Teshekpuk Lake Special Area—an approximately 1.7 million-acre area containing "Teshekpuk Lake and its

Brief is at Docket 33. Oral argument was held on September 20, 2019. Plaintiffs' Motion to Take Judicial Notice of Supplemental Factual Materials is also before the Court at Docket 44.

[2] *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006).

[3] *Id.*

[4] 42 U.S.C. § 6506a(a).

[5] 42 U.S.C. § 6504(a).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 2 of 73

watershed"—is one such designated area.[6]  This area "includes important nesting, staging, and molting habitat for a large number of waterfowl and shorebirds and critical Teshekpuk Caribou Herd caribou calving, migration, and insect-relief habitat."[7]

In 1994, the discovery of a large oil field on state land near the eastern border of the NPR-A spurred "renewed interest in leasing in the Reserve."[8] Additional discoveries in the northeastern portion of the NPR-A led to the creation of the Greater Mooses Tooth ("GMT") and the Bear Tooth exploratory units.[9] Between 2000 and 2012, operators drilled 29 exploration wells in the NPR-A.[10] Fifteen of these wells were drilled in the GMT unit and one was drilled in the Bear Tooth unit.[11]

In 2012, the Bureau of Land Management ("BLM") published a final integrated activity plan ("IAP") and supporting environmental impact statement ("EIS") (together the "2012 IAP/EIS") to govern its management of "all BLM-

---

[6] 42 U.S.C. § 6504(a); National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977).  An additional 10,000 acres were added to the Teshekpuk Lake Special Area in 1999.  AR0369 (2012 Final Integrated Activity Plan/Final Environmental Impact Statement).

[7] AR0369.

[8] AR0542.

[9] AR0542.  The GMT unit comprises 164,014 acres, and the Bear Tooth unit comprises 105,475 acres.  *Id.*

[10] AR0542.

[11] AR0542.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 3 of 73

managed lands in the [NPR-A]."[12]  The subsequent Record of Decision ("ROD")

adopted Alternative B-2 of the IAP/EIS, which made 11.8 million acres—or 52%—

of the NPR-A available for oil and gas leasing.[13]  It kept much of the Teshekpuk

Lake Special Area closed to leasing.[14]  However, it made "lands in the eastern-

most part of [that area] available for oil and gas leasing" because they "include or

are close to existing leases, including those with oil discoveries in the [GMT] Unit

. . . [and] offer the greatest promise for oil and gas development."[15]  The ROD also

adopted a series of lease stipulations and best management practices ("BMPs"),

which are mitigation measures "required, implemented, and enforced at the

operational level for all authorized (not just oil and gas) activities in the planning

area."[16]

Previously, in 2004, BLM had prepared an EIS and approved

ConocoPhillips' proposal to expand its existing operations on state land by

constructing satellite drill pads in the NPR-A.[17]  Two of these pads—GMT1 and

---

[12] AR0005.  Previous planning documents had only dealt with certain regions of the NPR-A, not the area as a whole.  *See* AR0006–07 (describing earlier plans).

[13] AR2642.

[14] AR2650–51.

[15] AR2650–51.  The Record of Decision recognized that areas made available for leasing within the Teshekpuk Lake Special Area have "valuable waterfowl and caribou habitat," but concluded that opening them to drilling "constitute[d] a proper balancing of BLM's management responsibilities for [the] NPR-A."  *Id.*

[16] AR2669.

[17] AR4534.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 4 of 73

GMT2—lie within the GMT unit.[18]  In October 2014, BLM completed a supplemental EIS to analyze revisions that ConocoPhillips had made to its plan for the development of the GMT1 drill pad.[19]  The agency approved the revised plan for that drill pad in a February, 2015 ROD.[20]  BLM approved revisions to ConocoPhillips' development plan for the GMT2 drill pad through a similar process, completing a supplemental EIS in August 2018 and issuing a ROD approving the revisions in October, 2018.[21]

In 2013, 2015, 2017, and 2018, BLM approved a series of winter exploratory drilling programs within the NPR-A, which included the construction of wells and associated access route corridors and water supply.[22]  Each of these programs was approved after BLM completed an Environmental Assessment ("EA") and made a finding of no significant impact ("FONSI") or a finding of no new significant impact ("FONNSI") beyond those already considered in previous EISs.[23]

---

[18] AR4534.

[19] AR2739.

[20] AR4406.

[21] AR4516 (SEIS); AR6542 (ROD).

[22] AR8550–52.

[23] AR8550–52.  Pursuant to Department of Interior regulations, "[a] finding of no significant impact other than those already disclosed and analyzed in the environmental impact statement to which the environmental assessment is tiered may also be called a 'finding of no new significant impact.'" 43 C.F.R. § 46.140(c).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 5 of 73

In August, 2018, ConocoPhillips completed an Exploration and Appraisal Program describing activities it planned to conduct during the 2018-2019 winter season to "explore and appraise oil and gas potential on" leases it owned within the NPR-A.[24]   The proposed exploration would occur to the west of Nuiqsut and the GMT1 and GMT2 projects, in the Bear Tooth unit near the confluence of Fish and Judy Creeks.[25]  In support of its exploration plan, ConocoPhillips submitted to BLM in October 2018 an application for a right-of-way grant,[26] requests to deviate from several of the 2012 IAP/EIS BMPs,[27] and applications for permits to drill up to six exploration wells in or near the Bear Tooth unit.[28]

BLM released a preliminary EA analyzing ConocoPhillips' proposed operations on November 9, 2018.[29]  After the requisite public comment period had closed, the agency published a final EA on December 6, 2018 ("2018 EA"), which proposed approving ConocoPhillips' various applications and requests.[30]   The 2018 EA tiered to the 2012 IAP/EIS and the supplemental EISs for the GMT1 and

_____

[24] AR6939–59.

[25] *See* AR8475 (map showing winter exploration project area).

[26] AR6960.

[27] AR7795; AR7797; AR7802.

[28] AR7807–25; AR7831–7999

[29] AR8596.

[30] AR8467; AR8482–95 (describing proposed action alternative).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 6 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 6 of 73

GMT2 drill pads.[31]  BLM then issued a FONNSI,[32] and released a ROD that, among other things, authorized ConocoPhillips to conduct exploration drilling and testing at up to eight well sites and build associated infrastructure, including up to 57 miles of ice roads, 42.7 miles of snow trails, 23 ice pads, an air strip, and temporary housing for its employees during the 2018-2019 winter season.[33]  ConocoPhillips fully completed the operations authorized by the ROD on April 28, 2019.[34]

Several other projects occurred in the northeast of the NPR-A during the 2018-2019 winter season as well.  The largest of these was construction of the road and drill pad for the GMT2 development.[35]  ConocoPhillips also obtained authorization to engage in geotechnical exploration in the area, in order to locate "potential gravel resources" to "support[] oil and gas development in the Bear Tooth Unit."[36]  This exploration program consisted of drilling up "up to 125 onshore boreholes" and "up to 40 nearshore boreholes" in search of gravel.[37]  The majority

---

[31] AR8477; *see also* 40 C.F.R. § 1508.28 (defining tiered environmental review and describing when it is appropriate).

[32] AR8588.

[33] AR8595, AR8597.

[34] Docket 32 at 3, ¶ 5 (Decl. of Lorna K. Richmond).

[35] AR8503 (concluding that "GMT2 construction activity is anticipated to present the most prominent immediate impacts for the community because the gravel is mined east of town then hauled with large trucks over an ice road to the GMT2 area west of town"); *see* AR4573–75 (describing road and drill pad construction during first three years of GMT2 development).

[36] AR8691.  BLM approved the geotechnical exploration program after completing an EA, AR8684, and a FONNSI. AR8743.

[37] AR8691.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 7 of 73

of the onshore borehole drilling occurred in the vicinity of the GMT1 and GMT2 projects, with a smaller number of boreholes drilled in the area of ConocoPhillips' 2018-2019 winter exploration.[38] The nearshore borehole drilling occurred several miles north, off Atigaru Point.[39] ConocoPhillips' winter exploration and geotechnical survey both supported the company's plan to develop the Willow prospect, for which BLM is preparing an EIS.[40]

Nuiqsut is a predominantly Alaska Native community of nearly 500 people located on the eastern border of the NPR-A.[41] In recent decades, several oil and gas development projects have been undertaken near Nuiqsut, which is "situated closer to current and foreseeable areas of petroleum development than any other community on the North Slope."[42] This development has created conflicts with the community's traditional ways of life. A comment from the North Slope Borough on the GMT2 SEIS explained:

> Nuiqsut residents, more so than residents of other North Slope communities, and perhaps more so than any other Alaskan residents, have lived with a decades-long, ever-increasing, near constant level of frustration and apprehension as expanding oil and gas facilities and

---

[38] AR8693 (map showing location of onshore geotechnical survey).

[39] AR8694.

[40] AR5021 n.b.

[41] AR0417 (Nuiqsut lies "about 35 miles south of the Beaufort Sea coast on the Niġlik channel of the Colville River in the Colville River Delta"); AR8505 ("[T]he population of Nuiqsut . . . is predominantly Inupiaq."); *see also* AR2540 (map).

[42] AR0420.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 8 of 73

operations have impinged upon their traditional onshore and offshore subsistence harvest areas.[43]

Many of ConocoPhillips' activities during the winter of 2018-2019 occurred in the general vicinity of Nuiqsut. The ice road construction and drilling associated with the winter exploration program occurred largely 25 miles or more to the west of the community.[44] The GMT2 development is closer to Nuiqsut; the drill pad site "lies approximately 16.5 miles west of Nuiqsut," and connects to the GMT1 drill site by an access road extending towards the northwest.[45] Maps showing the locations of development relative to Nuiqsut are included in an appendix to this decision.[46]

The Native Village of Nuiqsut[47] and several non-profit organizations initiated this action on March 1, 2019, claiming that BLM's environmental analysis of ConocoPhillips' 2018-2019 winter exploration plan was deficient in several ways, and seeking declaratory and injunctive relief.[48] Plaintiffs filed an Amended Complaint on March 26, 2019, which contained five claims for relief:

---

[43] AR5065. "Subsistence Activities are important components of the Nuiqsut economy and of local Iñupiaq culture and identity." AR0420. The GMT2 SEIS reports that caribou make up, on average, 30 percent of Nuiqsut's subsistence harvest, and the average per capita caribou harvest is 157 pounds. AR4725; AR4752.

[44] *See* AR8504 ("Most of the ice roads for the proposed exploration project are located more than 25 miles from Nuiqsut."); AR8474 (map showing winter exploration project area).

[45] AR4598; *see also* AR5177 (map showing proposed GMT2 development).

[46] *See* Docket 46-1.

[47] The Native Village of Nuiqsut "is [a] Federally Recognized Tribal Government" that "is responsible for over 400 tribal members" residing in Nuiqsut. Docket 5 at 5, ¶ 9.

[48] Docket 1.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 9 of 73

(1) That BLM's FONNSI for the winter exploration program, and its associated decision not to prepare an EIS, failed to account for significant impacts to the Teshekpuk Caribou Herd and subsistence activity and was thus in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2);[49]

(2) That BLM's FONNSI, and associated decision not to prepare an EIS, failed to consider the cumulative impacts of the winter exploration program, and thus violated NEPA, 42 U.S.C. § 4332(2)(C), and the APA, 5 U.S.C. § 706(2);[50]

(3) That "BLM's failure to consider the winter exploration program and geotechnical exploration program together in a single EIS" violated NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. § 1508.25, and the APA, 5 U.S.C. 706(2);[51]

(4) That BLM failed to consider appropriate alternatives to ConocoPhillips' proposed winter exploration plan, in violation of NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1507.2(d), 1508.9(b), and the APA, 5 U.S.C. §§ 702, 706;[52] and

---

[49] Docket 5 at 22–23, ¶¶ 87–88.

[50] Docket 5 at 24–25, ¶¶ 98–99.

[51] Docket 5 at 25, ¶ 103.

[52] Docket 5 at 26, ¶ 107.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 10 of 73

(5) That BLM failed to consider alternatives to the winter exploration plan that would reduce the impact to subsistence uses of the affected areas, in violation of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3120(a), and the APA, 5 U.S.C. §§ 702, 706.[53]

The Amended Complaint requested declaratory relief, an order vacating the ROD for the 2018-2019 winter exploration, and an injunction prohibiting "further exploration activities in the [Petroleum] Reserve until BLM has complied with the requirements of NEPA and ANILCA."[54] However, in their briefing on the merits, Plaintiffs seek only declaratory relief and vacatur.[55]

The Court granted ConocoPhillips' Motion to Intervene on April 10, 2019,[56] and the company answered the Amended Complaint on April 12, 2019.[57] Federal Defendants filed their answer on May 6, 2019.[58] Plaintiffs filed their opening brief on the merits on May 23, 2019.[59]

---

[53] Docket 5 at 27, ¶ 111.

[54] Docket 5 at 27.

[55] Docket 27 at 42–43.

[56] Docket 15.

[57] Docket 17.

[58] Docket 25.

[59] Docket 27; *see also* L. R. Civ. P. 16.3(c) (establishing briefing schedule for administrative appeals).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 11 of 73

# JURISDICTION

"It is an inexorable command of the United States Constitution that the federal courts confine themselves to deciding actual cases and controversies."[60] This case-or-controversy requirement "underpins both . . . standing and . . . mootness jurisprudence."[61] Standing and mootness are related, but distinct legal concepts.[62] The standing inquiry asks whether a case or controversy existed at the time a complaint was filed;[63] the mootness inquiry asks whether that case or controversy "persist[s] throughout all stages of the litigation."[64]

ConocoPhillips argues that Plaintiffs do not have standing to challenge the EA for the 2018-19 winter exploration,[65] and Federal Defendants and

---

[60] *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1128 (9th Cir. 2005) (citing U.S. Const. art. III, § 2).

[61] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

[62] *Id.* at 189–93 (discussing difference between mootness and standing).

[63] *See e.g.*, *Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Trust*, 867 F.3d 1093, 1102 (9th Cir. 2017) (recognizing the "general rule that standing is determined 'at the time the action commences'" (quoting *Friends of the Earth, Inc.*, 528 U.S. at 191)).

[64] *Gator.com Corp.*, 398 F.3d at 1128–29 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974)); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71–72 (2013) ("A corollary to th[e] case-or-controversy requirement is that 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)).

[65] Docket 31 at 18–25.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 12 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 12 of 73

ConocoPhillips both argue that Plaintiffs' claims are moot.[66]  The Court will address these two arguments separately, beginning with standing.[67]

## I.    Standing

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[68]  At the summary judgment stage, plaintiffs must submit evidence, such as affidavits, showing that each of these elements is met through specific facts.[69]  Plaintiffs submitted nine declarations from their members in an effort to carry this burden.[70]

ConocoPhillips contends that Plaintiffs have failed to establish each of these three elements.[71]  ConocoPhillips' briefing relies heavily on the fact that the winter exploration program challenged by Plaintiffs had concluded by the time they filed

---

[66] Docket 30 at 14–20; Docket 31 at 16–18 (agreeing with and adopting Federal Defendants' mootness argument).

[67] *See Friends of the Earth, Inc.*, 528 U.S. at 180 (addressing standing and mootness separately and beginning by asking whether plaintiffs "had Article III standing at the outset of the litigation"); *Bernhardt v. Cty. of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002) ("We examine whether Bernhardt had standing at the time the lawsuit was filed, and separately consider whether her case has become moot.").

[68] *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[69] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992).  The Court considers summary judgment to be analogous to the administrative agency appeal process established by Local Rule 16.3.

[70] Docket 27-1–27-9.

[71] Docket 31 at 18–19.

their opening brief.[72]  However, ConocoPhillips' arguments about the timing of the challenges to its winter exploration are more relevant to the question of mootness, which is discussed separately below.[73]  As explained above, the standing inquiry focuses on the plaintiff's position at the time the operative complaint was filed; consistent with the "general rule that standing is determined 'at the time the action commences.'"[74]  The Court will thus consider whether Plaintiffs established that each of the standing elements existed at the time the Amended Complaint was filed, in March, 2019, when exploration activities were ongoing.[75]

### A.    Injury-in-Fact

The injury-in-fact element requires Plaintiffs to show that they have suffered an injury that is "(a) concrete and particularized and (b) actual or imminent, not

---

[72] *See, e.g.*, Docket 31 at 19 ("The primary flaw with Plaintiffs' declarations is that by the time Plaintiffs moved for summary judgment, the 2018-19 Program was *already completed*." (emphasis in original)).

[73] *See Friends of the Earth, Inc.*, 528 U.S. at 189–93 (discussing difference between mootness and standing and noting that "confusion [between the two] is understandable").

[74] *Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Trust*, 867 F.3d 1093, 1102 (9th Cir. 2017) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 191); *see also Friends of the Earth*, 528 U.S. at 178, 184 (concluding that plaintiffs retained standing despite defendant's cessation of challenged activity because "it is undisputed that Laidlaw's unlawful conduct—discharging pollutants in excess of permit limits—was occurring *at the time the complaint was filed*." (emphasis added)); *Nat. Law Party of U.S. v. Fed. Elec. Comm'n*, 111 F. Supp. 2d 33, 41 (D.D.C. 2000) ("Standing is based upon the facts as they exist at the time the complaint is filed . . . .").

[75] *Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1044 (9th Cir. 2015) ("[T]he proper focus in determining jurisdiction are 'the facts existing at the time the complaint *under consideration* was filed'." (quoting *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008) (emphasis in original))).  Here, it is the Amended Complaint that is complaint under consideration.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 14 of 73

conjectural or hypothetical."[76] If "plaintiffs seek declaratory and injunctive relief only," as here, "there is a further requirement that they show a very significant possibility of future harm."[77]

The Native Village of Nuiqsut satisfied this burden through the declarations of its tribal members. For example, Martha Itta, the Tribal Administrator for the Native Village of Nuiqsut,[78] stated that "[ConocoPhillips'] exploration activities and other oil activities in the region affect every aspect of our lives[;] . . . [t]here is 24-7 never-ending traffic during ice road season, nonstop noise pollution."[79] And the EA itself recognized that the winter exploration's "[p]roximity to the community [of Nuiqsut] is a key concern for residents, particularly in terms of air quality and noise."[80] It explained that while the planned winter exploration activities "would not easily be discernible" from other oil and gas development projects in the area, residents "will generally be aware of the unprecedented scale and extent of activity

---

[76] *Friends of the Earth, Inc.*, 528 U.S. at 180 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[77] *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (citing *Bras v. Cal. Pub. Util. Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996)).

[78] Docket 27-1 at 1, ¶ 1.

[79] Docket 27-1 at 3–4, ¶ 8; *see also* Docket 27-2 at 18, ¶ 31 (Decl. of Rosemary Ahtuangaruak) ("[O]ur village is now completely surrounded by lights from the oil and gas infrastructure. . . . These artificial lights are confusing our people.").

[80] AR8504.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 15 of 73

on the west side [of Nuiqsut] this season."[81]  Noise and light pollution are concrete

injuries sufficient to establish injury-in-fact.[82]

Further, tribal members described in their declarations a fear that

ConocoPhillips' winter exploration activities would interfere with subsistence uses

of the affected area.  For example, Tribal Administrator Itta stated that "[t]he area

where [ConocoPhillips] conducts its current winter exploration activities is . . .

where [tribal members] fish and hunt," but that she has not been "able to utilize

[her] family's traditional camps [in the Teshekpuk Lake area] due to infrastructure

and the animals no longer going to those areas."[83]  The EA also recognizes these

concerns, stating that the winter exploration "would . . . encompass a large area

around Fish Creek, which is an important area for wintertime caribou hunting," on

which "Nuiqsut residents place extreme value."[84]  It recognized that "[t]he proposed

action is anticipated to deflect caribou and furbearers from the area" and that

---

[81] AR8504.

[82] *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 987–88 (8th Cir. 2011) (holding member's declaration that project's "light and noise pollution threatened his aesthetic enjoyment of the area" sufficient to establish injury-in-fact).

[83] Docket 27-1 at 2–3, 6, ¶¶ 7, 15.  Rosemary Ahtuangaruak, another tribal member, stated that she can no longer use her family's hunting cabin, which is "across the river from where the Alpine oilfield was built," to hunt caribou due to disturbance from industrial activity and that she was concerned that "disturbances to nesting grounds from oil and gas activities are also affecting the density of birds in our traditional hunting grounds."  Docket 27-2 at 5, ¶ 9.

[84] AR8497.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 16 of 73

"[s]ubsistence hunters would likely avoid the area."[85]  Accordingly, the Court finds that the Native Village of Nuiqsut has established injury-in-fact.

Members of at least some of the plaintiff environmental organizations, through their declarations, also identified concrete and imminent harm they feared they would suffer as a result of ConocoPhillips' winter exploration.  The Supreme Court has held that "environmental plaintiffs adequately allege injury-in-fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."[86]

For example, Jeffrey Scott Fair, a member of the NRDC, is a wildlife biologist who has researched yellow-billed loons in the area of ConocoPhillips' 2018-2019 winter exploration.[87]  He describes his concern that ice-road construction during the exploration season could harm loons directly by artificially lowering the water level of the lakes by which they nest in the spring:  the loons "need to nest right at the water line," but "[g]iven the likelihood that these lakes would refill later in the early nesting season (from their unnatural drawdowns), rising waters would flood and kill the loon nests."[88]  Mr. Fair states that he plans to revisit loon sites "for comparison and follow-up" and that he is currently "awaiting acceptance and

---

[85] AR8497.

[86] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

[87] Docket 27-7 at 2, 7, ¶¶ 4, 20.

[88] Docket 27-7 at 8–9, ¶ 23.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 17 of 73

funding for a red-throated loon study . . ., potentially including areas within approximately 20 miles of the exploration area" as early as summer, 2020.[89]

Dan Ritzman, a member of both the Sierra Club and Alaska Wilderness League,[90] stated that he had plans to float "portions of the Nigu, Etivlik and Colville rivers" in the summer of 2020,[91] but feared that "noise impacts from exploration drilling, development, and production activities will drive away wildlife from . . . the critical areas around Teshekpuk Lake," and thus "significantly decrease or completely erase [his] opportunity to enjoy wildlife viewing" on his upcoming trip.[92]

ConocoPhillips maintains that Plaintiffs' declarations are deficient and do not show impending harm because "they surmise about effects that they believe *could* occur—despite the fact that the declarations were submitted *after* the program

---

[89] Docket 27-7 at 9, ¶ 24. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (holding that vague statements of intent to revisit areas of interest cannot show injury-in-fact because "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require" (emphasis in original)).

[90] Docket 27-9 at 2, ¶ 3.

[91] Docket 27-9 at 12, ¶ 33.

[92] Docket 27-9 at 14, ¶ 37. The Court construes Mr. Ritzman's declaration broadly to assert that disturbances to wildlife from ConocoPhillips' 2018-2019 winter exploration program will last long enough to negatively impact his summer 2020 river trip. However, the remaining plaintiff environmental organizations—Center for Biological Diversity and Friends of the Earth—have failed to provide declarations from their members identifying particular injuries they expect to stem from the particular exploration program at issue in this case. They instead largely focus on the impacts of oil and gas development in the NPR-A generally, giving little attention to ConocoPhillips' 2018-2019 winter exploration activities. *See, e.g.*, Docket 27-4 (Decl. of Richard G. Steiner, member, Center for Biological Diversity); Docket 27-6 (Decl. of Marcelin E. Keever, Legal Director, Friends of the Earth). The Court finds, therefore, that the Center for Biological Diversity and Friends of the Earth have failed to allege a concrete and particularized injury in fact and dismisses these plaintiffs for lack of standing.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 18 of 73

completed—and identify no harms that actually occurred."[93]    ConocoPhillips

mischaracterizes Plaintiffs' burden; as explained above, the standing inquiry

focuses on Plaintiffs' position at the filing of the Amended Complaint, not the filing

of their opening brief on the merits.[94]  Viewed through this lens, the above quoted

declarations filed with Plaintiffs' briefing demonstrate that members of at least

some plaintiff organizations had articulated sufficiently specific concerns about

how the winter exploration would "affect [their] recreational, aesthetic, and

economic interests." [95]

For the foregoing reasons, the Native Village of Nuiqsut, NRDC, Sierra Club,

and Alaska Wilderness League have met their burden to show a concrete,

imminent injury-in-fact.  The Court finds that the Friends of the Earth and the

Center for Biological Diversity have not met this burden, however, and dismisses

them from the case.

### B.    Causation

ConocoPhillips maintains that "[t]he completed 2018-19 Program either

caused harm to Plaintiffs or did not," and contends that "Plaintiffs have presented

---

[93] Docket 31 at 21–22.

[94] *Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Trust*, 867 F.3d 1093, 1102 (9th Cir. 2017). Many of the declarations were signed after the completion of the winter exploration program, *see, e.g.*, Docket 27-7 at 11 (Decl. of Mr. Fair signed May 21, 2019), but this delay is understandable since the use of declarations to demonstrate standing does not become necessary until the summary judgment stage.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992).

[95] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 19 of 73

no evidence from which th[e] Court can conclude that any of the Plaintiffs suffered injury due to the 2018-19 Program."[96] ConocoPhillips' argument again focuses on the facts as they were at the time of Plaintiffs' opening brief, when winter exploration had completed, rather than the facts at the time the Amended Complaint was filed, when exploration activities were still ongoing.

As explained above, certain Plaintiffs have demonstrated that they had been injured and reasonably feared continuing and imminent future injury at the time the Amended Complaint was filed. They have also shown that that injury would be "fairly traceable" to ConocoPhillips' winter exploration.[97] For example, Mr. Fair explained how the construction of ice roads could impact loon habitat,[98] and Tribal Administrator Itta explained that exploration activities cause noise and light pollution and impact subsistence uses of the Teshekpuk Lake area.[99] And, as noted above, the EA itself recognized that winter exploration would cause subsistence users to avoid the area.[100]

---

[96] Docket 31 at 24.

[97] *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61 (1992)).

[98] Docket 27-7 at 8–9, ¶ 23.

[99] *See* Docket 27-1 at 4, ¶ 8; *see also* Docket 27-2 at 5, ¶ 9 (Decl. of Ms. Ahtuangaruak).

[100] AR8497.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 20 of 73

## C.    Redressability

ConocoPhillips argues that "a declaration from th[e] Court that BLM did not comply with NEPA or ANILCA . . . would not redress any . . . injury" suffered by Plaintiffs because the "2018-19 Program, including demobilization, is complete."[101] However, exploration was ongoing at the time the Amended Complaint was filed, and a declaratory judgment and vacatur of the EA, at that point in time, would have caused exploration to cease and thus redressed Plaintiffs' injuries.  Accordingly, the Court finds that Plaintiffs have established the elements of standing as of March 26, 2019, the date of the Amended Complaint.

## II.    Mootness

"A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party."[102]  "[T]he burden of demonstrating mootness is a heavy one."[103]  Federal Defendants and ConocoPhillips argue that Plaintiffs' claims are moot because the 2018-2019 winter exploration program they

---

[101] Docket 31 at 25.

[102] *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (internal quotations omitted) (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).  Indeed, "defendants in NEPA cases face a particularly heavy burden in establishing mootness," and the Ninth Circuit has "repeatedly emphasized that if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities 'could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine.'"  *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) (quoting *West v. Sec'y of Dept. of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000)).

[103] *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008) (quoting *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988)).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 21 of 73

challenge has already been completed.[104]   Federal Defendants maintain that "there is no effective relief the Court can order here with the Program completed and the wells suspended."[105]

Plaintiffs argue that their claims fit within the "capable of repetition yet evading review" exception to the mootness doctrine.  This "exception applies when (1) the duration of the challenged action is too short to allow full litigation before it ceases or expires, and (2) there is a reasonable expectation that the plaintiffs will be subjected to the challenged action again."[106]  .

Beginning with the first prong, "[a]n action is 'fully litigated' if it is reviewed by [a court of appeals] and the Supreme Court."[107]   In *Shell Offshore, Inc. v. Greenpeace, Inc.*, the Ninth Circuit held that a preliminary injunction "limited to a total duration of less than seven months" could not be fully litigated before expiring, concluding that "[o]rders of such inherently limited duration will almost always evade full review."[108]   The EA at issue in this case authorized winter exploration that began in December, 2018 and concluded in April, 2019, a period of only five

---

[104] Docket 30 at 14–20; Docket 31 at 16–18 (agreeing with and adopting Federal Defendants' mootness argument).

[105] Docket 30 at 16.

[106] *See Wildwest Inst. v. Kurth*, 855 F.3d 995, 1002–03 (9th Cir. 2017) (quoting *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1018 (9th Cir. 2014)).

[107] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1287 (9th Cir. 2013).

[108] *Id.*

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 22 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 22 of 73

months.[109]  BLM's approval of the 2018-2019 winter exploration in the NPR-A is thus precisely the sort of short-term action that evades judicial review.

Defendants contend that this is a problem of Plaintiffs' own making.  They maintain that Plaintiffs could have brought their case sooner and moved for a preliminary injunction of the winter exploration in order to preserve the issue for judicial review.[110]  Plaintiffs did not file the initial complaint in this case until March 1, 2019, well after ConocoPhillips' winter exploration had begun.[111]  A preliminary injunction, if entered, may have prevented the initiation or completion of the winter exploration.  However, no judicial relief could have prevented the expiration of the authorization provided by the EA before it could be fully litigated.[112]

Turning to the second prong, Plaintiffs argue that BLM is likely to authorize winter exploration in the area again, using the same, allegedly deficient environmental review.[113]  BLM has repeatedly authorized winter exploration

---

[109] Docket 32 at 2–3, ¶¶ 3–5 (Decl. of Lorna K. Richmond).

[110] *See* Docket 30 at 19–20 ("To the extent BLM's decision can be said to have evaded review, it is only due to Plaintiffs' own delay and not to something inherent in the governmental action challenged."); Docket 31 at 17–18 ("Nothing prevented Plaintiffs from filing this lawsuit earlier, before the alleged deficiencies became moot for lack of an effective remedy."); *cf. Headwaters, Inc. v. Bureau of Land Mgmt*, 893 F.2d 1012, 1016 (9th Cir. 1989) ("Where prompt application for a stay pending appeal can preserve an issue for appeal, the issue is not one that will evade review." (quoting *Am. Horse Prot. Ass'n, Inc. v. Watt*, 679 F.2d 150, 151 (9th Cir. 1982))).

[111] Docket 1.

[112] *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1330 (9th Cir. 1992) ("Although the harvest of pollock could have been enjoined, the expiration of the 1991 [Total Allowable Catch] could not. No injunction could have preserved this challenge to a short-term rule.").

[113] Docket 33 at 8–9.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 23 of 73

programs in the NPR-A after completing an EA and issuing a FONNSI.[114]  Neither Federal Defendants nor ConocoPhillips dispute the company's continued interest in conducting winter exploration in the area.  Indeed, the Court takes judicial notice of the fact that ConocoPhillips has since proposed winter exploration for 2019-2020 in the same area as the 2018-2019 exploration at issue in this case,[115] and that BLM has again completed an EA to review impacts of the proposed activity.[116]

Defendants argue, instead, that Plaintiffs' claims are moot because the specific EA and exploration activities in question cannot, by their very nature, recur.[117]  They cite *Friends of the Earth, Inc. v. Bergland*, where the Ninth Circuit held that a challenge to exploratory mining operations in Montana's Stillwater Complex was mooted by the termination of activity.[118]  In that case, the mining operator ceased exploration when it struck water.[119]  As a result, the Circuit reasoned that "[t]here [was] no reasonable possibility . . . that [the mining operator] will resume or repeat the exploratory operation which plaintiffs previously sought

---

[114] AR8550–52; *see also* Docket 31 at 8–9 ("This is the same practice BLM has followed for *every* winter exploration program in the [NPR-A] for two decades." (emphasis in original)).

[115] Docket 44-2 at 1–3.  Plaintiffs' Motion to Take Judicial Notice of Supplemental Factual Materials Pursuant to L. Civ. R. 7.1(d)(2) & L. Civ. R. 7.3(d) at Docket 44 is hereby GRANTED.

[116] Docket 44-1.

[117] *See* Docket 30 at 19 ("[I]t is not relevant that Conoco may, in future years, apply to conduct additional winter exploration programs in the [NPR-A], for approval of any such program would constitute new action for which new NEPA analysis would be required.").

[118] 576 F.2d 1377, 1379 (9th Cir. 1978).

[119] *Id.* at 1378.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 24 of 73

to enjoin."[120]   The Ninth Circuit dismissed the plaintiffs' argument that future exploration was likely to occur in other areas within the broader Stillwater Complex, stating that "relief under NEPA must be tailored to *remedy* the particular violations in the case."[121]

This case is distinguishable.  In *Bergland*, the agency had determined that no EIS was needed for the mining activity at issue.[122]   But the Ninth Circuit's opinion in that case gives no indication that the NEPA analysis for that mining exploration case was tiered to any project-level analyses, on which the agency may rely to authorize future exploratory projects.  Further, unlike in *Bergland*, Plaintiffs have here introduced evidence that ConocoPhillips plans to return to the same general location of its 2018-2019 winter exploration to conduct further exploratory drilling,[123] not to "other places . . . in the" NPR-A .[124]

In this case, while the 2018 EA and the exploration it authorized cannot themselves be repeated, the Court finds it quite likely that BLM will authorize future winter exploration in the Teshekpuk Lake Area using an EA that tiers to the 2012

---

[120] *Id.* at 1379.

[121] *Id.* (emphasis in original) (quoting *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456 (D.C. Cir. 1977)).

[122] *Id.* at 1378.

[123] *Compare* Docket 44-2 at 1–2 (listing lease tracts for proposed 2019-2020 exploratory drilling) *with* AR8482–83 (listing lease tracts for 2018-2019 exploratory drilling).

[124] *Bergland*, 576 F.2d at 1379.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 25 of 73

IAP/EIS and the GMT1 and GMT2 SEISs to support conclusions regarding impacts to caribou and subsistence uses. In *Greenpeace Action v. Franklin*, the Ninth Circuit held that a challenge to the National Marine Fisheries Service's total allowable catch ("TAC") for 1991 fell into the capable of repetition yet evading review exception to the mootness doctrine.[125] Although the TAC had expired, the Circuit concluded that "[t]he major issue—whether the Secretary has adequately examined the effects of pollock fishing on the Steller sea lions—is likely to recur in future years," noting that the agency had relied on the same biological opinion to support the 1992 TAC that it had used for the 1991 TAC.[126] Similarly, it appears likely that additional NEPA analyses for future exploration in the NPR-A will tier to and rely on the 2012 IAP/EIS, the GMT1 SEIS, and the GMT2 SEIS in the same manner as the 2018 EA.[127]

Based on the foregoing, the Court finds that the challenged action is capable of repetition yet evades review and that the exception to the mootness doctrine applies. Accordingly, the Court turns to the merits of Plaintiffs' arguments.

---

[125] 14 F.3d 1324, 1330 (9th Cir. 1992).

[126] *Id.*

[127] *Cf. Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1075 (9th Cir. 1995) (distinguishing *Greenpeace Action* and holding that challenge to TAC was mooted by issuance of new biological opinion); *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996) (holding that challenge to fishery management plan was moot because the "agency [would] be basing its rulings on different criteria or factors in the future").

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 26 of 73

# LEGAL STANDARD

## I.  Administrative Procedure Act

The Court reviews Federal Defendants' compliance with NEPA and ANILCA under the Administrative Procedure Act.[128]  A reviewing court may not set aside an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[129]  Agency action is arbitrary and capricious if it

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise.[130]

A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency.[131]  Courts will generally "uphold agency decisions so long as the agencies have 'considered the relevant factors and

---

[128] *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (explaining that when a statute does not "provide[] a private right of action for violations of its provisions," plaintiffs may obtain "judicial review [of agency action] under § 10(a) of the APA"); *Alaska v. U.S. Dep't of Agric.*, 273 F. Supp. 3d 102, 112 (D.D.C. 2017) ("Because NEPA, . . . , ANILCA, . . . , and [several other statutes] do not create a private right of action for violations of those statutes, I review the Forest Service's promulgation of the Roadless Rule as a final agency action under the APA . . . .").

[129] 5 U.S.C. § 706(2)(A).

[130] *Prot. Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

[131] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

articulated a rational connection between the factors found and the choices made.'"[132]

## II. National Environmental Policy Act

Pursuant to NEPA, an agency must prepare an EIS before taking an action "significantly affecting the quality of the human environment."[133]  An agency may prepare an EA in order to determine whether an action significantly affects the environment, such that an EIS is necessary.[134]  If, based on the EA, the agency finds that the action will have no significant impact, it need not complete an EIS;[135] however, "if substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factor," the "agency must prepare an EIS."[136]  "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant."[137]

---

[132] *Prot. Our Cmty's. Found.*, 939 F.3d at 1034 (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 1206).

[133] 42 U.S.C. § 4332(2)(C) (requiring a "detailed statement" analyzing "the environmental impact of the proposed action," among other things).

[134] *See* 40 C.F.R. § 1501.4(b).

[135] *See* 40 C.F.R. § 1501.4(e); *id*. at § 1508.13 (defining "finding of no significant impact").

[136] *Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1274 (9th Cir. 2017) (omission and emphasis in original) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*, 538 F.3d 1172, 1219 (9th Cir. 2008)).

[137] *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015) (quoting *Blue Mountains Diversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 28 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 28 of 73

"Courts apply a 'rule of reason' standard in reviewing the adequacy of a NEPA document."[138] This inquiry "involves 'a pragmatic judgment whether the [document's] form, content, and preparation foster both informed decision-making and informed public participation.'"[139] "Alternatively phrased, the task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action."[140]

NEPA's implementing regulations provide that "[a]gencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."[141] ConocoPhillips and Plaintiffs argue over the correct standard for reviewing EAs that tier to previously completed EISs. Quoting the Ninth Circuit, ConocoPhillips maintains that "[a] comprehensive programmatic impact statement generally obviates the need for a subsequent site-specific or

---

[138] *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) (quoting *Churchill Cty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001)) (reviewing EAs that tiered to project-level EIS to approve timber sales).

[139] *Prot. Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1035 (9th Cir. 2019) (quoting *Churchill Cty.*, 276 F.3d at 1071) (reviewing EIS approving wind facility).

[140] *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (quoting *Churchill Cty.*, 276 F.3d at 1072).

[141] 40 C.F.R. § 1502.20. Under this regulation,

> Whenever a broad environmental impact statement has been prepared . . . and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy . . . the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 29 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 29 of 73

project specific impact statement, *unless new and significant environmental impacts arise that were not previously considered.*"[142]   Plaintiffs respond that "[t]iering satisfies BLM's NEPA obligations only to the extent that the tiered-to documents contain sufficient analysis to support conclusions regarding site-specific impacts."[143]

These positions are not inconsistent; Plaintiffs and ConocoPhillips each make a correct statement of the applicable standard, although they emphasize different aspects of that standard.   A programmatic, or broad-level EIS "must provide 'sufficient detail to foster informed decision-making'" but need not evaluate "site-specific impacts . . . until a critical decision has been made to act on site development."[144]   The fact that an "EIS contains sufficient analysis for informed decision-making at the programmatic level does not reduce or minimize [an agency's] critical duty to 'fully evaluate[]' site-specific impacts" at later stages of review.[145]   However, when a programmatic EIS *does* adequately consider the

---

[142] Docket 31 at 26 (alteration and emphasis in ConocoPhillips' briefing) (quoting *Salmon River Concerned Citizens v. Roberston*, 32 F.3d 1346, 1356 (9th Cir. 1994)).

[143] Docket 33 at 13 (citing *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997–99).

[144] *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1049 (9th Cir. 2013) (quoting *N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir. 1992)).

[145] *Id.* (second alteration in original) (quoting *N. Alaska Envtl. Ctr.*, 961 F.2d at 890–91); *see also Prot. Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1039 (9th Cir. 2019) (explaining that "a site-specific project demands site-specific analysis" and that "[a]gencies cannot rely on a general discussion in a programmatic EIS or other document to satisfy its NEPA obligations for a site-specific action").

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 30 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 30 of 73

impacts of subsequent site-specific projects, a subsequent NEPA document need not repeat that analysis "unless new and significant environmental impacts arise that were not previously considered."[146]

Tiering promotes efficiency; it allows an agency to take the requisite "'hard look' at the potential environmental consequences of [a] proposed action"[147] without treading the same ground twice. Department of Interior regulations describe this balance well: "An environmental assessment may be prepared, and a finding of no significant impact reached, for a proposed action with significant effects, whether direct, indirect, or cumulative, if the environmental assessment is tiered to a broader environmental impact statement which fully analyzed those significant effects."[148] This does not, however, relieve the agency of its burden to provide a "'convincing statement of reasons' to explain why" a project will not result in impacts beyond those previously considered.[149]

---

[146] *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 783 (9th Cir. 2006) (quoting *Salmon River Concerned Citizens*, 32 F.3d at 1356); *cf. Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989) (recognizing that NEPA's implementing regulations require preparation of an SEIS if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." (quoting 40 C.F.R. § 1502.9(c))). Whether "new and significant environmental impacts" have arisen is itself subject to the "rule of reason" standard that generally governs NEPA actions. *Cf. id.* at 373 (explaining that "[i]n this respect the decision whether to prepare an [SEIS] is similar to the decision whether to prepare an EIS in the first instance").

[147] *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (quoting *Churchill Cty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)).

[148] 43 C.F.R. § 46.140(c).

[149] *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015) (quoting *Blue Mountains Diversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 31 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 31 of 73

## III.    Alaska National Interest Lands Conservation Act

Congress enacted ANILCA to "cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of [the public lands in Alaska]."[150] Section 810 of ANILCA contains procedural requirements that are similar to NEPA's; pursuant to its terms, an agency proposing an action resulting in the "use, occupancy, or disposition of public lands" must evaluate that action's effects on "subsistence uses and needs," the availability of other lands for the same purpose, and "other alternatives" that would reduce the impacts to subsistence uses.[151] Due to their similarities, courts have analyzed the procedural requirements of NEPA and ANILCA under the same standard.[152]

## DISCUSSION

Although the parties' briefing does not directly track the five claims set forth in Plaintiffs' Amended Complaint, the Court addresses each claim in the Amended Complaint in the context of the applicable argument from the briefing.

---

[150] 16 U.S.C. § 3112(1).

[151] 16 U.S.C. § 3120(a).

[152] *See, e.g.*, *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310–12 (9th Cir. 1990) (evaluating adequacy of EIS's consideration of alternatives under NEPA and ANILCA together); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995) (same); *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987) ("NEPA case law is helpful in interpreting § 810.").

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 32 of 73

## I.  First Claim: Impacts to Caribou and Subsistence

Plaintiffs' first claim for relief alleges that there were "substantial questions about whether the [2018-2019] winter exploration program would have significant environmental impacts to caribou and subsistence activities."[153]  They contend that it was arbitrary and capricious for BLM to issue a FONNSI and authorize the program without first completing an EIS.[154]  The Court will address the 2018-2019 EA's discussion of impacts to caribou and subsistence in turn.

### A.  Caribou

Plaintiffs argue that the 2018 EA "include[s] no specific discussion of the effects of ConocoPhillips' winter exploration program on caribou."[155]  They contend that the EA disregards "substantial questions . . . concerning the effects of winter exploration on caribou," and that BLM was thus required to "prepare an EIS or to supply a convincing statement of reasons to explain why the effects would be insignificant."[156]

The 2018 EA characterizes caribou as a "minimally impacted" species, meaning that caribou "would not be affected to a degree requiring further analysis

---

[153] Docket 5 at 22, ¶ 85.

[154] Docket 5 at 22–23, ¶¶ 85–88.

[155] Docket 27 at 21.

[156] Docket 27 at 20; *see also Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015) ("If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." (quoting *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1988))).

because either the expected impacts from the proposed action and alternative would be minimal, or standard protections . . . would reduce impacts."[157] Specifically, the EA states:

> Caribou, grizzly bear, wolf, wolverine and small mammals . . . may inhabit the area. Only minor impacts would be expected and impacts were covered in the 2012 NPRA IAP/EIS. The proposed action may disturb and displace wildlife from the immediate area of activities but would not reduce population levels or distribution during the winter season.[158]

Responding to Plaintiffs' concerns about caribou impacts raised in their comments on the Preliminary EA, BLM states in the Final EA that:

> Activities associated with the exploration including the construction and use of ice roads and pads could be disruptive to caribou. It would not be expected that caribou would vacate an extensive area adjacent to exploration activities during winter and would not result in changes to distribution of herds during the winter. . . . Although the proposed action may be disruptive to individual caribou and displace some individuals from the immediate vicinity of activities, these impacts would be local in extent, would not affect herd distribution or reduce populations.[159]

The 2012 IAP/EIS, to which the 2018 EA tiers, describes the Teshekpuk Caribou Herd in detail, discussing its population trends, seasonal distribution, and the significance of multiple environmental factors on calving success.[160] It explains that a majority of the Teshekpuk Caribou Herd has historically "wintered on the

---

[157] AR8481.

[158] AR8480 tbl. 1.2.

[159] AR8575.

[160] AR0294–301.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 34 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 34 of 73

coastal plain of the NPR-A, especially around Atqasuk and southeast of Teshekpuk Lake."[161]

The 2012 IAP/EIS discussed the potential impacts of exploration activities on caribou for each of the five alternatives it considered.[162] Alternative A assumed that "196 oil or gas exploratory or delineation wells would be drilled from winter ice pads over [a thirty-year period]" in the project area.[163] Discussing the impacts of exploration under this alternative, the EIS states that "[e]xploratory drilling operations and ice roads would traverse Teshekpuk Caribou Herd caribou wintering areas" and that "[a]ny caribou in the immediate vicinity of the activity would be disturbed, possibly having a negative effect on their energy balance, hormonal status, and calving success, due to prolonged stress."[164] However, the EIS explained that "[b]ecause these animals are mobile and the operation would be temporary, it is not expected that there would be any long-lasting effects on caribou."[165] This analysis included a caveat: "However, this assumption has not been scientifically tested and conditions for winter survival vary year to year. It is

---

[161] AR0301.

[162] *See* AR722–32 (Alternative A); AR941–45 (Alternative B-1); AR1064–67 (Alternative B-2); AR1180–84 (Alternative C); AR1292–96 (Alternative D).

[163] AR0722.

[164] AR0725.

[165] AR0725.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 35 of 73

possible that this disturbance could have an additive effect on natural winter mortality."[166]

Alternative B-2—the preferred and ultimately selected alternative—altered the project area to provide additional protections for the Teshekpuk Caribou Herd; it "would add approximately 1.9 million acres to the Teshekpuk Lake Special Area . . . to protect caribou calving and insect-relief areas."[167] All told, Alternative B-2 "would make approximately 11 million acres of the NPR-A unavailable for oil and gas leasing . . . includ[ing] important calving and insect-relief areas for the Teshekpuk Caribou Herd."[168] However, Alternative B-2 would "make[] lands . . . in northeastern NPR-A near Fish Creek available";[169] i.e. the area of ConocoPhillips' 2018-2019 winter exploration activities.

Within this project area, Alternative B-2 assumed that "152 oil or gas exploratory or delineation wells, 78 percent of those assumed under Alternative A, would be drilled from winter ice pads [over a 30-year] period."[170] Discussing the impacts of exploratory drilling under Alternative B-2, the 2012 IAP/EIS explained that "[e]xploratory drilling would be conducted during the winter, when some

---

[166] AR0723.

[167] AR0036.

[168] AR0037.

[169] AR0037.

[170] AR1064.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 36 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 36 of 73

mammal species are less active or less often present, although wintering Teshekpuk Caribou Herd caribou could be present in large numbers."[171] The EIS ultimately concluded that, under Alternative B-2, "[i]mpacts to terrestrial animals would be similar to those discussed under Alternative A, but somewhat less in spatial extent, frequency and magnitude."[172]

Based on this record, Plaintiffs make several arguments about the sufficiency of the 2018 EA's conclusion with respect to the impact on caribou. Primarily, Plaintiffs contend that several statements of uncertainty in the 2012 IAP/EIS raise "substantial questions as to whether the winter exploration may significantly affect caribou in th[e] project area."[173] They emphasize the 2012 IAP/EIS's recognition that its assumptions regarding the impact of winter exploration have not been scientifically tested and that "it is possible that this disturbance could have an additive effect on natural winter mortality."[174] Plaintiffs also highlight the following statement, which appears in the EIS's discussion of the

---

[171] AR1065.

[172] AR1064–65.

[173] Docket 27 at 25; *see also Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1274 (9th Cir. 2017) ("An agency must prepare an EIS 'if substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factor." (internal quotation marks omitted) (emphasis and omission in original) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1219 (9th Cir. 2008))).

[174] AR0723; *see also* Docket 33 at 16.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 37 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 37 of 73

impacts of the development of oil production, as opposed to exploration, under

several alternatives:

> Oil and gas development within the NPR-A could introduce for the first
> time such infrastructure and activities into the winter range of a North
> Slope caribou herd (Teshekpuk Caribou Herd).  Previously, no North
> Slope caribou herd has been exposed to oil [and] gas activities year-
> round.  The Teshekpuk Caribou Herd has experienced seismic
> exploration and activities near villages for many years, and some herd
> members on the periphery of the range have been exposed to oil field
> facilities in some years, but there is no evidence as yet of adverse
> effects other than increased hunting mortality for those animals close
> to villages.  It is not known what population effects might occur if the
> majority of the herd were to have year-round contact with oil and gas
> facilities and activities.  Despite the current lack of evidence regarding
> adverse impacts from seismic exploration and village contact,
> negative effects on caribou energy budgets during winter could result
> from this new situation.  Such an effect could be manifested through
> increased winter mortality itself, or a reduction in calf productivity.[175]

Although these portions of the record acknowledge uncertainty about the

extent of the impact that winter exploration could have on Teshekpuk Caribou Herd

caribou, they do not demonstrate that the 2018 EA's discussion of caribou was

inadequate or that BLM's decision to issue a FONNSI was arbitrary and capricious.

The portions of the 2012 IAP/EIS on which Plaintiffs rely state that, as of that date,

there was "no evidence . . . of adverse effects" to caribou from the herd's previous

exposure to exploration activities.[176]  And the EIS echoes this point in its discussion

of the cumulative impacts of Alternative B-2, stating:  "[P]opulations of Teshekpuk

---

[175] AR1067; *see also* Docket 27 at 20–24.

[176] AR1067.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 38 of 73

Caribou Herd and Central Arctic Herd caribou have increased between the mid-1970s and 2008.  Thus, disturbance of caribou due to oilfield development may adversely affect caribou populations, but these effects are not readily apparent based on population trends."[177]  The evidence available to BLM when it completed the 2012 IAP/EIS therefore indicated that oil and gas exploration and development activities had not had significantly impacted NPR-A caribou, and it was reasonable to assume that future exploration activities would similarly have minimal impacts. Despite this, the EIS recognized the possibility that future studies could demonstrate otherwise.[178]  Uncertainty in the face of incomplete information is acceptable in an EIS, provided that the agency "candidly disclose[s] the risks and any scientific uncertainty" of the action under review.[179]

Moreover, the 2014 GMT1 and 2018 GMT2 SEISs, to which the 2018 EA also tiers, support the 2012 IAP/EIS's assumption that the 2018-2019 winter exploration activities would have a minimal impact on Teshekpuk Caribou Herd caribou.  In its discussion of the impacts to terrestrial mammal survival or productivity, the GMT1 SEIS notes that "[c]aribou displaced from habitats with more nutritious forage, and caribou that expend energy responding to disturbances

---

[177] AR1518

[178] *See* AR0723; AR1067.

[179] *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1318 (W.D. Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 39 of 73

may not be able to compensate for these energetic losses, which would potentially reduce the individual's survival and reproduction."[180]  However, it then concludes that "recent studies of calf growth and survival for caribou displaced by or exposed to oil and gas infrastructure disturbance during calving . . . did not conclude significant survival or growth impacts."[181]  Similarly, the GMT2 SEIS notes that the Teshekpuk Caribou Herd and the Central Arctic Herd "have undergone recent changes in size, demography, and distribution," but that "these changes are not thought to be related to oil field development."[182]

Based on this record, the 2018 EA adequately explains the basis for its conclusion that ConocoPhillips' winter exploration program would have minimal impacts on Teshekpuk Caribou Herd caribou that "would not affect herd distribution or reduce populations."[183]  The 2012 IAP/EIS adequately evaluated the effects of exploratory drilling in the area southeast of Teshekpuk Lake and concluded that

---

[180] AR3122.

[181] AR3122 (citing U.S. Army Corps of Eng'rs, Point Thompson Proj. Final EIS (2012)).

[182] AR4884 (citing L. S. Parett, Caribou Biologist to Peter Bente, RV Management Coordinator, Memorandum: Summary of Teshekpuk Caribou Herd Photocensus Conducted July 6, 2015 (2015) and E. A. Lenart, Units 26B and 26C caribou. *In*: P. Harper and L. A. McCarthy, Editors. Caribou management report of survey and inventory activities 1 July 2012-30 June 2014. Alaska Department of Fish and Game, Species Management Report ADF&G/DWC/SMR-2015-4, Juneau, AK. Ch18:18-1 through 18-38. (2015)).

[183] AR8575; *see also* AR8480 tbl. 1.2. (concluding that terrestrial mammals would be minimally impacted); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (requiring agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962))).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 40 of 73

impacts to caribou would be minimal based on the information then available, and this analysis was supported by the subsequent 2014 GMT1 and 2018 GMT2 SEISs. There is no indication in the record that new evidence of a significant impact on caribou has arisen that casts doubt on the continuing validity of Federal Defendants' conclusions.[184]

Plaintiffs also contend that the 2012 IAP/EIS's "general discussions cannot substitute for a specific analysis of this particular winter exploration program's impacts in this particular place."[185] Although the 2012 IAP/EIS did not discuss the specific placement of the six exploratory wells authorized by the 2018 EA, it did anticipate significant exploration within the area to the southeast of Teshekpuk Lake, including the Fish Creek area.[186] Moreover, it recognized that the Teshekpuk

---

[184] Plaintiffs maintain that they "submitted multiple studies, one of which was published several years after the [2012 IAP/EIS], demonstrating the potential for significant effects to caribou from winter activities." Docket 33 at 17. Their comments to the Preliminary EA cite a 2017 study of Norwegian reindeer, which concludes that "conditions affecting maternal body mass during winter explain close to all the variation in [calf viability]," not "a mismatch between plant phenology and calving date" caused by "[w]arming of the arctic." AR8447; *see also* AR8007 (Plaintiffs' comments on Preliminary EA). This study, while potentially relevant to the effect of winter energy expenditures made by Arctic herbivores to avoid disturbances related to oil and gas exploration and development, does not undermine the assumptions regarding population-level effects to the Teshekpuk Caribou Herd contained in the documents to which the 2018 EA tiers. Indeed, as discussed above, the 2012 IAP/EIS considered this possibility; it recognized that "caribou in the immediate vicinity of [exploration activities] would be disturbed, possibly having a negative effect on their energy balance . . . and calving success," but concluded that these effects would be minimal due to the mobility of caribou and the temporary nature of the exploration activities. AR0725.

[185] Docket 31 at 16.

[186] AR0036–37 (discussing areas available for exploration and development under Alternative B-2); AR1065 (describing extent of exploration authorized under Alternative B-2).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 41 of 73

Caribou Herd would be present in this area during exploration activities and discussed potential impacts to the herd.[187]  The 2012 IAP/EIS therefore adequately considered the effect of exploratory drilling on caribou in the area to the southeast of Teshekpuk Lake, such that additional site-specific analysis was not necessary.[188]

By tiering to NEPA documents that fully analyze the impacts on caribou of exploration activity to the southeast of Teshekpuk Lake, the 2018 EA supplied a convincing reason for why additional analysis was not necessary.  Accordingly, the Court finds that the 2018 EA's discussion of impacts to caribou was permissible under NEPA and its implementing regulations and that it was neither arbitrary nor capricious to issue a FONNSI with respect to caribou.[189]

### B.  Subsistence Activities

Plaintiffs next argue that Federal Defendants violated NEPA by "fail[ing] to either prepare an EIS or supply a convincing statement of reasons explaining why

---

[187] AR1065.

[188] 43 C.F.R. § 46.140(c).

[189] 43 C.F.R. § 46.140(c) ("An environmental assessment may be prepared, and a finding of no significant impact reached, for a proposed action with significant effects, whether direct, indirect, or cumulative, if the environmental assessment is tiered to a broader environmental impact statement which fully analyzed those significant effects."); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 783 (9th Cir. 2006) ("A comprehensive programmatic impact statement generally obviates the need for a site-specific or project-specific impact statement, unless new and significant environmental impacts arise that were not previously considered." (quoting *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994))).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 42 of 73

the effects to subsistence from winter exploration will be insignificant."[190]

The 2018 EA identifies subsistence activities as "potentially affected" by ConocoPhillips' winter exploration, explaining that:

> Large game (subsistence resources) would likely be deflected from areas of exploration activity. Caribou hunting is lowest during winter, therefore the deflection of furbearers and potential overlap with trapping areas would be the most likely impact. . . . The area is on the edge of the high use area for furbearer hunting and trapping. However, ice roads may facilitate hunter access to areas otherwise only accessible via snowmachine. Impacts to subsistence use from this project in and of itself would be expected to be minor to moderate and short term (reduced traditional access and reduced availability of resources, primarily affecting families for whom furbearer harvesting is important). . . . Harvest levels have remained stable to date, and no reduction in the overall abundance of subsistence resources would be anticipated.[191]

A separate section of the EA discussing the direct and indirect impacts of the winter exploration program on subsistence activities expands on this analysis.[192] It explains that the "project area is traditionally used for winter furbearer hunting and trapping and limited caribou hunting."[193] The EA tiers to the 2012 IAP/EIS, the GMT1 SEIS, and the GMT2 SEIS for a discussion of the potential impacts to these resources, and provides only a "brief[] summar[y] and analy[sis]" itself.[194]

---

[190] Docket 27 at 26.

[191] AR8479 tbl. 1.2.

[192] AR8496–98.

[193] AR8496.

[194] AR8496–97.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 43 of 73

The 2018 EA's subsistence impact section begins with a discussion of furbearers:

> The most likely direct impact would be experienced by furbearer hunters and trappers because the area is used by all Nuiqsut furbearer hunters and trappers and was, until recent development, one of the few remaining areas near town where people could hunt and trap without nearby infrastructure and industrial activity.[195]

The EA explains that "[a]lthough wolf and wolverine harvests do not contribute to the subsistence diet and it is primarily young men who participate in the activity, it is a critical component of the seasonal round of subsistence activities for Nuiqsut," and that "[f]or these reasons, impacts to furbearer harvesting could have an outsized sociocultural impact for those families in Nuiqsut that depend on it."[196]

Turning to caribou, the 2018 EA explains that "[t]he proposed activity would also encompass a large area around Fish Creek, which is an important area for wintertime caribou hunting because it is one of the rare areas on the [Arctic Coastal Plain] where caribou can be found throughout the year."[197] For this reason, "Nuiqsut residents place extreme value on the Fish Creek area because it has been understood as an area that provides food security."[198] But the EA notes that "[c]aribou harvest levels in the area have been low in recent years, and it is

---

[195] AR8497.

[196] AR8497.

[197] AR8497.

[198] AR8497.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 44 of 73

possible that more hunters will access the area to attempt harvests via the exploration ice roads."[199]

For both caribou and furbearers, the 2018 EA explains that "[s]ubsistence hunters would likely avoid the area either because they believe that resources will not be there or because they prefer not to hunt and trap around exploration activities."[200] It recognizes that "[b]eing required to travel further to conduct [subsistence] activities [in winter] increases the risk, time, and costs involved."[201] The EA notes, though, that "[s]ome hunters who are not disturbed by industrial activities or who are less able to travel and hunt elsewhere . . . may take advantage of the ice roads to travel."[202]

Plaintiffs maintain that the analysis in the 2018 EA raises "substantial questions as to whether the winter exploration program may significantly affect subsistence activities in this project area."[203] They contend that the issuance of a FONNSI was improper because none of the tiered-to EISs "specifically analyze[] the effects of winter exploration in this project area," such that preparation of a

---

[199] AR8497.

[200] AR8497.

[201] AR8497.

[202] AR8497.

[203] Docket 27 at 29.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 45 of 73

separate EIS was necessary.[204]  Defendants maintain that the record supports the EA's conclusion and that the decision to issue a FONNSI for the 2018-2019 winter exploration program was neither arbitrary nor capricious.[205]

The 2018 GMT2 SEIS and the 2012 IAP/EIS each contain a detailed description of Nuiqsut subsistence activities.[206]  These analyses generally support the 2018 EA's description of subsistence uses in the project area.  For instance, the GMT2 SEIS explained that "[d]uring the winter months, furbearer hunters pursue wolves (amaġuq) and wolverines (qavvik), [and] target caribou . . . as needed and available," but that "[o]verall, Nuiqsut harvesters target the highest numbers of resources during the summer/fall months of August and September."[207] The GMT2 SEIS noted that a long-term project monitoring Nuiqsut caribou harvesting "has documented a general increase in the percentage of harvests in the area west of Nuiqsut," an area that includes the location of the 2018-2019 winter exploration.[208]  Discussing the specific area at issue in this case, the GMT2

---

[204] Docket 27 at 29.

[205] Docket 30 at 24–26; Docket 31 at 34–35.

[206] See AR4695–4758 (GMT2 SEIS); AR0417–25 (2012 IAP/EIS).

[207] AR4720; see also, e.g., AR4746–48 (describing graphically and through narrative seasonal subsistence usage of GMT2 project study area, which abuts 2018-2019 winter exploration project area); AR0424 (2012 IAP/EIS stating that "Fish and Judy creeks area" is one of "several primary harvest areas for caribou," and that "West of Nuiqsut are some of the most important remaining subsistence use areas for terrestrial mammals, including caribou, wolf, and wolverine").

[208] AR4953. The GMT2 SEIS concludes that this increase in subsistence harvest to the west of Nuiqsut is a result of intensified summer and fall hunting "due to the growing use of four-wheelers that can access overland areas during summer and fall." AR4953; see also AR4975 ("During Year 9 of the [Nuiqsut Caribou Subsistence Monitoring Project], an increase in winter use of the project

SEIS stated that "[s]ome members of the [Teshekpuk Caribou Herd] remain on the coastal plain through winter, which contributes to Nuiqsut hunters' understanding that caribou can usually be found west of the [GMT2] Project area in the vicinity of Fish Creek."[209]

Turning to impacts, the NEPA documents to which the 2018 EA tiers discussed at length game deflection by, and hunter avoidance of, industrial activity. The 2012 IAP/EIS stated that direct impacts "from an exploratory drilling operation" would include "displacement of resources away from the drill site," and that "subsistence hunters report that [exploration] activity displaces game, especially caribou, wolves, and wolverine."[210]   And the GMT2 SEIS reported that "[s]ubsistence harvesters often avoid areas of industrial construction due to discomfort about hunting near human or industrial activity."[211]   The GMT2 SEIS explained that "[s]ome hunters are able to afford and are willing to respond to impacts [of development] by traveling farther or taking more trips," but recognized that "[o]ther harvesters may not be able to afford or may not be willing to take more

---

study area was evident, likely as a result of year-round access to roads (including ice roads) west of the community."); AR4735–38 (maps showing moderate to high subsistence uses of the 2018-2019 winter exploration project area).

[209] AR4973.

[210] AR0826–27.

[211] AR4971; *see also id.* (citing a 2000 study that "notes that 80 percent of [Nuiqsut's] 1993 harvest came from areas more than 16 miles from any development"); AR4959 (noting that "[h]unter avoidance could also result from actual or perceived reduced availability of subsistence resources in the GMT2 area").

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 47 of 73

or more distant hunting trips"[212]  It also noted that "[s]ome hunters are less likely to bring younger family members along if they anticipate longer and/or riskier trips."[213] And the 2012 IAP/EIS explained that having to travel further to hunt and trap "affects subsistence users in the following ways: loss of subsistence food; loss of time; loss of money; increased stress and anxiety; increased risk of equipment failure; and increased risk of loss of life or serious bodily injury."[214]  That said, the GMT2 SEIS's ANICLA evaluation explained that "ice roads, where and when access is permitted and feasible, facilitate access to remote areas that some subsistence hunters appreciate and can be considered a countervailing effect."[215]

The GMT2 SEIS reported that Nuiqsut's per capita caribou harvest has remained generally stable as development has intensified around the village, and that "[m]ost hunters have continued to harvest caribou in desired amounts" while avoiding industry.[216]  It recognized, though, that "as industry has moved closer to Nuiqsut, it has become more difficult for residents to avoid industry" and that "[a]voidance may be less of an option as fewer areas without development are

---

[212] AR4957.

[213] AR4957.

[214] AR0826; *see also* AR5083–84 (GMT2 SEIS explaining that "hunters . . . travel[ing] farther west to access hunting grounds . . . could result in increased investments in time, money, fuel, and equipment and potentially affect hunting success").

[215] AR5496.

[216] AR4960.  The GMT2 SEIS noted that "[f]uture research will reveal how harvest levels change when infrastructure is established closer to town or in core hunting areas and it becomes more difficult for hunters to avoid development."  *Id*.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 48 of 73

present."[217]

The GMT2 SEIS also considered the sociocultural impacts of reduced access to traditional hunting grounds and decreased subsistence opportunities: "When subsistence users' opportunities to engage in traditional activities are limited, transmittal of knowledge about those activities is reduced. If residents decrease use of the [GMT2] project area, the opportunity to transmit traditional knowledge about the area would diminish and could eventually be lost to younger generations."[218] It recognized that:

> If harvests or the number of active participants in harvesting declines, younger generations would have fewer opportunities to learn the skills necessary to hunt, harvest, and process subsistence resources. Fewer opportunities to participate in the sharing and consumption of traditional Inupiaq food would affect the social cohesion of the community. Any changes to residents' ability to participate in subsistence activities, to harvest resources in traditional places at the appropriate times, and to eat traditional Inupiaq foods could have long-term or permanent effects on culture by diminishing social ties within the community that are strengthened through harvesting, processing, and sharing.[219]

The GMT2 SEIS recognized "[t]he high level of concern that Nuiqsut residents place on future generations' ability to maintain traditional subsistence."[220]

---

[217] AR5082.

[218] AR4957.

[219] AR4957; *see also* AR4950 ("For the subsistence lifestyle to be healthy, there must be continued harvests (material value) at continued levels of traditional land use, identification with traditional land use areas, community and harvester participation, processing, consumption, and sharing (cultural values).").

[220] AR4957.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 49 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 49 of 73

Finally, Plaintiffs' arguments notwithstanding, the 2012 IAP/EIS and 2018 GMT2 SEIS anticipated that these impacts would occur in the area of ConocoPhillips' 2018-2019 winter exploration. As noted above, in the portion of this decision addressing the impacts to caribou, the 2012 IAP/EIS's preferred alternative authorized significant exploration within the area to the southeast of Teshekpuk Lake, including the Fish Creek area.[221] And while the project area studied in the GMT2 SEIS does not include the area of ConocoPhillips' winter exploration, it is directly adjacent to it.[222] The GMT2 "SEIS also analyze[d] indirect impacts to the larger Nuiqsut subsistence us area," including Judy and Fish creeks, such as "hunter avoidance of infrastructure, the potential for localized deflection of caribou, wolves, and wolverines, disturbance from aircraft and ground traffic, and community participation."[223] The GMT2 SEIS's cumulative impacts section identified the expected development of the Willow project, and explained that exploratory drilling would likely occur over the winter of 2018-2019.[224] It

---

[221] AR0036–37 (discussing areas available for exploration and development under Alternative B-2); AR1064–65 (describing extent of exploration authorized under Alternative B-2); *see also* AR1101–02 (discussing subsistence impacts under Alternative B-2).

[222] *See* 5177 (map showing lease tracts involved in 2018-2019 winter exploration as west of GMT2 SEIS project study area); AR4735–38 (maps showing caribou, wolf, and wolverine subsistence use areas in relation to GMT2 SEIS project study area).

[223] AR4949.

[224] AR5079–80 ("Willow/Tingmiaq, 2 exploratory wells drilled 2016, 3 exploratory wells drilled in winter 2017-18, and possible appraisal wells in 2019. . . . 27 miles from Nuiqsut."); *see also* AR5496 (GMT2 SEIS ANILCA evaluation stating "[a]nnual winter oil and gas exploration activities are expected to continue in areas west of Nuiqsut in the coming decades.").

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 50 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 50 of 73

recognized that full development of the Willow area, "in combination with development of GMT2, [is] likely to increase problems between subsistence users and oil and gas activities," and "will most likely pose difficulties for those hunters who prefer to avoid oil and gas infrastructure altogether."[225]

On this record, the Court is satisfied that the 2018 EA took the requisite hard look at the proposed action's impacts to subsistence activities. The 2012 IAP/EIS and 2018 GMT2 SEIS each contain discussion of subsistence use by Nuiqsut residents of the 2018-2019 winter exploration area. The record shows that winter use of the area, although highly valued, is low relative to summer use, and that Nuiqsut harvests, especially of caribou, have remained steady despite increased development around the village. And the record supports the EA's conclusion that while many hunters may avoid the area of ConocoPhillips' winter exploration, some may use the project's ice roads to gain increased access to overwintering caribou.

It was thus reasonable for the EA to determine that subsistence impacts associated with one season's winter exploration would be moderate and short-term.[226] Moreover, the GMT2 SEIS and 2012 IAP/EIS considered at length the impacts associated with hunter avoidance and reduced access to traditional hunting areas, which the EA identified as potential consequences of the 2018-2019

---

[225] AR5082.

[226] *See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) ("Courts apply a 'rule of reason' standard in reviewing the adequacy of a NEPA document.'" (quoting *Churchill Cty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001))).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 51 of 73

winter exploration program.  By tiering to these documents, which fully analyzed the issue, the 2018 EA provided a convincing reason for why further analysis of impacts to subsistence uses was not necessary.  The Court therefore finds that the issuance of a FONNSI with respect to subsistence uses was neither arbitrary nor capricious.[227]

## II.    Second Claim: Cumulative Impacts

Plaintiffs' second claim for relief alleges that the 2018 EA "provides no convincing justification for concluding that cumulative impacts to caribou and subsistence activities" from the winter exploration and concurrent projects in the area "will be insignificant."[228]  They contend, therefore, that the issuance of a FONNSI was arbitrary and capricious and a violation of NEPA.[229]

"'NEPA requires an agency to consider' cumulative effects, which 'result[] from the incremental impact of the action when added to other past, present and

---

[227] *See* 43 C.F.R. § 46.140(c); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 783 (9th Cir. 2006).

[228] Docket 5 at 24, ¶ 97.

[229] Docket 5 at 23–25, ¶¶ 89–99.  A separate claim in the Amended Complaint, Claim Three, alleges that the "failure to consider the winter exploration program and geotechnical exploration program together in the same EIS" violates NEPA's implementing regulations.  Docket 5 at 25, ¶¶ 100–103.  However, Plaintiffs do not raise, or even mention, this claim in their briefing.  The Court therefore considers this claim waived.  *Cf. Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1213 (9th Cir. 2017) ("We 'will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief.'" (quoting *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 979 F.2d 721, 726 (9th Cir. 1992))); *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999) ("Arguments not raised in opening brief are waived").  The Court does, to a certain extent, address the geotechnical exploration program in its analysis of the 2018 EA's consideration of cumulative impacts.  *See infra* at 55–56.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 52 of 73

reasonably foreseeable actions . . . .'"[230]  "An EA's analysis of cumulative impacts 'must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.'"[231]   "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided."[232]  To prevail on a claim that an EA should have analyzed the cumulative impacts of a certain project, a plaintiff "must show only the potential for cumulative impact."[233]

The 2018 EA contains a section discussing cumulative impacts, which identifies all of the projects slated to occur in the winter exploration project area, including geotechnical exploration and GMT2 development.[234]   It notes that "exploration and construction in the area have occurred at the same time in previous years," but that "[t]he cumulative scenario for winter 2018-2019 is likely more intense and extensive than previous winter seasons, or will likely be

---

[230] *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) (alteration in original) (quoting *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005)); *see also* 40 C.F.R. § 1508.7.

[231] *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005)).

[232] *Id.* (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)).

[233] *Id.* at 605.

[234] AR8502–07.

perceived as such by residents."[235]  Similar to the EA's discussion of caribou and

subsistence impacts, the cumulative impacts section "tiers to the most recent

cumulative impact analysis in" the 2012 IAP/EIS, the 2014 GMT1 SEIS, and the

2018 GMT2 SEIS.[236]

The 2018 EA provides a more detailed discussion of cumulative impacts to

the two issue areas that its scoping process had identified as potentially impacted

by the proposed action:  "subsistence, sociocultural systems, and environmental

justice" and "fish and water resources."[237]  Its introduction concludes that "[n]either

the Proposed Action nor the No-Action Alternative would add substantially to the

incremental past, present, and future impacts described below."[238]  Regarding

subsistence, the EA concludes that likely cumulative impacts "include hunter

disturbance and avoidance and reduced local availability of resources."[239]  The EA

does not specifically address the cumulative impacts to caribou.

Plaintiffs contend that "[i]mpacts to caribou and subsistence activities from

ConocoPhillips' [geotechnical] exploration and GMT2 construction projects will

undeniably cumulate with the impacts from winter exploration," and that the EA

---

[235] AR8503.

[236] AR8502.

[237] AR8503–05.

[238] AR8503.

[239] AR8503.

does not contain a meaningful discussion of these cumulative impacts.[240] Defendants maintain that the EA and the NEPA documents to which it tiers adequately considered the cumulative impacts of ConocoPhillips' 2018-2019 winter exploration, and that the issuance of a FONNSI was appropriate.[241]

Plaintiffs first argue that the 2018 EA "failed to provide any meaningful analysis of the cumulative impacts from the [geotechnical] exploration program and winter exploration on caribou."[242] Although the EA does not contain a discrete section analyzing the cumulative impacts on caribou, the 2012 IAP/EIS and the 2018 GMT2 SEIS, to which it tiers, discuss the issue in detail.[243] Neither document identifies geotechnical exploration specifically; however, the geotechnical exploration EA prepared by BLM in February 2019 shows that the anticipated impacts of that activity are similar in kind to those of exploratory drilling.[244] For this

---

[240] Docket 27 at 31; Docket 33 at 21 ("Despite ample evidence that the conjunction of these three projects would affect caribou and subsistence activities, BLM's EA fails to analyze those impacts in adequate detail." (citations omitted)).

[241] Docket 30 at 27–29; Docket 31 at 29–33.

[242] Docket 27 at 31.

[243] AR1515–31 (IAP/EIS); AR5042–45.

[244] *See* AR8721 ("The proposed action is anticipated to deflect caribou and furbearers from the area."); AR8700 ("The proposed action may disturb and displace wildlife from the immediate area of activities but would not reduce population levels or distribution during the winter season."). Plaintiffs identify the potential impacts of geotechnical exploration program as "drilling, increased vehicular traffic, [and] increased human presence." Docket 27 at 31. The geotechnical exploration plan called for drilling to occur largely in the vicinity of the GMT1 development, but also in several places within the 2018-2019 winter exploration project area. *See* AR8693 (map showing area of geotechnical exploration). Under the plan, survey areas were to be accessed by existing permanent infrastructure and previously permitted ice roads, as well as "tundra travel." AR8706. It appears that the geotechnical exploration project would not meaningfully expand the

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 55 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 55 of 73

reason, the Court is satisfied that discussion of the anticipated cumulative impacts of exploratory drilling adequately captured the impacts of geotechnical exploration as well. Moreover, the geotechnical exploration is a component of the broader Willow development process, which both the GMT2 SEIS anticipated and discussed in detail.[245]

The 2012 IAP/EIS recognized that "[f]uture leases in the NPR-A could expose a large number of the Teshekpuk Caribou Herd caribou to exploration and development activities on their summer and winter grounds, and during migration."[246] It explained that "[l]oss of habitat and disturbance (including noise) are the two primary factors associated with seismic activities and exploration drilling that could affect mammals on the North Slope."[247] The 2012 IAP/EIS reported that "it has been assumed that these effects [of prior exploration on Teshekpuk Caribou Herd caribou] did not persist after exploration was completed, and there was no consequential effect on the abundance or productivity of the caribou."[248] It recognized, however, that "[i]t is not known what population effects might occur if the majority of the [Teshekpuk Caribou] herd were to have year-

---

footprint of activities in the vicinity of Nuiqsut but would increase their intensity.

[245] AR5019, AR5021 (cumulative effects section of GMT2 SEIS identifying Willow development and associated gravel mine as a "present/future" project).

[246] AR1522.

[247] AR1515.

[248] AR1516.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 56 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 56 of 73

round contact with oil and gas facilities and activities."[249]  It concluded that "[d]espite the current lack of evidence regarding adverse effects from seismic exploration and village contact, negative effects on caribou energy budgets during winter could result from this new situation."[250]

The 2018 GMT2 SEIS identified ConocoPhillips' 2018-2019 winter exploration as a foreseeable future action.[251]  Addressing caribou generally, the SEIS explained that "disturbance of caribou due to oil field development may adversely affect caribou populations, but these impacts are not readily apparent based on population trends."[252]  The SEIS also addressed the cumulation of development and exploration specifically, stating that "[t]he loss of habitats resulting from the development of GMT2 and reasonably foreseeable future exploration and development activities would affect primarily the [Teshekpuk Caribou Herd] whose range is west of the Colville river."[253]  The GMT2 SEIS concluded:

> Overall, industry and agency actions on the North Slope are expected to have minor impacts to caribou herd productivity.  Determining the overall cumulative impacts on herd abundance is difficult to predict.

---

[249] AR1524.

[250] AR1524.

[251] AR5019.

[252] AR5042.

[253] AR5044.  The GMT2 SEIS also gave detailed consideration to the cumulative impacts of the broader Willow development, of which the 2018-2019 winter exploration program was a part. AR5043–44.

Displacement of caribou from the periphery of core calving area would be expected but this impact may have only a minor effect on the [Teshekpuk Caribou Herd] population.[254]

As with their arguments relating to the sufficiency of the 2018 EA's discussion of direct and indirect impacts to caribou, Plaintiffs contend that these statements raise questions that "demonstrate the need for detailed information at" the site-specific planning phase.[255] They argue that the "admittedly speculative accounts" in the tiered-to EISs "cannot make up for fatal deficiencies in the winter exploration EA."[256] However, as previously noted, NEPA allows for uncertainty, so long as the agency provides "a justification regarding why more definitive information could not be provided."[257]

The GMT2 SEIS and the 2012 IAP/EIS adequately explained the difficulty in predicting the effect that extended contact with oil and gas activities will have on the Teshekpuk Caribou Herd because no North Slope herd has previously been in that situation; there is no data because it is a novel situation. In the face of this uncertainty, along with the uncertainty caused by variable winter conditions year

---

[254] AR5044.

[255] Docket 27 at 33; *see also* Docket 33 at 21–22.

[256] Docket 27 at 34.

[257] *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)); *see also Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1318 (W.D. Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996) (explaining that it is permissible for EIS to "candidly disclose the risks and any scientific uncertainty" pertaining to action under review).

to year,[258] the planning documents to which the 2018 EA tiers described the foreseeable future projects occurring in the area to the west of Nuiqsut and made reasonable assumptions about their cumulative impact to caribou based on the data available. This is not the sort of "vague discussion" of cumulative impacts that the Ninth Circuit has held to be improper in other cases.[259] The Court therefore finds that the issuance of a FONNSI with respect to the winter exploration's cumulative impacts to caribou was neither arbitrary nor capricious.

Plaintiffs do not articulate how the 2018 EA's discussion of cumulative impacts to subsistence activities is deficient, other than to state that "impacts to caribou and impacts to subsistence activities are necessarily intertwined."[260] As discussed above, the GMT2 SEIS and 2012 IAP/EIS, to which the EA tiers, adequately discussed the cumulative impacts to caribou caused by concurrent development and exploratory drilling to the west of Nuiqsut. Moreover, the EA's conclusion that cumulative impacts from ConocoPhillips' winter exploration would "include hunter disturbance and avoidance and the reduced local availability of resources"[261] is well supported by the record.

---

[258] AR1516.

[259] *See, e.g.*, *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 604 (describing EA that "devotes a scant three sentences to the cumulative impacts to Water Resources" and makes unsupported statements that any cumulative impacts will be mitigated, holding that "[t]his type of conclusory 'analysis'" violates NEPA).

[260] Docket 33 at 20 n.2.

[261] AR8503.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 59 of 73

The GMT2 SEIS contained a detailed discussion of the expected cumulative impacts to subsistence caused by "oil and gas exploration and development activities."[262] This section of the SEIS identified ConocoPhillips' 2018-2019 winter exploration as a foreseeable future project.[263] It noted that "[r]ecently leased acreage within and near the NPR-A indicates the likely future progression of oil exploration and development on the western and southern sides of Nuiqsut."[264] The GMT2 SEIS stated that "[t]hese activities, in combination with development of GMT2, are likely to increase problems between subsistence users and oil and gas activities," adversely impacting "hunters who prefer to avoid oil and gas infrastructure altogether" and contributing to a loss of caribou habitat.[265] The section concluded that "the GMT2 Project in addition to other current and reasonably foreseeable activities could increase the severity of existing impacts on Nuiqsut subsistence uses" and that "[t]hese impacts include continued hunter avoidance of industrial areas, continued disturbance of hunters and wildlife from increased air and road traffic, reduced access to or loss of subsistence use areas, and reduced availability of subsistence resources in development areas."[266]

---

[262] AR5078–84.

[263] AR5080.

[264] AR5080.

[265] AR5082.

[266] AR5083.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 60 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 60 of 73

This record demonstrates that the 2018 EA took the requisite hard look at cumulative impacts to caribou and subsistence activities in the project area. And by tiering to previous EISs that fully analyze these issues, the 2018 EA provides a convincing justification for why further discussion of cumulative impacts is unnecessary. The issuance of a FONNSI with respect to the cumulative impacts to caribou and subsistence activities was therefore neither arbitrary nor capricious.[267]

## III. Fourth Claim: Consideration of Alternatives Under NEPA

The Amended Complaint's fourth claim for relief argues that Federal Defendants "failed to consider appropriate alternatives" in the 2018 EA.[268] Plaintiffs contend that this violated NEPA, which requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action."[269]

"Although an agency must still 'give full and meaningful consideration to all reasonable alternatives' in an [EA], the agency's obligation to discuss alternatives is less than in an EIS."[270] "[W]ith an EA, an agency only is required to include a

---

[267] *See* 43 C.F.R. § 46.140(c); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 783 (9th Cir. 2006).

[268] Docket 5 at 26, ¶ 106.

[269] 42 U.S.C. § 4332(2)(E); Docket 27 at 39–42.

[270] *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (quoting *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)).

brief discussion of reasonable alternatives."[271]   An agency need not "consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives."[272]   "NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences."[273]

The 2018 EA only considers two alternatives in detail:  the preferred alternative and a no-action alternative.[274]  This by itself does not render the EA deficient; "[t]he statutory and regulatory requirements that an agency must consider 'appropriate' and 'reasonable' alternatives does not dictate the minimum number of alternatives that an agency must consider,"[275] and consideration in an EA of only the preferred alternative and a no-action alternative can be sufficient

---

[271] *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008).

[272] *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (quoting *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996)).

[273] *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990)); *see also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corp of Eng'rs*, 524 F.3d 938, 955 (9th Cir. 2008) ("An agency need not . . . discuss alternatives similar to alternatives actually considered, or alternative which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." (quoting *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006))).

[274] *See* AR8484–94 (discussing preferred alternative); AR8495 (discussing no-action alternative).

[275] *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 62 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 62 of 73

under NEPA.[276]   However, "[t]he existence of a viable but unexamined alternative renders an [EA] inadequate."[277]

In their comments on the Preliminary EA, Plaintiffs stated that "[t]wo reasonable alternatives BLM has failed to consider are: (1) allowing fewer wells; and (2) requiring [ConocoPhillips] to comply with all BMPs" from the 2012 IAP/EIS.[278]   Plaintiffs contend that Federal Defendants' failure to consider each of these alternatives in detail renders the EA inadequate.[279]   Whether an alternative is reasonable and appropriate depends on the stated purpose for the proposed action.[280]   "So long as 'all reasonable alternatives' have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement is satisfied."[281]

---

[276] *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 602 n.11 ("To the extent that [Plaintiff] is complaining that having only two final alternatives—no action and a preferred alternative—violates [NEPA's] regulatory scheme, a plain reading of the regulations dooms that argument." (alteration in original) (quoting *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005))).

[277] *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (second alteration in original) (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)).

[278] AR8010.

[279] Docket 27 at 39–42.

[280] *Native Ecosys. Council*, 428 F.3d at 1246 ("In judging whether the Forest Service considered appropriate and reasonable alternatives, we focus first on the stated purpose for the Jimtown Project.").

[281] *Id.*

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 63 of 73

The 2018 EA identifies the need for the proposed action as follows: "The project is needed to provide detailed information regarding potential reserves of oil and gas within the NPR-A."[282] It explains that the "purpose for the proposed action is for BLM to provide reasonable access to and use of public lands within the NPR-A in a manner that would allow the applicant to explore and appraise oil and gas potential on NPR-A leases operated by [ConocoPhillips]."[283]

The 2018 EA explained that it had considered but eliminated from detailed analysis an alternative that would reduce the number of wells approved for drilling.[284] It states that "[t]he proposed action itself . . . significantly limits alternatives for the location and timing of exploration," and that "[l]ocations of leases with oil and gas prospects limit the options for feasible drill site locations and access routes."[285] Specifically, the EA explains that ConocoPhillips had an obligation to "continue drilling to delineate the resource and an associated future participating area" on its leases, and noted that a fewer-wells alternative "would be contrary to the terms of [ConocoPhillips'] leases, which allow[] the company to have a drilling program on its leases after going through the review process for

_____

[282] AR8473.

[283] AR8473.

[284] AR8495.

[285] AR8495.

particular wells."[286] The 2018 EA concludes that an alternative with fewer wells "would not meet the purpose and need" of the proposed action.[287]

The Court finds that the EA gives an "appropriate explanation" for eliminating an alternative that would authorize fewer wells.[288] The record generally supports Plaintiffs' assertion that authorizing fewer exploratory wells would likely reduce the impacts of ConocoPhillips' winter exploration, resulting in fewer miles of ice roads and a generally smaller footprint.[289] And Plaintiffs are correct that BLM has the authority to place limitations on the extent of lease-holder's exploratory drilling during a given season.[290] However, the fact that BLM had the authority to limit the number of wells does not mean that doing so would serve the purpose and need of the project. The stated purpose of the proposed action in the 2018 EA was to "allow the applicant to explore and appraise oil and gas potential on [its] NPR-A leases."[291] That section of the EA further explains that the winter

---

[286] AR8495 (citing 43 C.F.R. § 3137).

[287] AR8495.

[288] *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).

[289] *See, e.g.*, AR8475 (map showing footprint of winter exploration); AR8497 (discussing impact of ice roads and drilling); AR8498 (stating that under no-action alternative "[s]ociocultural stress over the pace and extent of exploration and development may be reduced, and subsistence users and resources would experience less disturbance from activities in the area").

[290] Docket 27 at 38; *see also, e.g.*, 42 U.S.C. § 6506a(b) (allowing BLM to include "conditions, restrictions, and prohibitions" on activities in NPR-A it deems necessary to "mitigate . . . significantly adverse effects on . . . surface resources); 43 C.F.R. § 3131.3 (same); 43 C.F.R. § 3152.5 (allowing BLM to modify exploration permit "after consultation with the permittee").

[291] AR8473.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 65 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 65 of 73

exploration program was "composed of several elements . . . designed to meet the applicant's needs and objectives," including "[d]rilling up to six exploratory wells to acquire sufficient subsurface information to satisfy the applicant's economic and exploration performance criteria."[292]   With ConocoPhillips having apparently concluded that up to six additional exploration wells were necessary to obtain sufficient information about the area's development potential, it was reasonable for the 2018 EA to eliminate an alternative authorizing fewer wells as inconsistent with the proposed action's purpose and need.[293]

Plaintiffs also maintain that the 2018 EA is deficient because it does not consider an alternative that would have required ConocoPhillips to comply with all of the 2012 IAP/EIS's BMPs.[294]   ConocoPhillips requested deviations from three of the 2012 IAP/EIS's BMPs:  BMP B-2g, which prohibits "[c]ompaction of snow cover or snow removal from fish-bearing waterbodies," except in approved locations, in order to maintain fish populations and habitat;[295] BMP B-2d, which

---

[292] AR8473–74.

[293] *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (explaining that an agency need not "consider alternatives that are . . . inconsistent with its basic policy objectives" (quoting *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996))); *see also Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) ("A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." (quoting *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011))).

[294] Docket 27 at 39–42.

[295] AR8487.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 66 of 73

limits the amount of "unfrozen water and ice" that may be removed from lakes, in order to maintain fish populations and habitat;[296] and BMP A-5, which prohibits refueling "within 500 feet of [an] active floodplain" and generally requires "[f]uel storage stations . . . [to] be located at least 500 feet from any water body," in order to "[m]inimize the impacts of contaminants . . . on fish, wildlife, and the environment."[297] The EA grants each of these deviation requests after determining that they would not compromise the objectives of the BMPs.[298] It explains that each deviation contains mitigation measures to promote the purpose of the BMP in question, or that recent data shows that the deviation will not result in adverse impacts.[299]

---

[296] AR8489.

[297] AR8491.

[298] AR8487 ("[ConocoPhillips] would support the intent of BMP B-2g."); AR8489 ("[T]he objective of . . . BMP [B-2d] can still be maintained while allowing for the deviation."); AR8492 ("[ConocoPhillips] would support the objective of BMP A-5 and minimize the impacts of contaminants from refueling operations on fish wildlife and the environment.").

[299] *See* AR8487 (stating that ConocoPhillips "provided . . . the bathymetry data for lake M0007" showing that a deviation from BMP B-2g "should not have an adverse effect on the overall hydrologic regime of the lake and should not impact habitat or populations of fish, invertebrates, or waterfowl); AR8489 (explaining that data submitted by ConocoPhillips and data developed by BLM "supports an increased use of ice aggregate beyond what is stated in . . . BMP B-2d, in concurrence with [Alaska State agency] water permitting specialists"); AR8492 (explaining that ConocoPhillips "has designed fuel storage facilities and developed plans and protocols to avoid critical waterbodies and to properly account for the project area's hydrologic conditions" to mitigate deviation from BMP A-5); *see also* AR8537–40 (providing data regarding lakes in project area and characteristics supporting BMP B2-d deviation); AR8566–74 (responding to comments about BMP B-2 deviations).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 67 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 67 of 73

The 2018 EA concludes that deviation from BMPs B-2g, B-2d, and A-5 would not result in additional adverse impacts and explained its reasoning.[300] An alternative requiring compliance with these BMPs would therefore have substantially similar consequences to the EA's preferred alternative. Under these circumstances, it was neither arbitrary nor capricious for the agency to exclude this alternative from consideration.[301]

The Court is therefore satisfied that the 2018 EA considered a proper range of alternatives. Under Ninth Circuit precedent, an EA considering only a preferred alternative and a no-action alternative can satisfy an agency's duty under NEPA.[302] And unlike the cases on which Plaintiffs rely, two of which are unreported, the two alternatives considered in 2018 EA would authorize meaningfully different levels

---

[300] The Court defers to the agency's scientific judgment regarding the impact of deviation from the BMPs. *See Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) ("A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." (quoting *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011))).

[301] *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) ("NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990))).

[302] *See, e.g.*, *Id.* at 602 n.11 (9th Cir. 2010) ("To the extent that [Plaintiff] is complaining that having only two final alternatives—no action and a preferred alternative—violates [NEPA's] regulatory scheme, a plain reading of the regulations dooms that argument." (alteration in original) (quoting *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005))); *see also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1023 (9th Cir. 2012) (explaining that "it makes little sense to fault an agency for failure to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway.").

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 68 of 73

of activity.[303]  Finally, as discussed above, BLM's decision not to consider the two

alternatives proposed by Plaintiffs was appropriate.

## IV.    Fifth Claim: Consideration of Alternatives Under ANILCA

The fifth claim for relief in the Amended Complaint is that Federal

Defendants "failed to consider alternatives that would reduce or eliminate the use

of lands needed for subsistence purposes" in violation of ANILCA.[304]  Section

810(a) of ANILCA provides that:

> In determining whether to withdraw, reserve, lease, or otherwise
> permit the use, occupancy, or disposition of public lands under any
> provision of law authorizing such actions, the head of the Federal
> agency having primary jurisdiction over such lands or his designee
> shall evaluate the effect of such use, occupancy or disposition on
> subsistence uses and needs, the availability of other lands for the
> purposes sought to be achieved, and other alternatives which would
> reduce or eliminate the use, occupancy, or disposition of public lands
> needed for subsistence purposes.[305]

The 2018 EA includes a separate ANILCA § 810 evaluation.[306]  The

evaluation describes the winter exploration program and evaluates its "[e]ffect . . .

---

[303] *See Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of Interior*, 655 F. App'x 595, 599 (9th Cir. 2016) (holding that agency's "decision not to give full and meaningful consideration to the alternative of a reduction in maximum interim contract water quantities was an abuse of discretion" where no-action alternative assumed maximum interim contract water qualities); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (holding that EA's consideration of alternatives was improper where three action alternatives and no-action alternative all "considered issuing a new grazing permit at the same grazing level as the previous permit").

[304] Docket 5 at 26–27, ¶¶ 108–11.

[305] 16 U.S.C. § 3120(a).

[306] AR8581–86.

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 69 of 73

on subsistence uses and needs."[307]  It finds that ConocoPhillips' winter exploration would "not significantly reduce harvestable fisheries resources" or "significantly reduce the abundance of harvestable wildlife resources."[308]  The evaluation determines that "no other lands are appropriate for this specific purpose" due to the nature of ConocoPhillips' leases.[309]  Finally, it discusses the no-action alternative, explaining that it was "contrary to the current Administration's policy and [ConocoPhillips'] lease rights."[310]  The evaluation ultimately concludes that:

> The direct and indirect effects of the proposed action are not anticipated to significantly restrict subsistence uses.  The proposed action is anticipated to result in minor to moderate, short-term impacts to subsistence uses, primarily associated with restrictions on hunter access and reduced availability of subsistence resources in areas where they are traditionally harvested.[311]

As with their NEPA claim, Plaintiffs contend that this evaluation is deficient, and that ANILCA § 810(a) required the 2018 EA to either consider a fewer-wells alternative and an alternative with no deviations from the 2012 IAP/EIS BMPs or provide an adequate explanation for not doing so.[312]  Courts generally evaluate the procedural requirements of ANILCA and NEPA under the same standard.[313]

---

[307] AR8585.

[308] AR8585.

[309] AR8585.

[310] AR8585.

[311] AR8586.

[312] Docket 27 at 35–39.

[313] *See, e.g.*, *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1311–1312 (9th Cir. 1990) (noting

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 70 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 70 of 73

At the outset, Federal Defendants argue that consideration of Plaintiffs' proposed alternatives is not mandated by ANILCA § 810(a). They contend that ANILCA only requires the consideration of alternatives that would reduce the total amount of land needed for a given action.[314] The Court finds this argument unconvincing. The plain language of § 810(a) requires agencies to consider alternatives that would "reduce or eliminate the *use, occupancy, or disposition* of public lands needed for subsistence purposes;"[315] an alternative could restrict the ability to use an area for subsistence purposes without reducing that area's size.

Federal Defendants rely on the Ninth Circuit's statement in *Kunaknana v. Clark* that § 810(a) requires an agency to consider "other alternatives which would reduce or eliminate the amount of land taken away from subsistence uses."[316] But the Circuit there applied the language of § 810(a) to the particular facts of the case, which concerned BLM's decision to offer certain tracts in the NPR-A for oil and gas leasing.[317] Since *Kunaknana*, the Ninth Circuit has considered alternatives that

---

that "[b]oth NEPA and ANILCA require the [agency] to consider reasonable alternatives to a proposed action" and evaluating claims brought under each statute together); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (same); *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987) ("NEPA case law is helpful in interpreting § 810.").

[314] Docket 30 at 30–32. According to Federal Defendants, consideration of potential mitigation measures, as they characterize Plaintiffs' proposed alternatives, is only necessary under ANILCA when the agency determines that an action will "significantly restrict subsistence uses." *Id.* at 31 (quoting 16 U.S.C. § 3120(a)).

[315] 16 U.S.C. § 3120(a) (emphasis added).

[316] 742 F.2d 1145, 1150–51 (9th Cir. 1984) (citing 16 U.S.C. § 3120(a)); *see also* Docket 30 at 31–32.

[317] *Id.* at 1150–51. The Ninth Circuit explained that "[t]he plain terms of Section 810(a)

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 71 of 73

Case 3:19-cv-00056-SLG   Document 46   Filed 01/09/20   Page 71 of 73

reduce the scope or intensity of an activity within a given area to fall within § 810(a)'s meaning.[318] Moreover, even if Federal Defendants were correct on this point, Plaintiffs' proposed alternatives would have reduced the footprint of the 2018-2019 winter exploration by authorizing fewer wells or prohibiting the use of certain areas for infrastructure by denying ConocoPhillips' BMP deviation requests.[319] Plaintiffs' proposed alternatives therefore fell within the scope of ANILCA § 810(a).

Nevertheless, the Court is satisfied that BLM fulfilled its obligation under that provision to evaluate "alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[320] As noted above, this section is analogous to NEPA's mandate to consider reasonable and appropriate alternatives, and "NEPA case law is helpful in interpreting § 810."[321] As explained in the previous section of this decision, the 2018 EA's

---

require . . . the BLM . . . to 'evaluate' three factors *concerning the decision to issue oil and gas leases involved in the programmatic leasing sale*." *Id.* at 1150 (emphasis added).

[318] *See Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 730 (9th Cir. 1995) (holding that failure to consider alternative reducing volume of logging in Tongass National Forest violated NEPA and ANILCA § 810); *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1311 (9th Cir. 1990) (holding that EIS violated NEPA and ANILCA § 810 because it did not consider alternative "which would have resulted in less timber being made available").

[319] *See* Docket 33 at 23.

[320] 16 U.S.C. 3120(a).

[321] *Sierra Club v. Penfold*, 664 F.Supp. 1299, 1307 (D. Alaska 1987); *see also City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1311–12 (9th Cir. 1990) (noting that "[b]oth NEPA and ANILCA require the [agency] to consider reasonable alternatives to a proposed action" and evaluating claims brought under each statute together).

Case No. 3:19-cv-00056-SLG, *Native Village of Nuiqsut, et al. v. Bureau of Land Management, et al.*
Decision and Order
Page 72 of 73

consideration of only the preferred alternative and a no-action alternative was permissible under NEPA, and Federal Defendants' decision to eliminate Plaintiffs' proposed alternatives from consideration was neither arbitrary nor capricious.[322] For the same reasons, the Court finds that the EA complied with ANILCA § 810(a).

## ORDER

In light of the foregoing, it is hereby ORDERED that:

Plaintiffs Center for Biological Diversity and Friends of the Earth are DISMISSED for lack of standing.

The 2018 EA and the ROD authorizing ConocoPhillips' 2018-2019 winter exploration in the NPR-A are UPHELD. Plaintiffs' requests at Docket 27 for declaratory relief and vacatur of the 2018 EA and the ROD are therefore DENIED.

Plaintiffs' Motion to Take Judicial Notice of Supplemental Factual Materials at Docket 44 is GRANTED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 9th day of January, 2020 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[322] *See supra* 61–69.